

**Crystal Massarelli**

| | |
|---|---|
| **From:** | Harry Lewis [hlewis8@nyc.rr.com] |
| **Sent:** | Sunday, July 06, 2003 5:10 PM |
| **To:** | William Margrabe |
| **Subject:** | Strategy for Settlement Agreement CONFIDENTIAL ATTORNEY CLIENT |

Brainstoming a bit, one possible strategy for dealing with the lack of collateral in the current documents would be:

1. Request the draft mortgage and security agreement ("collateral")documents from counsel, together with a list of the items of collateral A.J. will be putting up to secure the note, and their appraised value. (You can use A.J.'s appraisals for these purposes, since they should be more conservative in valuing the properties than your own.)

2. When cousel tell you there is no collateral, or that Betty and Tony's properties placed in escrow are the collateral, express puzzlement and anger. Tell counsel that Betty and Tony clearly understood that there would be collateral provided by A.J. to secure the note, that "collateral", "collateral documents", and "commercially reasonable" terms of the loan clearly were mentioned repeatedly at the hearing, that Betty and Tony relied upon their understanding that adequate collateral and collateral documents would be provided to secure the note in agreeing to the settlement, and that Grauer did not object when A.J.'s providing "collateral" and "collateral documents" was specifically recited to the judge as part of the settlement.

3. If cousel tries to deny that this is the agreement, refer him to the excerpts in the transcript.

4. If counsel tries to mischaracterize the escrow agreement as "collateral", ask how Betty's and Tony's property can possibly be "collateral" for A.J.'s loan, since they are the lenders and he is the borrower in this transaction.

5. If counsel then says that there is no collateral, or that A.J. will be providing no collateral, tell him that this was not the agreement recited to the judge, and not the deal Betty and Tony agreed to. Demand that he contact Grauer to obtain the list of collateral A.J. will be providing. If he refuses, terminate his employment, and bring your new lawyers on board.

6. Have your new lawyers write Grauer a letter asking for a list of the collateral A.J. proposes to provide to secure the note.

7. If Grauer denies that this is the agreement, have your attorneys call their attention to the transcript, and write a letter to the judge asking for a follow-up hearing. Have Betty and Tony submit affidavits saying that their understanding of the agreement was that they were to receive collateral pledged by A.J. and/or the entities (mortgage of real estate, security agreement in personal property, or both) adequate to fully secure the face amount of the note.

8. Go to the hearing with your new lawyers loaded for bear.

-H

**170**

## Crystal Massarelli

**From:**     Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**     Monday, July 14, 2003 6:41 PM
**To:**        William Margrabe
**Subject:**  Re: Margrabe et al. v. Rusciano et al. ratification

You already know my opinion of this document. It needs work by a good commercial loan attorney, and much better collateral! I won't rehash all of my previous comments, but for starters, there's no representation that A.J.'s financial statement is true, complete, or correct, and that we are relying upon its veracity in proceeding with this transaction. There are a bunch of other warranties and representations that a commercial loan lawyer would put in, in addition to thorough definitions of "default", and the consequences of default, including a material adverse change in fianancial condition as a default.

Changing the subject, I've checked out N.Y. law on an attorney's authority to reach an agreement without his client's consent.

7 N.Y. Jur.2d Attorneys at Law §108 (1997) says, "A stipulation by an attorney in excess of his authority may be ratified. Thus, the conduct or acquiescence of a client can ratify a stipulation of settlement entered into by counsel. If a party is present at the making of a stipulation between his attorney and the opposing attorney, and assents thereto, such circumstances render it unnecessary even to consider whether the stipulation was made within the scope of the attorney's authority."

§112 says, "As a matter of law, an attorney has been clothed with apparent authority to enter into a settlement where he or she represented the client through the litigation, engaged in prior settlement negotiations for the client, and in furtherance of the authority which has been vested, was present in the final pretrial conference, such presence constituting an implied representation by the client that the attorney had authority to enter into a binding settlement."

Here's the interesting part: "The existence of apparent authority depends upon a factual showing that the third party (Josh) relied upon the misrepresentation of the attorney because of some misleading conduct on the part of the client, not the attorney. An attorney cannot by his or her own acts imbue him or herself with apparent authority. Thus, an attorney who entered into a settlement by misleading the court and opposing counsel into believing it was not necessary for him to contact his client lacked actual authority and could not, by his own acts, imbue himself with apparent authority; further, no acts creating apparent authority had been committed by the client where (1) the client vigorously defended the proceedings on the merits from the start; (2) there had not been any previous settlement negotiations; and (3) the client promptly moved to vacate the stipulation upon being advised of its attoney's actions. Also, a third party with whom the attoney deals may rely on an appearance of authority only to the extent such reliance is reasonable."

"§114 Ratification or estoppel to repudiate

An unauthorized compromise by an attorney may be ratified by the client. An inference of ratification is justifiable where there is a long acquiescence and silence on the part of the client after knowledge of the compromise. The bare fact that a client retained his attorney's check for the proceeds of a settlement for 3 weeks, when it was returned with a letter from his new attorney, stating that he had not authroized the settlement, did not constitute a ratification."

What this means is that if you can fire David prior to closing, do it. It'll be much harder for you to complain about his fees if you let him guide you through settlement after becoming aware of his position on the collateral issue, which I still don't think you, Betty, or Tony authorized. The sooner you complain about this, fire David, and have your new lawyers take over, the better. It's a mistake to let David be the escrow agent in any event-- it gives him too much leverage in paying himself his fees out of the proceeds.

Of course, if the risks of dumping David are too high (per Phil), we may have to let him escape.

-H

269

## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Tuesday, July 15, 2003 7:49 AM
**To:** William Margrabe
**Subject:** Re: Margrabe et al. v. Rusciano et al. ratification

The argument comes down to this: if David told Betty and Tony clearly and comprehensibly that mortgage collateral (and/or other collateral) was off the table before you walked into the courtroom to announce the settlement, you're probably stuck with that. If, on the other hand, he didn't inform Betty and Tony of that, or was so unclear in his explanation that they didn't understand, and hence were unable to object to the deal, because they didn't understand the implications of what he was doing, you have a shot at forcing the mortgage back onto the table. To take that shot, you have to raise the issue of taking a mortgage now (which demonstrates that you didn't understand, or you wouldn't be raising it now), let Josh scream "murder" (because David or Michael told him it was off the table WITHOUT AUTHORITY from Betty and Tony to do so), and then say, "Wait a minute. I never authorized my lawyer to waive collateral. I thought I was getting collateral. That's what they said at the hearing. I agreed to everything at the hearing, but waiving collateral wasn't part of what I heard at the hearing, or agreed to at the hearing or any time before the hearing."

If Betty and Tony cannot say this honestly and in good faith, we should give it up.

-H

272

## Crystal Massarelli

**From:**     Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**     Tuesday, July 15, 2003 8:41 AM
**To:**        William Margrabe
**Subject:** CONFIDENTIAL-- Lawyers acting "without authority"

One additional thought-- to do a memo about the theory that Michael and David were acting without authority from Betty and Tony in abandoning a demand for collateral, I'll need a concise chronolgy of the facts surrounding the abandonment of the demand for collateral. From what I know, it sounds like it happened on the day of trial, not before, so the time frame should be very limited in scope. You seem to have been aware (and very unhappy) that this had happened, while Betty and Tony were not. Phil seems to think that your awareness is the controlling factor, but I don't agree. If you were aware that this had happened, but were unable to stop it, you clearly were not in control of the lawyers. They gave information to Betty and Tony (who were their clients, not you), and were obligated to obey their clients' instructions, not yours. You told me you were screaming at one point, but that it made no difference. Betty and Tony went ahead anyway.

Ironically, your lack of power to control the situation also proves that your perception of the situation is irrelevant to what Betty and Tony knew and understood, based upon what the lawyers told them. If you were the client, and were screaming "no" at your own lawyers based upon what they told you, they'd be disbarred for ignoring you.

So it all comes down to what Betty and Tony knew and understood at the time, based upon what the lawyers told them (or failed to tell them). (Obviously, I need your observations as a reliable witness to what occurred to corroborate what the lawyers told Betty and Tony, and what they knew and understood as a consequence, so your own perceptions are important, and I'm not discounting them.) I'm just saying that the most significant fact legally is what David and Michael told Betty and Tony at the time, and what they knew and understood as a consequnce of being told this by their lawyers, not what you heard, knew, and understood.

One final caveat: clients are expected to apply their own common sense and experience to what their lawyers tell them, so if Michael said, "The moon is made of green cheese," Betty and Tony can't get away with idiotically repeating that mantra just because their lawyers said it. They have to have reasonably believed what they were told.

-H



**Crystal Massarelli**

**From:** William Margrabe [bill@margrabe.com]
**Sent:** Friday, July 18, 2003 3:26 PM
**To:** Harry Lewis
**Subject:** Thanks for lending me that book

Harry

Thanks for lending me the book, which I don't have with me right now. I read some
introductory material, but not yet any cases, which appear intimidating in their volume.
Two things struck me. One is that assuming fiduciary responsibility can be plopping down
in the middle of a minefield. The other is that the victim of faithlessness can have a
hard time proving the infidelity. Overall, I was a bit discouraged. I'll reread and read
some more.

By the way, it appears to me that either David and Michael were incompetent in letting the
trust issues age and then let Josh throw them into the hopper, or else that was a plan to
make those issues go away by deliberately undercutting Betty and Tony.

More infidelity, but could Betty and Tony make that case? Would they even try?

Bill
tel 914-738-3309
Bill@Margrabe.com

**Tracking:**

| Recipient | Read |
|---|---|
| Harry Lewis | Read: 7/18/2003 4:12 PM |

1

2

**Crystal Massarelli**

From:        Harry Lewis [hlewis8@nyc.rr.com]
Sent:        Tuesday, July 29, 2003 11:05 AM
To:          William Margrabe
Subject:     Your retainer agreement with Sexter &  Warmflash

Moving on to another topic, has Phil successfully obtained a copy of your retainer
agreement with Sexter & Warmflash for a usury analysis?

-H



**Crystal Massarelli**

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Monday, August 11, 2003 4:06 PM |
| **To:** | Philip Halpern |
| **Subject:** | The Endgame? |

Phil

I'm trying to understand how we want to try to orchestrate things on 9/9/03 in front of Judge Donovan. I think we need a written script and supporting documents. Based on what you said about your preparation for trial, including what I think you called a "trial book", which I took to be a tentative script, I'll be amazed if you think we need anything less. However, please let me know if I have it wrong.

In anticipation of a possible need for Betty & Tony to testify as to their understanding of their agreement, I'm working with Betty to prepare her sworn affidavit about her understanding of the meaning of the agreement about which she allocated on 6/18/03.

I'll call you to discuss what else we should prepare. I've been reading Sandra Schnitzer Stern, Structuring and Drafting Commercial Loan Agreements, Revised ed., A.S. Pratt & Sons. The standard terms in such an agreement are a far cry from what Michael and David contemplated. Frankly, they're a lot closer to what I screamed at David on the day of the trial. For example, each borrower would ordinarily provide an income statement, balance sheet, analysis of equity, and sources and uses of funds statement. The more I learn about practice in the commercial loan market, the less "commercially reasonable" the explicit terms in the transcript seem. However, I suppose that we can fill in the gaps of the transcript with standard industry practice. Something about David and Michael's participation in this whole thing doesn't make sense to me. I am wondering if they just got in over their heads, when the parties didn't reach a cheap and easy solution for A.J., and push came to shove.

Also, I read Herbert G. Feuerhake, J.D., "Compromise, Accord, and Release," 19A NY Jur 2d.

Bill
tel 914-738-3309
Bill@Margrabe.com

**Tracking:**

| Recipient | Read |
|---|---|
| Philip Halpern | |
| Harry Lewis | Read: 8/11/2003 6:16 PM |

1




## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Wednesday, August 13, 2003 8:35 AM
**To:** William Margrabe
**Subject:** Tony's and Betty's Agreement-- a cautionary note

Only one question about the proposed agreement. Why are you amending the retainer agreement with the lawyers rather than the letter agreement directly between Betty and Tony? I understand that the 50/50 split is described there, and that's good, but understand that if you want to raise a usury defense as to the S&W compensation scheme later, someone may ask why you also didn't change, or object to, that provision in the engagement letter at this time.

I'm probably being overcautious on this point, and you shouldn't obsess about it. I just wonder if you can casually shift the document to be amended to the letter agreement directly between Betty and Tony rather than amending the engagement letter document itself?

Best wishes,

-H

----- Original Message -----
**From:** William Margrabe
**To:** Tony Rusciano ; Michael Present
**Cc:** Philip Halpern
**Sent:** Wednesday, August 13, 2003 6:05 AM
**Subject:** Tony's and Betty's Agreement

Tony and Michael

I'm starting out with the bottom line, the "Draft Proposed Agreement", followed by backup for anyone who wants to know where this proposal originates. Tony wanted me to come up with an idea for amended the current agreement between him and Betty. Here goes. Does this accomplish what we want?

DRAFT PROPOSED AGREEMENT
"This Agreement is an addendum to our agreement of February 4, 2000 with Sexter & Warmflash, Re: Rusciano Entities. Where this Agreement and that agreement or any other agreement conflict, this agreement supercedes the other agreement. We, the undersigned, agree to share equally in any and all benefits (net of fees for attorneys, consultants, experts, etc.) that either of us derives from
(a) an ownership interest in a corporation or partnership that is a defendant in the lawsuit, styled Margrabe, et al. v. Rusciano, et al., index no. 10032/2001, Supreme Court of the State of New York, Westchester County
(b) the outcome of that lawsuit, whether it is a contract or a judgment.

We agree to share all such benefits, including, but not limited to:
(a) the proceeds of each settlement agreement with A.J. Rusciano and/or any of the other Defendants and/or any affiliates
(b) each judgment obtained against any of the Defendants as a result of this lawsuit
(c) any distributions of cash or other property from any of the Defendants
(d) any wages, salaries, or other forms of compensation from any of the Defendants or any entity that one of the Defendants might control.

Signed: Elizabeth A. Margrabe                    Anthony J. Rusciano III

BACKGROUND
This is my message to Michael, at Tony's request, following up my conversation with Tony a week or two ago.



I told Tony that my top priorities were to (a) get Judge Donovan on our side about the precise meaning of the agreement that A.J. and Plaintiffs reached in the hearing on or about 6/18/03 in Judge Donovan's courtroom, and which appears in the transcript and (b) use that as leverage to get A.J. to sign the agreement as we see it.

I added that it seemed possible that the settlement might blow up on or after 9/9/03 for two main reasons: A.J. is resisting our efforts to obtain "commercially reasonable security" for the $7 million loan that Tony and Betty are extending to him. I think the most likely problem with signing without sufficient collateral would be exposure to possible default in case the value of the properties crashed, because of events that either resulted from A.J.'s incompetent management or were currently unforeseeable, random occurrences. However, I find it disturbing that Josh dictated terms that would have allowed A.J. to drain the companies of all equity value WHILE NOT REALLY PAYING TONY AND BETTY EVEN THEIR "DOWN PAYMENT". Josh's suggestion that A.J.'s payment at closing would be "subject to collection" was a nice touch, and I'm glad that Michael left that out of the stipulation that he wrote. A few other terms are just what a crook would want, in order to keep his mark from either seeing the theft in progress or defending himself.
It appears that Michael has caught Josh and A.J. trying to perpetrate a fraud against Plaintiffs by hiding assets, namely, certain additional tax certiorari refunds.

I mentioned that I thought it made sense to put into writing what I understood to be Tony's & Betty's agreement, namely, that that they would split all proceeds that either of them got from A.J., whether by settlement before or after trial, or as a result of distributions from the Rusciano Companies. As I understood Tony's response, he felt the same way, as long as Tony and Betty both agreed to go to trial.

In the Sexter & Warmflash retainer agreement of 2/4/00 I see that Tony and Betty have agreed to the following: "We have indicated to you that a cursory view of some of the documents indicates, theoretically, [there] may be a conflict of interest between the two of you relating to the value of each of your interests and that you have advised us that, irrespective of the agreements, any and all benefits to be derived shall be shared between you equally."

Although one might argue that this means that the two parties will split in two "any and all benefits", no matter how this case proceeds, it's probably better to make things clear.

Bill
tel 914-738-3309
Bill@Margrabe.com

**Crystal Massarelli**

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Tuesday, September 02, 2003 3:00 PM |
| **To:** | Harry Lewis |
| **Subject:** | RE: Tony's and Betty's Agreement-- a cautionary note |

**Tracking:** **Recipient   Read**

Harry Lewis   Read: 9/2/2003 6:20 PM

I asked Michael to talk with Tony and write up a Tony-Betty agreement. We'll see if he does anything, and if he does, then what.

Can consent of the borrower to a usurious rate be much of a defense? Otherwise, criminal usury charges wouldn't be much of a threat.

Bill
tel 914-738-3309
Bill@Margrabe.com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Wednesday, August 13, 2003 8:35 AM
**To:** William Margrabe
**Subject:** Tony's and Betty's Agreement-- a cautionary note

Only one question about the proposed agreement.  Why are you amending the retainer agreement with the lawyers rather than the letter agreement directly between Betty and Tony?  I understand that the 50/50 split is described there, and that's good, but understand that if you want to raise a usury defense as to the S&W compensation scheme later, someone may ask why you also didn't change, or object to, that provision in the engagement letter at this time.

I'm probably being overcautious on this point, and you shouldn't obsess about it.  I just wonder if you can casually shift the document to be amended to the letter agreement directly between Betty and Tony rather than amending the engagement letter document itself?

Best wishes,

-H

----- Original Message -----
**From:** William Margrabe

**To:** Tony Rusciano ; Michael Present
**Cc:** Philip Halpern
**Sent:** Wednesday, August 13, 2003 6:05 AM
**Subject:** Tony's and Betty's Agreement

Tony and Michael

I'm starting out with the bottom line, the "Draft Proposed Agreement", followed by backup for anyone who wants to know where this proposal originates. Tony wanted me to come up with an idea for amended the current agreement between him and Betty. Here goes. Does this accomplish what we want?

292

## Crystal Massarelli

**From:**     Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**     Tuesday, September 02, 2003 6:23 PM
**To:**       William Margrabe
**Subject:**  Re: Tony's and Betty's Agreement-- a cautionary note

Criminal usury is also called "loan-sharking". The debtors always "consent" to the exorbitant interest rates, because they're desperate for a loan. So "consent" isn't usually a defense to a criminal usury charge.

-H

----- Original Message -----
**From:** William Margrabe
**To:** Harry Lewis
**Sent:** Tuesday, September 02, 2003 2:59 PM
**Subject:** RE: Tony's and Betty's Agreement-- a cautionary note

I asked Michael to talk with Tony and write up a Tony-Betty agreement. We'll see if he does anything, and if he does, then what.

Can consent of the borrower to a usurious rate be much of a defense? Otherwise, criminal usury charges wouldn't be much of a threat.

Bill
tel 914-738-3309
Bill@Margrabe.com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Wednesday, August 13, 2003 8:35 AM
**To:** William Margrabe
**Subject:** Tony's and Betty's Agreement-- a cautionary note

Only one question about the proposed agreement. Why are you amending the retainer agreement with the lawyers rather than the letter agreement directly between Betty and Tony? I understand that the 50/50 split is described there, and that's good, but understand that if you want to raise a usury defense as to the S&W compensation scheme later, someone may ask why you also didn't change, or object to, that provision in the engagement letter at this time.

I'm probably being overcautious on this point, and you shouldn't obsess about it. I just wonder if you can casually shift the document to be amended to the letter agreement directly between Betty and Tony rather than amending the engagement letter document itself?

Best wishes,

-H
----- Original Message -----
**From:** William Margrabe

**To:** Tony Rusciano ; Michael Present
**Cc:** Philip Halpern

7/11/2005



# Crystal Massarelli

**From:**     William Margrabe [bill@margrabe.com]

**Sent:**     Monday, September 08, 2003 3:52 AM

**To:**     Philip Halpern

**Subject:**     The value of Betty's interest under different legal outcomes

**Tracking:**  **Recipient**     **Read**

Philip Halpern

Harry Lewis     Read: 9/9/2003 4:11 PM

Phil

You asked me to do an economic analysis of what Betty would get if the case went to trial. I'm all for that and have attached my "philosophy" about this at the end of this message. I've already done this calculation for Betty AND TONY, in a few ways, so I went through my files to find what I've got. I've attached an Excel workbook ("Rusciano Settlement 2003.5.23.xls") that should open up to a summary sheet ("5-28-03 Summary"). Supporting information is in spreadsheet "Minimum". When you open the workbook, don't update, etc.

After you look at the values of the possible outcomes, all we have to do is assign probabilities, or perhaps you'll tell me that I have to consider additional outcomes. I discuss philosophical issues, at the end of this message.

Some basic assumptions:

- Real property in corporations is worth about $22,250,000. It's probably more, because our appraisals are from maybe four years ago, and A.J. is talking deals with Lowe's, etc. Betty and Tony own about $9 million of that by strict percentage ownership.
- Partnership real estate is about $3,875,000. It's probably much more, because a 30-year-old lease on the Burger King in Portchester expires this month and the rent will skyrocket, and A.J. has just had Patrick Reilly's firm handle the rezoning of 4.7 acres next to Costco in New Rochelle. Betty and Tony own about $2,147,000 of that by strict percentage ownership.
- My calculation assumes $850,000 of tax certs (low by probably $50,000 to $100,000, we know, now), of which Betty and Tony would get $317,000 or more.
- David and Michael said that Betty and Tony would get $1 million to $2 million in compensatory damages for eight years of theft, so I use $1.5 million.
- Tony and Betty own nearly the same number of shares or same partnership percentage in each entity. However, Tony owns maybe ten percent more than Betty in Rusciano and Sons, and he owns about 66 to 93 of 150 more shares of class A voting shares in R&S. As things now stand, if A.J. died, Tony would be THE MAN. He would be in a position to screw everyone as A.J. is now doing.

If the judge ordered liquidation of all Rusciano Companies, after taxes, Betty and Tony would get about $8.1 million and A.J. would get about $7.8 million. Uncle Sam and Gov. Pataki would get $13.4 million. It would be a disaster for A.J., but not much worse for Tony and Betty than the $8.375+ million that they have negotiated. Maybe, it would be better for them, because they'd get their money, right away, not over time at a ridiculously low 2 ½% interest for four years. Liquidation is not their enemy, as disastrous as it is for total value to the family. Liquidation is A.J.'s nightmare. I'd like to see an order for liquidation. Then, let A.J. negotiate his way out of that.

If A.J. bought Betty and Tony out for $14 million, their "fair value before taxes", Betty and Tony would pay about $3 million in capital gains tax and have $10.9 million left. A.J. would have left $15 million of net value. One assumes that he could avoid paying any tax on that. This is an indication of how much better off buying Tony and Betty out is than having a court-ordered liquidation.

Here's the best-case scenario for Tony and Betty, united. If Tony and Betty got a judgment of $1,500,000, then got liquidation of partnerships, they'd get about $2,147,000 from liquidating the partnerships. This puts Betty and Tony at about $3.6 million, while they keep their claims on corporate property worth $9 million at liquidation, and





Tony still gets to take over when 64-year-old A.J. kicks off. After that old goat dies, Tony (and Betty, if Michael ever drafts the Tony-Betty agreement that he told me he would draft) start milking the corporations the way A.J. has done, except they get to do it forever. To me, unless the settlement is at least $1.5 million richer than the current $8.5+ million, this is obviously the smart way to go, if only to screw A.J. to the wall and extract the highest settlement and best terms. If you consider that Tony would have the opportunity to milk the corporations the way A.J. is now doing it, this outcomes is worth millions more than these calculations. However, David and Michael weren't interested in this and misled and propelled their clients away from this resolution, which is one reason I think that their urgent desire for settlement may be best for them, but not for their clients. I think that making a case for legal malpractice is difficult, so I might not urge Betty to sue David and Michael for malpractice, any more than I urged (that is, I didn't urge) my mother to sue the G+I specialist who misdiagnosed and mistreated my late father. However, I haven't ruled out a malpractice suit and I'm leaning toward going after S&W for loan-sharking.

Of course, if A.J. can appeal a judgment and fight liquidation of partnerships for ten years, then Betty and Tony are stressed to the max. This assumes that A.J. isn't dead in ten years, which would have him outliving BOTH his parents by about eleven years. When A.J. would die, stress would go to the OTHER side of the Rusciano family.

Now, let's consider Betty's situation, alone, after Tony would settle. She'd get about $1.8 million from compensatory damages and liquidating the partnership. She and I can wait for that money We don't have money problems, at this time, except that for me to support five adults and six children is expensive. If A.J. ever wanted to pay dividends, then she'd get her share, some 21.5% of $30 million, with present value of more than $6 million. If A.J. sold out, she'd get her share, some 21.5%, with present value of more than $6 million more. However, and here's the problem, if A.J. could continue taking everything and paying nothing, as in the past, then Betty'd get nothing more than her compensatory damages (if he didn't just put the money back in the corporation) and $1 million worth of partnership interests. She would never take control or have the rights of someone with class A voting shares.

You're the lawyer. If Tony settles and Betty fights, what does all this mean? Does A.J. have the ability to cheat Betty, forever? Could she demand a place on the payroll for her family member and get 21.5% of revenues before payroll? What other calculations can I do for you?

PHILOSOPHY
The professors of law and economics (Posner, Shavell, etc.) make clear what anybody with a Ph.D. in economics should be able to figure out on his own: In order to make an informed opinion about whether to settle or go to trial, one has to estimate the expected proceeds from the trial, judgment, and collection. In order to do that, one needs a detailed understanding of the workings of the legal process, the relevant law, the facts of the case, etc.

Now, how does a client in his first lawsuit do that? A client cannot possibly do that by just sitting back, letting the attorney carry the ball, and waiting for the announcement of a decision or a settlement to sign. The client has to approach the case, as if he were a scientist and the case were a phenomenon, such as a green flame, or a shadow, apparently emanating from the sun at sunset. The scientist makes hypotheses and tests them ("runs them by nature for an opinion"). Eventually, the client makes hypotheses about what's going to happen and runs them by his attorney for an opinion. If possible, the client runs the hypotheses by multiple attorneys who know the facts, relevant law, judge, jury system, etc.

You strongly suggested that I should try to do that calculation, and I've gotten back to you with what I can do. In contrast, David has pooh-poohed every calculation that I've done and said that we should simply trust in his 30 years of experience and go with our guts. That might have worked if he had ever predicted anything that later happened. However, after reality has falsified all (or nearly all) of David's predictions, Betty isn't much interested in what David has to say, and thinks he's down-market, incompetent, and self-serving. To inform our "gut feelings", David and Michael made comments in favor of settlement at a low figure, such as, "$3 million is a lot of money", "six million is 'real money'", and "You're getting more money than A.J.'s sisters" (In about 1993 they got $3.5 million, with zero voting shares.) That's all true, and it's all irrelevant. Compared to 43% of $25 million of property, plus $2 million in compensatory damages, $6 million isn't much. As it turns out, even A.J. agreed with my analysis that Betty and Tony have interests worth more than $8 million, assuming that he isn't just holding out the promise of a large settlement to set up a scam. Since ten years have gone by since the sisters settled, the sisters owned much smaller interests than Betty and Tony, and the sisters had no class A voting shares, one would expect that Tony and Betty would get more than the sisters. Listening to crap arguments like this from Michael and David was distressing. Personally, I could not believe that they were both competent and honest.

Bill
tel 914-738-3309



## Unknown

**From:**     Harry Lewis [hlewis@amexcenters.com]
**Sent:**     Tuesday, September 16, 2003 9:36 AM
**To:**       'William Margrabe'
**Subject:**  RE: A possible approach to this mess

Only one thing's missing: a demand that he withdraw as to both clients, given his actual conflict of interest. Otherwise you may be waiving any objection to his continuing representation of Tony. If Phil needs a few extra days to prepare for the closing, he can ask for it. No one will hold the request against him, especially if he tells everyone that the deal is on despite S & W's departure, and that Betty will agree to its terms.

-H

-----Original Message-----
**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Tuesday, September 16, 2003 3:39 AM
**To:** Philip Halpern
**Cc:** Scott Salant
**Subject:** A possible approach to this mess

Phil

Betty finds herself on the receiving end of her attorneys' power play, and would like to accomplish two goals.

1. Betty's number one priority is to accept this agreement and not lose it, weak as it is, assuming that nothing too horrible pops up in the next few days.
2. However, at my urging, she wants to keep open her options for seeking sanctions against and damages from Sexter & Warmflash, including criminal prosecution for loan-sharking.

Accomplishing both may not be easy, but I have a thought. How about the following approach? You would write them a letter, along the following lines, but better:

Dear David and Michael

Our client, Betty Margrabe, has asked us to write you about your outrageous and unprofessional conduct in representing her. Said conduct includes, but is not limited to, refusal to prepare properly for negotiations, refusal to communicate properly with your client, exacerbating potential conflicts of interest between her and her brother, and resolving in your own favor certain conflicts of interest between you and your clients. Here are a few particulars, but by no means all:

1. You refused to file your lawsuit for about two years after Betty Margrabe retained your services, thus losing for your clients any claim for restitution for Defendant's peculation for two years, due to the statute of limitations.
2. Finding your clients in financial distress you falsely claimed that you could arrange financing for clients with HSBC.
3. You financed half of your clients' legal fees by extending them a loan that clients have learned recently may be criminally usurious.
4. With your e-mail message of 9/15/03 at 1:47 p.m. you have claimed an actual conflict of interest between your clients, Betty and Tony.
5. Upon information and belief you exacerbated the potential conflict of interest.
6. Your resolution to this conflict has been to stop representing Betty against the Defendants in her case, to represent Tony against Betty's interests, to deny her information about the case, and to start dictating terms to her in an attempt to force her to settle.
7. In May you agreed to partake in a negotiation session for which you did not prepare properly, resulting in our consultant making false, incompetent, and damaging statements that Defendants attorneys used against them in the subsequent "mediation".
8. You urged clients to partake in a "mediation" session for which you did not properly prepare,
9. On 6/18/03 you misled your clients about the terms of the agreement to which they later allocuted.



 

10. On 6/18/03 you sat by, inertly, while Defendant's attorney dictated terms that were contrary to the terms that you described to your clients. In fact, the terms were so poorly formed that agreement was not reached even on 9/9/03, and the terms were not finalized even on 9/15/03.

11. On or around July 2, 2003, you disregarded written client instructions and sent an unauthorized draft Order and Stipulation of Settlement to Josh Grauer. This unauthorized draft seriously hurt the negotiating position of your clients.

12. You have repeatedly acted without authority, covered up those actions, and maneuvered your clients into situations where they would face serious consequences for failing to ratify your unauthorized actions.

13. Upon information and belief you refused to notify Josh Grauer of your error, misleading him into responding to the unauthorized draft Order and Stipulation of Settlement, and allowing him to ignore the authorized draft Order and Stipulation of Settlement until AFTER the 9/9/03 meeting with Judge Donovan.

14. You have repeatedly misinformed your client, Betty Margrabe, about the case.

15. You have repeated refused to answer the reasonable questions of your client, Betty Margrabe, about the case.

16. Upon information and belief on 9/9/03 you misinformed Judge Donovan about your clients' decisions and statements.

17. Upon information and belief after 9/9/03 you misled your client, Tony Rusciano, about the terms of the agreement.

18. Upon information and belief after 9/9/03 you aggravated any potential conflict of interest between Plaintiffs Tony Rusciano and Betty Margrabe.

19. Because you aggravated this conflict you created enormous risks of going forward in the litigation for Mrs. Margrabe.

20. Your conduct has forced her to accept the offer, seriously flawed as it is in the dollar amount, financial terms, and security.

21. You appear to have negotiated certain terms that have no advantage to clients, but are to your advantage.

22. You have usurped Betty Margrabe's authority as client and attempted to force her to accept a settlement that is in your interest, to her detriment.

23. By information and belief it has come recently to our attention that you have in the past misled one or more persons who had reason to trust you, and said person or persons suffered consequent damage.

24. You have drafted an Order and Stipulation of Settlement that Betty Margrabe fears would make her party to tax fraud.

Given the recent date of your most disgusting conduct, false information that you have provided to Judge Donovan, the judge's preferred closing date, and lack of realistic alternatives, Mrs. Margrabe accepts the proposal on the table, will be at the closing on 9/19/03 at the Cuddy, Feder & Worby offices in White Plains, and will sign the settlement documents.

However, you no longer represent Mrs. Margrabe. You are fired, with prejudice. The firm of Collier, Halpern, Newberg, Nolletti & Bock, LLP now represents Mrs. Margrabe through the signing of the agreement. They will represent Mrs. Margrabe at the closing and hold her documents in escrow.

Mrs. Margrabe will inform you if and when she decides to take further legal action against you.

Sincerely

I guess that delivery would be on Wednesday, without fail. Then you would call Josh and let him know that your firm would represent Betty at the closing.

We wouldn't want to throw a monkey wrench in the closing. At this date it's probably too late for your firm to take it over. However, if you could do it, without breaking the deal, I would like to know how that would work.

I have followed another case where two of the defendants had an actual conflict of interests that opposing counsel pointed out to the court. This threw a monkey wrench in the defense counsel's plans, and defendants settled half a dozen causes of action, partly to avoid counsel being forced to withdraw from the case. I read that in such a case the law requires the attorney to withdraw, unless the clients waive the conflict. So, it appears that Betty may have an unused and perhaps unusable weapon in this conflict with S&W.

Let's talk at your convenience.

Bill
tel 914-738-3309
Bill@Margrabe.com

B62- H

2005




## Crystal Massarelli



**From:** Harry Lewis [hlewis@amexcenters.com]
**Sent:** Tuesday, September 16, 2003 2:47 PM
**To:** 'William Margrabe'
**Subject:** Tony v. Betty actual conflict of interest

I must have been unclear last night. To permit them to continue to represent Tony is to permit them to use confidential information they acquired about Betty during their representation of both Tony and Betty, as well as your overall strategy, against Betty. The point is, they were representing both Tony and Betty. Now they're siding with Tony against Betty. That's unacceptable. They're now adverse to Betty's interests—by siding with Tony, they've divided the siblings against each other and exposed Betty, forcing a settlement upon her she MUST accept-- and you cannot permit them to represent Tony against Betty, even at closing. As far as blowing up the deal goes, when Phil comes in, he should tell Josh immediately that he's replacing Michael et al., and that the deal still is on. He should tell Michael that Betty objects to S & W's continued representation of Tony, given the prior joint representation. As far as Tony is concerned, if he refuses to settle without Michael, that's his problem, but there's no reason he shouldn't settle on the same terms with or without Michael. IF Tony says, "I love Michael, and I want to stay with him," the appropriate reply is, "But Betty doesn't want Michael using his confidential information about HER against her in future dealings between you (Tony) and her (Betty).

The key to understanding this is: Given his past representation of them both, is it acceptable for Michael to continue to represent Tony against Betty not just at closing, but forever? (Do you really want this guy beating up Betty on behalf of Tony indefinitely? That's what you're asking for if you don't dump him over the side NOW!)

-H

-----Original Message-----
**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Tuesday, September 16, 2003 11:15 AM
**To:** Harry Lewis; Harry Lewis
**Subject:** RE: A possible approach to this mess

Harry

I'm not sure we object to their CONTINUED representation of Tony. We object to the damage that they did in the past. We don't want to do something that would bust the deal. Could we point out the conflict of interest, which would not stop them from closing the deal, and reserve our right to make an issue of the conflict if the deal blows up?

Bill
tel 914-738-3309
Bill@Margrabe.com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis@amexcenters.com]
**Sent:** Tuesday, September 16, 2003 9:36 AM
**To:** 'William Margrabe'
**Subject:** RE: A possible approach to this mess

Only one thing's missing: a demand that he withdraw as to both clients, given his actual conflict of interest. Otherwise you may be waiving any objection to his continuing representation of Tony. If Phil needs a few extra days to prepare for the closing, he can ask for it. No one will hold the request against him, especially if he tells everyone that the deal is on despite S & W's departure, and that Betty will agree to its terms.

-H

 

## Crystal Massarelli

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Thursday, September 18, 2003 5:17 AM |
| **To:** | Philip Halpern |
| **Subject:** | When are you available? |

**Tracking:**

| Recipient | Read |
|---|---|
| Philip Halpern | |
| Harry Lewis | Read: 9/18/2003 7:02 AM |
| Harry Lewis | Read: 9/22/2003 1:38 PM |

Phil

The next time the parties and their lawyers go to the courthouse to "negotiate", Betty would like you to be THERE for discussions, and she would like you to be available at closing, because she imagines that there will be surprises that require your expertise and faithfulness. She's going to ask David and Michael to make this happen. Unfortunately, David and Michael would probably prefer that you would not be there, so they would have more control. Betty has a lot of responsibilities, and would like to conform her schedule with yours over the next few weeks. What can you tell us about your current availability, next week?

Bill
tel 914-738-3309
Bill@Margrabe.com



## Crystal Massarelli

**From:** William Margrabe [bill@margrabe.com]
**Sent:** Thursday, September 18, 2003 1:49 PM
**To:** Philip Halpern
**Subject:** Sexter & Warmflash

**Tracking:** 

| Recipient | Read |
|---|---|
| Philip Halpern | |
| Harry Lewis | Read: 9/18/2003 6:47 PM |
| Harry Lewis | Read: 9/22/2003 1:38 PM |

Phil

Betty and Tony want the 6/18/03 deal. Betty has never pushed for anything that she thought was outside the "four corners". To deal with his financial situation, Tony wanted quarterly payments, appears to me to be clearly beyond the four corners. Michael didn't ask for it until about 9/15/03, Josh has refused it, and Michael has apparently caved, so what does that tell us?

As I see the situation, S&W have screwed things up, badly. Now, A.J. and Josh are running from this deal, because they think they can get additional concessions. David and Michael have stopped trying to do good for their clients and focused all their energy on getting paid. They are chasing A.J. and Josh down the street, offering more and more concessions. (However, I am heartened that they have found some points they won't concede.)

Betty's biggest downside is the potential that this thing blows up and Tony settles, alone. Scenarios that end up in that fashion usually involve S&W representing him, alone. We want to avoid that, but should think through how to proceed.

What do we do if S&W don't accept Betty's "apology"? Will it proceed, as follows:

- S&W quit.
- You point out the apparent, ACTUAL conflict of interest with their clients, because they are so desperate to get paid.
- You point out the way they have mishandled the potential conflict of interest between their clients, because they have been favoring one client over the other, and creating an ACTUAL conflict of interest.
- You demand that they withdraw totally from the case and from representing Tony.
- You tell them that if they agree, we will pay them at closing and not them sue for malpractice.
- You demand the deal of 6/18/03. Concede the things that don't matter much. Boil the issues down to a couple. Ask the Judge to decide the open issues.

Another scenario, where we would be proactive, if that had any advantages:

- You fire S&W.
- Then, same as above.

What do you think about those ways to go?

Bill
tel 914-738-3309
Bill@Margrabe.com



## Crystal Massarelli

**From:**    Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**    Saturday, October 04, 2003 6:25 PM
**To:**    William Margrabe
**Subject:**  Re: Your availability, next week. A new draft. See you this afternoon?

See attached.

-H

> ----- Original Message -----
> **From:** William Margrabe
> **To:** Harry Lewis
> **Sent:** Saturday, October 04, 2003 12:55 PM
> **Subject:** Your availability, next week. A new draft. See you this afternoon?
>
> Harry
>
> When would you be available to come to the courthouse, next week, if they schedule the meeting when Phil can't make it?
>
> Please see attached, still in my language, not yet translated into Betty's.
>
> Bill
> tel 914-738-3309
> Bill@Margrabe.com
>
> > -----Original Message-----
> > **From:** Philip Halpern [mailto:phalpern@chnnb.com]
> > **Sent:** Thursday, October 02, 2003 2:50 PM
> > **To:** mike@swnylaw.com
> > **Cc:** anthony3@verizon.net; bill@margrabe.com
> > **Subject:** Re: Rusciano litigation
> >
> > thurs pm ok;fri-no;wed- ihave a 12:30 lunch
> >
> > Philip M. Halpern
> > Collier, Halpern, Newberg, Nolletti & Bock, LLP
> > One North Lexington Avenue
> > White Plains, NY 10601
> > t: 914 684-6800
> > f: 914 684-6986
> > e-mail: phalpern@chnnb.com

**19D**

## Crystal Massarelli

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Monday, October 06, 2003 5:51 AM |
| **To:** | Harry Lewis; Harry Lewis |
| **Subject:** | Usury? |

**Tracking:** **Recipient** **Read**

Harry Lewis   Read: 10/10/2003 1:20 PM

Harry Lewis   Read: 10/6/2003 10:44 AM

Harry

Here's an experiment. I'm attaching a bunch of messages (11 of them) that shed light on Betty's payment arrangements with Sexter & Warmflash. This way, they stay together in a neat package.

Does this make usury or lawful interest apparent? I'm still looking for the agreement.

Bill
tel 914-738-3309
Bill@Margrabe.com

377

## Crystal Massarelli

**From:**  Harry Lewis [hlewis@amexcenters.com]

**Sent:**  Wednesday, October 08, 2003 4:05 PM

**To:**  'William Margrabe'

**Subject:**  RE: 10-7 Marked Settlement Stip0

My earlier message may have been harsh.  It looked to me like you were fighting battles that could add to the risk of Tony and Betty splitting, and the "deal" falling apart, with the consequences we've discussed.  Speaking in a vacuum, I would advise fighting on, but you're not in a vacuum.  It looks like you can't even get a straight answer about what deal Tony has accepted.  Apparently, Tony himself can't or won't tell you, and neither can or will Tony's lawyer!  I would focus on that one issue: what deal has Tony agreed to that gives rise to the statement that Tony and Betty don't agree?  How can you know if there's a disagreement if you don't know what the deal is?  They shouldn't be allowed get away with, "Here's a draft we've prepared you can take or leave, but we won't tell you that if you reject it, Tony and Betty have disagreed."  That's like hiding the ball.  They've stated that Tony and Betty are "likely" to disagree.  On what points, exactly?  Shouldn't everyone be in the same room when this is being discussed, instead of their being permitted to play Tony off against Betty?

You're going to have to decide when their games have become so noxious that you MUST dump them to protect yourself, and that the risk of replacing them is less than the trauma they've been inflicting on you for the past four months.  These are supposed to be YOUR LAWYERS!  (You do have Phil as a backstop).

-H

-----Original Message-----
**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Tuesday, October 07, 2003 11:23 PM
**To:** Philip Halpern
**Subject:** RE: 10-7 Marked Settlement Stip0

Phil

I don't understand something. Suppose that Tony tells Michael, "I don't care what A.J. does. Just get me that check #1." Betty tells Michael, "I don't want A.J. to sell any of the industrial district without paying us in full." Can Michael just pick and choose and present Tony's position to A.J.? Doesn't he have a responsibility to get them together and discuss the matter?

I have a hard time ignoring what I seem to me to be Michael's substandard messages and documents. Of course, with you help I would never again suggest such a thing, even if he totally "screwed the pooch". It just seems important for Betty's position to try to maintain some sort of standard of intellectual integrity. Otherwise, if we don't somehow flag stuff that makes no sense, aren't we condoning the nonsense? Or, perhaps, the only meaningful way to say that a lawyer's work is slipshod or dishonest is to fire the bastard. Since I'm not a lawyer, I don't know how to deal with Michael's sloppiness (at best).

How about the following? Is this neutral enough?

Michael

I showed the draft Settlement Stip to Betty. She is having trouble understanding your suggestion that the "proposed changes/compromises can be accepted or rejected as you see fit." We think that it would be helpful to know who proposed what, and who (if anyone) opposes the proposal. She would like to know what proposals are up in the air, but you think are likely to lead to some resolution away from Judge Donovan. Similarly, she would appreciate it if you could identify the "1 or 2 issues" that may end up in front of Judge Donovan. If you have any opinions on the pros and cons of the various proposed changes, that culd be useful.

Wouldn't it make more sense to say that an agreement that Tony and A.J. have both approved would be something that "can be accepted or rejected as you see fit"? Until that happens, wouldn't it make sense for you to

## Crystal Massarelli

**From:** Harry Lewis [hlewis@amexcenters.com]
**Sent:** Sunday, October 26, 2003 9:27 PM
**To:** 'William Margrabe'
**Subject:** RE: Conflict of Interest

A direct conflict of interest, and grounds to fire them immediately.

-H

-----Original Message-----
**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Sunday, October 26, 2003 2:44 PM
**To:** Harry Lewis; Harry Lewis
**Subject:** Conflict of Interest

Harry

Today I had a long conversation with Tony. Finally, he said that he didn't want right now to sign an agreement to split equally with Betty all money coming from proceeding to trial. He said that he had been advised not to sign it. I asked him who advised him that way. After a five- or ten-second pause, he said, "Michael and David."

I spoke to Tony, repeatedly, and he sounded amenable to such an agreement, but asked me to show it to Michael. I requested, repeatedly, that Michael to write up such an agreement, and he either said he would or said that he would speak with Tony. Of course, no such agreement ever arrived. Now, we know the games that they were playing. I believe that advice to Tony to be unethically adverse to Betty, and I think that it is another example of where they crossed the ethical line when handling what they saw as an actual conflict of interest. I think an ethical way to handle this problem would have been to tell Tony that he and Betty should discuss the issue. Please file this away as another abuse, in case we need to fire them. Please let me know your thoughts on the ethicality of that advice to Tony.

Bill
tel 914-738-3309
Bill@Margrabe.com



119

**Crystal Massarelli**

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Sunday, November 16, 2003 10:35 PM
**To:** William Margrabe
**Subject:** Names and addresses of opposing counsel

To be sure I have them correct on the Notice of Appearance,  what are the names and addresses of opposing counsel?

-H



## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Tuesday, November 18, 2003 9:30 AM
**To:** William Margrabe
**Subject:** Forwarding my memo



MEMORANDUM
11-18-03.doc    I've revised my memo on "commercially reasonable" for Michael's possible
review.  Please review it, and if it looks acceptable, forward it to him.

Tell him to send the draft to you on Wednesday afternoon at close of business no matter
where it stands.  We're not asking for a final version by
then-- just a draft so we can begin to review it.

Inform him in unequivocal terms that I am there to assist him, not to replace him, and
that he are I are to cooperate.  If he wants to voluntarily withdraw as counsel to the
plaintiffs, he can do so, but only as to both of the plaintiffs.  Our view of such an
action is that it would hurt our prospects for concluding the settlement at this juncture.

-H

## Crystal Massarelli

**From:**     Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**     Wednesday, November 19, 2003 3:22 PM
**To:**       William Margrabe
**Subject:**  Re: Memo on meaning of "commercially reasonable"

Call me about Michael's latest threat.

-H

----- Original Message -----
**From:** William Margrabe
**To:** Michael Present
**Cc:** Harry Lewis ; Philip Halpern ; Tony Rusciano
**Sent:** Wednesday, November 19, 2003 3:29 AM
**Subject:** Memo on meaning of "commercially reasonable"

Michael

I assume that your motion and your subsequent reply will contain legal discussions of "commercially reasonable security", a disputed issue in this case. So, I'm sure you will be pleased to receive the attached memo on "commercially reasonable" that I asked Harry Lewis to prepare. Maybe, it could save you some time. Please read it, use what parts you can, and supplement it, as required.

Harry's memo also answers briefly David's interesting question to me, Monday morning, about why I felt the need for help from a bankruptcy expert. I hope that you can appreciate better than David could the advantage of bringing onto our team someone who has toiled for two decades in bankruptcy law, where "screwing creditors" seems sometimes to be a law firm's mission statement. After all, you wrote, in your 10/7/03 draft of the order and stipulation of settlement, that it was "...enforceable in accordance with its terms except as such enforcement may be limited by bankruptcy, insolvency, moratorium or other similar laws presently or hereafter in effect affecting the enforcement of creditors' rights generally." (p. 20, emphasis added.) Clearly, Betty and Tony deserve protection from at least the most elementary methods that A.J. could use to deprive them of their full "cash settlement amount".

Harry is available to assist you with his expertise, not to replace you. I have instructed Harry to try to help you as much as possible. Betty and I would expect you to use all appropriate resources, including Harry, to prepare a motion and an affidavit that your clients can approve.

Bill
tel 914-738-3309
Bill@Margrabe.com

**Crystal Massarelli**

| | |
|---|---|
| **From:** | Harry Lewis [hlewis8@nyc.rr.com] |
| **Sent:** | Friday, November 21, 2003 8:13 AM |
| **To:** | Tony Rusciano |
| **Cc:** | William Margrabe |
| **Subject:** | My representation CONFIDENTIAL |

Tony:

To be clear on one point, I'm technically Betty's lawyer, not yours.  That means that as long as the two of you agree on everything, I'm representing your interests as well as hers, but if the two of you have a serious disagreement, then I will choose Betty's interests over yours.  That makes it all the more important to maintain excellent communications with Betty--
so that I never have to make such a choice.

Remember, if you and Betty are united, you control the lawyers.  If you are divided, the lawyers control you.

Best wishes,

-H



**Crystal Massarelli**

| | |
|---|---|
| **From:** | Harry Lewis [hlewis8@nyc.rr.com] |
| **Sent:** | Thursday, January 22, 2004 6:34 PM |
| **To:** | William Margrabe |
| **Subject:** | Warmflash etc. |

"They decided it was in your interest" without consulting you?   Huh?

Do you agree about having Al on your "good side", especially after AJ agreed to pay half ,but then welched on the deal?  Wouldn't we be better off paying him our half, and letting him get pissed off at AJ about not paying the balance?

You already know my opinion about their continued employment.

-H

154

**Crystal Massarelli**

| | |
|---|---|
| **From:** | Harry Lewis [hlewis8@nyc.rr.com] |
| **Sent:** | Friday, January 30, 2004 10:56 AM |
| **To:** | 'William Margrabe' |
| **Subject:** | Draft Termination letter |

Attached is a rough draft to give you an idea of where I'm going with this. Obviously, your comments are welcome.

-H

**Law Office**
**Harry D. Lewis**
**P.O. Box 2567**
**Grand Central Station**
**New York, N.Y. 10163**
**Phone: (718)-360-0759**
**Facsimile: (718)-874-4421**
**e-mail: hlewis8@nyc.rr.com**

February 2, 2004

Michael Present, Esq.
Sexter & Warmflash, P.C.  **DRAFT—FOR DISCUSSION PURPOSES ONLY**
115 Broadway
New York, N.Y. 10006

Re: Margrabe v. Rusciano et al.; Termination of employment of law firm of Sexter & Warmflash, P.C. as counsel to Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash as counsel to co-plaintiff Tony Rusciano

Dear Mr. Present:

On behalf of my client, Elizabeth Margrabe, I hereby terminate the employment of the law firm of Sexter & Warmflash with cause in the above-styled litigation and related negotiations.

Further, my client objects to Sexter & Warmflash's continuing representation of her co-plaintiff and brother, Tony Rusciano because of an actual conflict of interest which you yourself have repeatedly noted, as well as an additional conflict of interest (between Sexter & Warmflash itself and its own clients in this case) which you have failed to mention. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen.").  The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

In particular, in recent months <u>after</u> the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano <u>alone</u> (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between my client and her own brother to force a settlement upon terms advantageous to your law firm, if not to her and her brother.  You then attempted to exploit the divisions which you exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

1

210-A

The strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement.  You abused your leverage as an "indispensable" participant in those negotiations to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process which you hoped would result in a settlement redounding to your firm's benefit at least, if not to the benefit of your clients.

Further, you exploited Tony Rusciano's financial desperation by making, or offering to make, concessions to your adversaries which ensured payment of your fees while consigning your client to likely insolvency.  Even your strategy of offering concessions which the Defendants had not even requested failed to conclude the process.  In short, you could not close the deal even upon the most abject terms, and apparently were unaware of your clients' right to approach the judge for relief.

Only after Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did Mr. Halpern suggest an approach to Judge Donovan about the impasse.  With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to the client of Mr. Halpern's (and my own) time and expenses.

In addition to this very serious "cause", you also have failed to follow my client's written instructions with respect to providing her with copies of proposed settlement documents, and otherwise informing her of your proposed settlement positions, on at least two occasions after June 18, [list other "causes"].

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all services you assert are due and owing directly to the clients.  They then will consider their legal options in consultation with Mr. Halpern and with me.

Sincerely yours,


Harry D. Lewis

2

210-B

Cc: Elizabeth Margrabe
Philip Halpern, Esq.



# William Margrabe

**From:** William Margrabe [bill@margrabe.com]

**Sent:** Sunday, February 01, 2004 3:39 PM

**To:** Harry Lewis, Esq.

**Subject:** RE: Copies of papers

**Tracking:** Recipient        Read

Harry Lewis, Esq. Read: 2/2/2004 4:13 PM

Harry

Thanks for letting me know when I am doing something that is not helping Betty's cause (and my entire family's cause). I do my best, but I am not a lawyer, so I'm not always aware of the legal consequences of my actions. Also, I don't pretend to be a lawyer, which is why I hired two (not one, but TWO!) lawyers to help me deal with those lawyer assholes of epic proportions, namely, David and Michael. I was delighted when you agreed to help me, because you have essential elements that are hard to find in one attorney: Top-quality skills, loyalty to the client, and excellent work habits. David has zero of those characteristics, although he's okay at jiving the trusting. Michael's a hard worker, but not the brightest bulb, sloppy, and unfaithful. Phil has top skills and excellent work habits, but he's too loyal to Phil to be as loyal to Betty and Bill as I would like. You put it all together, and more. I thank you for your skilled work and loyalty.

HERE ARE MY THOUGHTS FOR THE MESSAGE TO MICHAEL.

Michael

Betty sends you the following message via me, since she doesn't do e-mail:

You transmission to opposing counsel of a draft order and stipulation of settlement that the rest of my legal and business team had not reviewed, and that I had not seen and approved is shocking! We're at a crucial stage in the settlement process, and this is not the time to send sloppily written, unedited language to opposing counsel. We will have to rewrite it, and even so it could come back to bite us. I think the polite, one-word comment on your explanation is "disingenuous".

We have spent more than seven months wrangling with A.J. over the meaning of the settlement language that you too hastily approved on June 18, 2003. Moreover, your sloppiness on June 18 has cost us hundreds of thousands of dollars. First, Justice Donovan has ordered that we don't get interest on our money that A.J. has been using for that period. The cost of that lost interest is about $125,000. Second, Justice Donovan has ordered that we get a share of only one tax cert. We don't know how much that has cost us, because you refused my repeated requests, via Bill, to demand that information from A.J. However, upon information and belief it is more than $100,000. Third, shortly before allocutions, David assured us that A.J. wasn't folding our claims against him as a crooked trustee into this settlement. Of course, Josh soon disabused us of that notion and David did not counter him. We don't know how many tens of thousands of dollars that cost us, because you said we would look into that matter, later.

After June 18, 2003, in order to provide you with the help you required to do a better job for Tony and me, and to help you avoid making additional, similar, costly errors, I assembled a team of legal and business experts. I believe that my experts reviewed every motion, affidavit, and draft document you have sent to the other side from July 3, 2003 to January 28, 2004. Even when you delivered your ultimatum to me, claiming that you had a draft order and stipulation of settlement that A.J. and Tony approved, threatening to have them settle for half the money, leaving me on my own, you let me see it before sending it to the other side. (As it turns out, the other side rejected that draft!) Why you would think that you had authority to act on your own at this crucial stage in the settlement process escapes me.

I find your response puzzling and disappointing. Since you are a lawyer, and your job involves choosing your words carefully, I find it interesting that your message leaves open the possibility that you deliberately



## Crystal Massarelli

**From:** John Lewis [stork203@adelphia.net]
**Sent:** Tuesday, February 03, 2004 8:24 PM
**To:** William Margrabe
**Subject:** Re: Thoughts on dropping the bomb, etc.

Phil is being a little "cute". There is an ethical limitation on a lawyer taking on a client if he knows he'll have to be a witness in the case. Did you hire and pay him solely to be a witness? (I don't think so!) My reaction is that if Betty and you can testify against S&W without Phil as a witness, that'll be good enough.

-H

----- Original Message -----
**From:** William Margrabe
**To:** Harry Lewis, Esq. ; John Lewis
**Sent:** Tuesday, February 03, 2004 4:18 PM
**Subject:** Thoughts on dropping the bomb, etc.

Harry

I read in the past week about someone who discussed a legal matter with an attorney and then with friends, thus the discussions lost some of their lawyer-client privilege. I am concerned that this basic concept could hurt Betty and me. Although this may sound paranoid, I am concerned that S&W could somehow get wind of your use of an e-mail account that another person can use. If your brother or his wife were to see our correspondence, then I would lose my expectation of privacy for the correspondence, and S&W could subpoena it. Could you please destroy all copies of our correspondence from your brother's computer before you leave? I'll have a copy of everything. I'm sending a copy of everything to your main e-mail address. You could do the same.

I spoke with Phil.

- I told him that I was thinking about firing S&W, but needed someone to step in to close the deal. I wondered if that would be a problem for him. He replied, "I told you, I'll help you any way that I can." He volunteered that he could be a witness to "some of what has happened". I would have to subpoena him, because he would not volunteer, but he would testify.
- He suggested to wait a while. "See what we get from the stip." Otherwise, S&W could say that things were great until Harry and Phil took over and screwed up the deal.
- I suggested that they could argue that we led S&W to believe that things were fine, until they did the work, and then fired them to cheat them of their fees. He laughed at that. "You've been pissing and moaning about them ever since I met you. There's no way they could argue that you've been happy with them." Since I act only with Betty's authority, that says the same about Betty's degree of satisfaction, I guess.
- He says that I don't want him to be my attorney and a witness in this case at the same time.

Bill
tel 914-738-3309
Bill@Margrabe.com

2/3/04



 

## William Margrabe

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Tuesday, February 03, 2004 5:22 AM |
| **To:** | Harry Lewis, Esq. |
| **Cc:** | stork203@adelphia.net |
| **Subject:** | REVISED REPLY 2004-2-2 RE: Copies of papers |

**Tracking:** **Recipient**          **Read**

Harry Lewis, Esq.

stork203@adelphia.net Read: 2/3/2004 8:17 PM

Whatever works best for Betty is what I want. I would be happy for you to be the "bad guy", or I'll do it, whichever works better. I think the main objective is for Betty to win her case against S&W. The secondary objective is to not poison her relationship with Tony, any more than required.

I read the material on terminating the attorney-client relationship. Thanks. Generally, I feel pretty good. The law appears to favor the client in this regard. My main concern would be the legal costs that they could generate, defending their fees. However, I guess that's going to be an order of magnitude smaller than the $250,000 or so cost of Margrabe v. Rusciano.

Just to review, possible actions against S&W and possible outcomes include:

1. Fired, with cause, requesting return of all fees. Even if they're clearly idiots, somehow, I don't see a judge doing this. I don't see how we can prove malice or sufficient incompetence. It just doesn't look right to outsiders, who haven't lived through the hell of a relationship with S&W. However, worth a shot.
2. Criminal usury, civil action. Possible loss of 100% of fees, leaving them with the 50%, already paid. Not bad.
3. Criminal usury, criminal prosecution. A nightmare for them. I suspect that Betty's case would be a winner, or else the loan sharks of this world have a blueprint for beating the rap: "She was in a bind, so she begged me to loan-shark her, then agreed to my usurious terms." Why not pursue this, along with the civil case?
4. Fired, without cause. Fees by *quantum meruit*. My guts tell me they lose the extra 50%, because the fee arrangement smells. Not bad.
5. Grievance Committee, Bar Association Disciplinary Committee. "Conduct unbecoming", excessive fees and/or excessive interest. I see a win for Betty, but I don't know if the bar association has any teeth. Bad publicity for S&W.
6. Malpractice. A real catfight. My gut feeling is that, given the low, minimum standards for lawyers, this is no slam dunk, although S&W fairly clearly screwed things up.

HERE'S THE RETIRED DRAFT

Michael

Betty sends you the following message via me, since she doesn't do e-mail:

You transmission to opposing counsel of a draft order and stipulation of settlement that the rest of my legal and business team had not reviewed, and that I had not seen and approved is shocking! We're at a crucial stage in the settlement process, and this is not the time to send sloppily written, unedited language to opposing counsel. We will have to rewrite it, and even so it could come back to bite us. I think the polite, one-word comment on your explanation is "disingenuous".

We have spent more than seven months wrangling with A.J. over the meaning of the settlement language that you too hastily approved on June 18, 2003. Moreover, your sloppiness on June 18 has cost us hundreds of thousands of dollars.

 

## Crystal Massarelli

**From:** John Lewis [stork203@adelphia.net]
**Sent:** Tuesday, February 03, 2004 8:18 PM
**To:** William Margrabe
**Subject:** Re: Thoughts on dropping the bomb, etc.

I routinely erase everything on his machine, and will continue to do so.

-H

----- Original Message -----
**From:** William Margrabe
**To:** Harry Lewis, Esq. ; John Lewis
**Sent:** Tuesday, February 03, 2004 4:18 PM
**Subject:** Thoughts on dropping the bomb, etc.

Harry

I read in the past week about someone who discussed a legal matter with an attorney and then with friends, thus the discussions lost some of their lawyer-client privilege. I am concerned that this basic concept could hurt Betty and me. Although this may sound paranoid, I am concerned that S&W could somehow get wind of your use of an e-mail account that another person can use. If your brother or his wife were to see our correspondence, then I would lose my expectation of privacy for the correspondence, and S&W could subpoena it. Could you please destroy all copies of our correspondence from your brother's computer before you leave? I'll have a copy of everything. I'm sending a copy of everything to your main e-mail address. You could do the same.

I spoke with Phil.

- I told him that I was thinking about firing S&W, but needed someone to step in to close the deal. I wondered if that would be a problem for him. He replied, "I told you, I'll help you any way that I can." He volunteered that he could be a witness to "some of what has happened". I would have to subpoena him, because he would not volunteer, but he would testify.
- He suggested to wait a while. "See what we get from the stip." Otherwise, S&W could say that things were great until Harry and Phil took over and screwed up the deal.
- I suggested that they could argue that we led S&W to believe that things were fine, until they did the work, and then fired them to cheat them of their fees. He laughed at that. "You've been pissing and moaning about them ever since I met you. There's no way they could argue that you've been happy with them." Since I act only with Betty's authority, that says the same about Betty's degree of satisfaction, I guess.
- He says that I don't want him to be my attorney and a witness in this case at the same time.

Bill
tel 914-738-3309
Bill@Margrabe.com

