#359

## Unknown

**From:** William Margrabe [bill@margrabe.com]
**Sent:** Sunday, February 08, 2004 5:24 PM
**To:** Harry Lewis
**Subject:** RE: Termination and Getting Money
**Attachments:** Termination letter 2-5-08.doc

**Tracking:** **Recipient Read**
Harry Lewis Read: 2/8/2004 8:51 PM

Harry

I'll be back around 6:30 p.m. I've attached a draft termination letter for your perusal.

Bill
tel 914-738-3309
Bill@Margrabe.com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Sunday, February 08, 2004 8:36 AM
**To:** 'William Margrabe'
**Subject:** RE: Termination and Getting Money

We'll talk later.

-H

---

**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Sunday, February 08, 2004 7:13 AM
**To:** Harry Lewis, Esq.
**Subject:** Termination and Getting Money

Harry

I am laboring mightily on the termination letter. I think we can make the case. I'm concerned that what I've written is so much (eleven pages) and points out so many of their heinous acts (about a dozen) that it looks unfair. You'll need to edit it into a document that works.

I'm thinking that the way to go is for Betty to give me power of attorney and for me to send the termination letter. I wonder if it is possible to shield her from cross-examination by having her power of attorney. If possible, would it be desirable, or would it strengthen the S&W argument that I'm the anti-Christ?

I have a couple ideas for demanding immediate payment by Defendants of sizable amounts of cash. However, I don't want to mention them to Michael, for obvious reasons. Nor do I want to mention them to Phil, because I don't want them to get to Michael.

1. If you look at the proceedings of 6/18/03, page 12, it says

"In addition, it has been agreed by Anthony J. Rusciano and Rusciano & Son Corp., that when a tax certiorari refund is received by Rusciano & Son Corp., in connection with the proceeding commenced and settled by Eugene Albert, MAI and Esq., after payment of attorney's fees, and tenant reimbursements, the defendants, Rusciano & Son Corp. by Anthony J. Rusciano, II agree to immediately remit, after the deduction from the gross sum of the attorney's fees taken by Eugene Albert and after deduction of tenant

359





reimbursements, Mr. Rusciano shall calculate 37.12 percent of those tax certiorari proceeds. And shall immediately send a check for 37.12 percent of those tax certiorari proceeds to the plaintiffs' attorneys for distribution to the plaintiffs."

Based on the above quote, I was going to ask Michael to demand immediate payment of the tax cert money, since the Transcript doesn't say that there needs to be a written settlement. Anyway, that's the argument. However, I don't want to try this until we fire S&W. I don't want them collecting the money, which would be used to pay their bills, first thing.

Josh's affidavit of 11/21/03 contains additional grist:

"... Defendants respectfully submit the Court should enforce the clear terms of the Stipulation of Settlement and declare that the initial payment of one million two hundred and fifty thousand dollars shall be paid by Defendants to Plaintiffs within thirty days of the signing of a formal settlement agreement consistent with the Stipulation (or within 30 days of a Decision on the Motion) ..."

Since Justice Donovan's order came down on 1/26/03, does this not mean that A.J. should pay $1,250,000 by 2/25/03? Isn't Josh estopped from arguing against this demand for money?

FYI:
Bill found some relevant information in Josh Grauer's affidavit of 11/21/03. On page 14 at paragraph 36, Josh asks "that the definition of 'Tax Certiorari Proceeding' reflect only the Son Corp. proceedings handled and settled by Gene Albert before June 18, 2003, under consolidated Index No. 16227-97[6] (Exhibit H, par. 1(r), 3.1)" His footnote indicates that the index numbers for the included proceedings are 16227-97, 15572-98, 15959-99, 14883-00, 15253-01, 4625-98, and 16800-02.

It's pretty clear that the quality of information that the other side is delivering is suspect.

- The report, dated 10/1/03, from Albert & Albert to Josh Kimerling, mentions 16253/01, rather than 15253/01. According to a Unified Court System (UCS) search by index number, 16253/01 refers to Wells Fargo Home Mortgage Inc. v. Birchwood et al. They can't all be right.
- Josh's affidavit and the A&A report both mention index no. 16800/02. The UCS says that that refers to Powell v. Serbia.
- The UCS contains both 16227/97 and 4625/98.

I think we need to go over the information from A.J. with care and verify that Tony and I are getting what Justice Donovan has ordered.

Bill
tel 914-738-3309
Bill@Margrabe.com



The New York Supreme Court case with index number 10032/2001 is about the birthright of Plaintiffs Elizabeth Rusciano Margrabe (Elizabeth Margrabe) and Anthony Rusciano III (Tony Rusciano). Their grandfather, A.J. Rusciano I, their grandmother, Peninah (sp?) Rusciano, their father, Eugene Rusciano, and their mother, Margaret Rusciano, intended to bestow on them approximately a 40% interest in the Rusciano Companies, which owned approximately $25 million of real estate in Westchester County, as of June 18, 2003, and which produced more than $750,000 of net operating income per year at that time.

However, after their father died on April 13, 1992, and could no longer protect them, their cousin, A.J. Rusciano II took complete control of all the Rusciano Companies and denied them their birthright. He also misbehaved as trustee and took undeserved money that was rightfully theirs.

On February 4, 2000 Plaintiffs Elizabeth Margrabe and Tony Rusciano retained you to help them fight for their birthright. Through June 18, 2003, when they stipulated to a settlement of that fight, Mrs. Margrabe trusted you to be her faithful and competent attorneys.

That faith was unfounded. The events of June 18, 2003 caught her unprepared, despite your representation of her. Worse, and inexcusably, the stipulation clearly caught you unprepared, as well. As she learned more and more about what had happened leading up to and on 6/18/03 she began to have growing doubts that you had performed either competently or faithfully.

- Your incompetence has cost Plaintiffs more than $125,000 in lost interest on money that all relevant parties agree is rightfully theirs.
- It has cost them tax certiorari refunds that you told them on 6/18/03 were theirs, and which you have argued in legal papers were theirs. Amazingly, you never bothered to find out their share of the tax cert refunds, which contributed to losing them in the first place.
- It has cost them recovery of the money that trustee A.J. Rusciano stole from them, and which you promised they could subsequently sue to recover.

As events unfolded after 6/18/03 it became clear that you were betraying the trust that she had invested in you. The week of September 15, 2003 through September 19, 2003 was particularly traumatic.

- You lied repeatedly to her about events at the recent conferences with Justice Donovan and with "the Joshes".
- You inserted a major, adverse change into a draft stipulation of settlement, without mentioning the change to either Plaintiff.
- The trauma culminated in your ultimatum to Mrs. Margrabe, which attempted to turn the potential conflict of interest between Mrs. Margrabe and her brother, Tony Rusciano, into an actual conflict of interest. According to your ultimatum she would have to sign the




stipulation as you had presented it, or you would
"revise the Settlement Stipulation by deleting Betty as a party and by specifying that Tony is to be paid one-half of the amount which plaintiffs agreed to accept on June 18th and September 9th. Betty can then proceed to settle or prosecute her claims on such terms as she deems acceptable."

Although Mrs. Margrabe had grounds to terminate you as of that date, your ultimatum meant that such an action would amount to abandoning the valuable and expensive alliance with her brother, in which she and her husband had invested more than $500,000 over the previous three years. As you knew, they had paid her brother's share of your fees and provided monthly payments that allowed him to (a) make regular payments on some $200,000 of credit card debt and a home mortgage loan in excess of $400,000 and (b) put food on the family table. They did this pursuant to an agreement that he and she would split the settlement proceeds from this lawsuit. One reason for making this investment, besides a feeling of loyalty to her brother, was to obtain for herself the benefits of his Class A (voting) shares, which are much more valuable than Class B (non-voting shares). If he settled, separately, you knew that Mrs. Margrabe's position would be much weaker, and you used that to coerce her into settling on adverse terms that you had hidden in the draft stipulation of 9/15/03.

Mrs. Margrabe has terminated your employment for the following causes:

- From the signing of our retainer agreement on 2/4/00 until about 6/22/01 you delayed the filing of our lawsuit, although you had already filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s. This delay in filing the lawsuit spawned three problems that we discuss more fully, later:
  (1) It denied Plaintiffs the assistance of the Court in obtaining information from the recalcitrant A.J. Rusciano II. Thus, it lengthened the discovery process, which you in fact never completed, to the detriment of your clients, contributing, among other things to the fiasco of the stipulation on 6/18/03.
  (2) It put Plaintiffs in great financial stress, which you exploited for your own gain by loan-sharking them.
  (3) It lost Plaintiffs a claim on approximately one year of earnings of the Rusciano Companies, following Justice Donovan's granting of summary judgment "to the extent that the Plaintiffs' claims were limited to those accruing within six years of the commencement of the action." (Josh Grauer's affidavit.)



- Beginning on or about April 5, 2001, you loan-sharked your own clients (i.e., subjected them to criminal usury) by charging them 100% interest on loans related to your fees. The annual percentage rate depends on the date on which you extended the loan and the date on which the loan matured. For example, if the case had settled as you had anticipated in July, 2003, the annual percentage rate on the loan for 50% of your fees of June, 2003, would have been *more than 1200%.*







- Alternatively, beginning on or about April 5, 2001, you violated ethical standards for legal fees by charging 150% of scheduled fees.
- Despite the nature of the case against Defendants, and abundant evidence that Defendant A.J. Rusciano II and his legal team went beyond normal and acceptable business and legal practice to drive a hard bargain and win their case, you did not take proper care and exhibit due diligence in gathering information. In fact, you have yet to provide clients with documented information about tax cert refunds, despite their frequent requests and the imminence of a closing.
- On or about From 12/12/02 to 6/18/03 you failed to practice law competently by failing to discover and document all the tax certiorari refunds that you told Plaintiffs they would share with Defendants. This is despite repeated efforts by Plaintiff Elizabeth Margrabe ("Plaintiff Margrabe") to have you obtain this information, and your assertion that you knew about it.
- On 6/18/03 you failed to practice law competently by inserting in the transcript that Plaintiffs would receive their share of all the tax certiorari refunds that you told them they would, and that David Warmflash swore in his affidavit of ***(date)*** that Plaintiffs should have, costing Plaintiffs hundreds of thousands of dollars.
- On or about 7/2/03 you (Michael) acted contrary to Plaintiff Margrabe's specific written and/or oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened Plaintiffs' negotiating position during settlement discussions.
- On or about 11/26/03 you failed to observe court protocol and serve a copy of your papers upon your named co-counsel in this case.
- On or about 12/12/03 you acted contrary to Plaintiff Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.
- From about 7/2/03 through about 11/28/03 you aggravated a potential conflict of interest between Plaintiffs, acting to favor Plaintiff Tony Rusciano ("Plaintiff Rusciano") over Plaintiff Elizabeth Margrabe ("Plaintiff Margrabe"), attempting to create an actual conflict of interest between Plaintiffs, threatening to act only for Plaintiff Rusciano, which would have been adverse to Plaintiff Margrabe's position, thereby terrifying and severely distressing your client.
- You misinformed Plaintiffs about the
- After 6/18/03 you failed to act competently to secure a speedy end to stalled settlement discussions and move the settlement to stipulation, order, and closing, costing Plaintiffs more than $125,000 in lost interest. Plaintiffs had to hire Philip Halpern, an outside counsel, to figure out how to use CPLR § 2104 to bring the dispute to a conclusion.
- Despite your need for help, you attempted to keep plaintiff Margrabe's other counsel from offering advice, after you repeatedly failed to guide your clients safely through allocutions and complete the settlement and







closing, and after Plaintiff Margrabe consequently hired attorneys Philip Halpern and Harry Lewis to help you do your job,

- You lied repeatedly to your clients about material facts related to the case, allocutions, and settlement discussions.

**Failed to Act Competently #1**

***Tax Certs***

1. A.J. Rusciano was notoriously lax about filing tax certiorari cases to obtain property tax refunds. Also, he was notorious for failing to maintain Rusciano property, leading to the loss of several tenants.

2. In about 1997 or 1998 Plaintiffs filed the tax cert cases for Rusciano & Son Corp. property in Pelham Manor. Since they were not receiving any money from Defendants, they assumed that the companies were having financial problems due to A.J. Rusciano's inattention to property management and laxity about property tax refunds.

3. Subsequently, Albert & Albert asked if they could take over the case and Plaintiffs consented.

4. In a letter, dated April 2, 2001, you told Plaintiffs that Joe Adrian, the professional appraiser that we used in this case, indicated that "the anticipated tax certiorari refunds for the three Pelham properties should total, in gross, somewhat in excess of $1,200,000.00." Mr. Adrian's statement indicated that this would be for years 1998 through 2001. Eventually, we learned that as of June 18, 2003 tax cert refunds for 1997 through 2002 had not been reflected in the corporate and partnership financial statements that Plaintiffs' counsel had pried from A.J. Rusciano.

5. On 12/12/02 I wrote you a message:

"Do you have complete data on all certioraris? Joe Adrian thinks A.J. could have a large sum in pending certioraris, of which Tony and Betty deserve a portion. They may have been unsettled since about 1997. If certs are for $1 million, then Tony and Betty deserve about $450,000."

6. On 12/13/02 I wrote you a message:

"1. Do we have all the relevant information on tax certs in which Rusciano & Son Corp. and/or any other Rusciano entities are plaintiffs for the past ten years? Our detective found certs for Town of Pelham for 1988 and 1997-2000, if I'm reading his report right. Anyway, I faxed the sheets to you, yesterday. Also, he found certs for Village of Pelham Manor for 1990 and 1998. What's going on with Mt. Vernon, New Rochelle, and Portchester?





"It appears to me that we should know the dates, amounts, dispositions, etc. for two reasons:

- In order to know the proper settlement. The more that we can show is at stake the more it makes sense for A.J. to settle on Tony and Betty, and the more it makes sense for T&B to demand.
- In order to be able to drag him through as many hot coals as possible, in front of the jury, when you get him on the witness stand.

"2. What do you think?"

7. On 12/13/02 you responded:

"Bill - In answer to your first question, we are aware of the pending tax cert proceedings. The New York State Unified Court System maintains a "Future Court Appearance System" website, listing the status of pending cases. There are a number of proceedings pending on behalf of Rusciano & Son Corp., Secor Lane Corp., Vinrus Corp. and VER Building Corp. Since these proceedings are public records - and since A.J. believes he is fully entitled to the compensation he is receiving from the Rusciano Companies - our sense is that he is not "pocketing" the money into accounts that do not belong to the Rusciano Companies. We can of course, subpoena records from the attorneys A.J. uses , to obtain details of theses proceedings. Don't forget, the cert proceedings are for the purpose of lowering the assessed value of the properties - and if we go to trial we want high values. Michael."

8. You never subpoenaed records about tax certs from any attorneys.

9. On February 3, 2004, Betty wrote you that she would like to know

"What are the dollars and cents to plaintiffs? What are the computations leading to this figure?"

10. On February 3, 2004, you replied, in relevant part:

"Josh Grauer has confirmed that the refunds have already been received. Accordingly, Tony and Betty are to receive their % share at the Closing. Prior to the closing, we are to be provided the closing statement from the Albert law firm, documenting the $ received, the expenses and plaintiffs net share. Obviously, we do not settle if we have questions regarding the calculations. My memory is the same as yours regarding the size of the refunds. The Court records indicate that the Rusciano and Son Corp proceedings for the years 1997,98,99 and 2000 all settled the same day, January 7, 2003 and the attorney for plaintiff was Albert & Albert."

11. On February 4, 2004, Betty replied, in relevant part:

"Betty would feel more comfortable if (a) the parties agreed before the next conference with Justice Donovan on sufficiently specific definitions of the "tax cert refunds" and "Rusciano Industrial Park", and (b) the draft order and stipulation of settlement contained precise definitions that could eliminate future litigation. We think that Justice Donovan would look with favor on clear definitions of these terms. As part of defining "tax cert refunds", she would like to know what happened to the tax cert proceedings (Rusciano & Son Corp v. Assessor, Town of Pelham et al.) for 2001 and 2002 and how they fit into the settlement."

12. On February 5, 2004, you replied, in relevant part:

"I agree that we must know exactly what Tony and Betty are to receive of the Net Tax Refunds prior to signing"







13. Finally, after four written requests and additional oral requests for tax cert information, after Plaintiffs lack of information on 6/18/03 about tax cert cases had resulted in a settlement that was hundreds of thousands of dollars less than you had led them to believe that it would be, you wrote a letter to Josh Grauer, requesting "a closing statement or other form of documentary evidence from Albert & Albert, concerning the details of the tax certiorari refunds." Talk about dragging one's feet, when it comes to closing the barn door after the horse has gotten out!

14. In The omissions and ambiguities in the June 18, 2003 settlement have cost the client hundreds of thousands of dollars.

15. Specifically, Justice Donovan now has ordered that your client won't get interest payments on the roughly $8.5 million settlement amount for the delay A.J. occasioned as he stalled the final written agreement from about July 18, 2003 past at least February 27, 2004. The cost of that lost interest to the client is about $125,000.

16. Second, Justice Donovan has ordered that your client gets a share of only one tax cert. Michael Present's complained in July 2003 that Josh Grauer's insistence on this was a "deal-breaker". Justice Donovan said that this is what the parties agreed on 6/18/03. Clearly David and Michael's misunderstanding of or inattention to the tax certs is bad by their admission, and their fault by Justice Donovan's ruling. David Warmflash's affidavit argues that all the Rusciano entity tax certs were part of the deal, but he and Michael were unable to get that on the record, so their clients lost it. The exact cost of that ruling to Mrs. Margrabe remains unclear, because you refused Bill Margrabe's repeated requests to demand documents and figures for all Rusciano entity tax certs from A.J. It is not unreasonable to estimate that the cost to plaintiffs of your failure to do due diligence could exceed $100,000. Based on the incomplete information that you have provided Mr. Margrabe so far, it could total as much as $500,000. Mrs. Margrabe doesn't know the precise cost of your miscue, because you refused Plaintiff Margrabe's repeated requests to gather complete and precise information about the tax certs.

17. Third, on 6/18/03, shortly before allocutions, David assured Plaintiff Margrabe that the settlement would not extinguish her claims against A.J. as a crooked trustee. Instead, during allocutions, opposing counsel dictated settlement of those same claims into the transcript without any additional consideration paid to Plaintiff Margrabe, and David did not contradict him. Mrs. Margrabe still doesn't know how many tens of thousands of dollars that cost her, because David put off demanding those figures both during disclosure, and later.



359-F

**Pushed Clients Hard toward Facilitating a Scheme for A.J. to Commit Tax Fraud**

18. On 9/9/03, after negotiations with Josh Grauer, you said that the other side had a really interesting idea, namely, that A.J. would pay all of Plaintiffs' attorneys and consultants. At first, you said that there was a tax advantage for Plaintiffs. Later, you withdrew that claim.

19. On 9/9/03 I never allocuted to any of the proposals on the table. Subsequently, I never agreed to those proposals.

20. On 11/17/03 Bill wrote for me:

> "#9 ZERO DOLLARS DEEMED REIMBURSEMENT FOR LEGAL FEES.
> "I don't want to renegotiate financial terms from 6/18/03, which was the last time the Parties agreed on anything, probably because of the vagueness and incompleteness of the terms "agreed". The subsequent history of discussions has been that of offers, rejections, and counter offers, getting exactly nowhere.
>
> "Contrary to your assertion, clearly Plaintiffs didn't make a deal on 9/9/03. We've discussed this, before, several times. For example, see my message, sent to you on Mon 9/15/03 at 1:56 AM."

21. On 11/17/03 you responded:

"I have said over and over, the allocation of any of the money [to reimbursement of legal fees, one supposes] does NOT effect [sic] the plaintiff's [sic] by one penny- we look silly (additionally, there is another reason for us not to complain- we I [sic] will explain in court)"

22. On 11/17/03 you responded:

In the hall, David explained that A.J. wanted to pay our legal fees, so he could deduct them for Rusciano Companies tax purposes, and that this was illegal.

**Acted Contrary to Specific Instructions**

***Documents (July 2, 2003)***

23. On July 2, 2003, contrary to Plaintiff Margrabe's specific written instructions, you sent important draft documents to opposing counsel <u>without</u> affording her (and her husband, Bill) any prior opportunity to review them and discuss them with you. In both cases, the drafts were replete with errors, as well as provisions that plaintiff Margrabe did not approve, because they were adverse to her.



359 - G





24. On June 19, 2003 Mrs. Margrabe provided you with detailed, written instructions to show her (and her husband, Bill) your draft documents for approval <u>before</u> showing them to opposing counsel:

> "Forward drafts of all settlement documents directly to [Bill] for his review, comments, and questions <u>before</u> sending them to, showing them to, or discussing them with, opposing counsel, or to any third party. You are <u>not</u> to propose terms in the settlement documents, <u>not</u> already presented to the court, unless Bill approves them."

25. In her letter of 6/19/03, Mrs. Margrabe also asked many detailed questions about what was going to be in the written agreement. She sent you this letter by e-mail, fax, and certified U.S.P.S. mail, return receipt requested.

26. Despite having received those written instructions on June 19, 2003, on or about July 2, 2003, without addressing Mrs. Margrabe's questions of June 19 in writing, as requested, and contrary to her clear, written instructions you sent Josh Grauer a draft settlement agreement that she and her husband, Bill, had not approved or even seen.

***Documents (January 29 2004)***

27. After that incident, Mrs. Margrabe retained attorney Philip Halpern to assist her in communicating between with you, and to assist you in preparing settlement and closing documents. In particular, he was to help define "commercially reasonable security", a concept that you clearly did not grasp. Mr. Halpern spoke with you about each draft document from July 3, 2003, through about January 29, 2004.

28. On or about January 29, 2004, you persisted in transmitting to opposing counsel another draft order and stipulation of settlement. That draft was replete with sloppily written, unedited language, needed clearer definition of certain terms, and was not a work product that she, or any of the other lawyers on the team, had seen or approved. This was <u>the second time</u> you directly disobeyed your client's written instructions about transmitting draft documents to the opposition. Why you would <u>again</u> send an unapproved and defective draft over to opposing counsel contrary to your client's express request to see it first is puzzling in the extreme.

***Payments***

29. On or about December 2, 2003, you disobeyed explicit oral and written instructions not to pay the bill that Alvin Goldstein, Esq., counsel to Defendants, submitted to Plaintiffs.

30. Instead, by your own admission in your message of 1/22/04, you paid it on your own authority:







"I believe that the fees paid others was the payment to Alvin Goldstein. If you recall, you and I agreed that the plaintiffs would pay ½ of alvin's fees for the mediation and aj would pay the other ½. When plaintiffs did not pay, I decided that it was in the plaintiffs' best interest not to alienate Alvin (who we may need at some time in the future...income bases of the stock, etc) so I had my firm pay his bill. I will check on the miscellaneous and respond "

That would have been fine, but you charged it to Plaintiffs. That was not fine, since Plaintiffs not only didn't authorize the payment, but also repeatedly told you orally and in writing not to pay it until they had determined that it was a valid bill.

**Aggravated a Potential Conflict of Interest between Plaintiffs**

On 9/15/03 you sent a message to Betty with the following language:

" Tony has advised us of his intention to proceed with the settlement as set forth in the Settlement Stipulation. Accordingly, it is imperative that Betty, Bill and Phil review the re-draft and advise us by no later than Wednsday, as to whether Betty desires to proceed with the settlement, or to preserve her claims. If Betty does not desire to proceed with the settlement, we will proceed to revise the Settlement Stipulation by deleting Betty as a party and by specifying that Tony is to be paid one-half of the amount which plaintiffs agreed to accept on June 18th and September 9th. Betty can then proceed to settle or prosecute her claims on such terms as she deems acceptable."

" Confirming our prior advice, we reiterate our concerns regarding conflicts of interest between Tony and Betty and reserve our right to seek relief from the court with respect to this matter. "

Your message was in fact an ambush that attempted to convert a potential conflict of interest into an actual conflict of interest by threatening to act as Tony's attorney in settling on your terms with A.J. and cutting plaintiff Margrabe loose to fend for herself. Your cynical plan had two objectives:

- You could jettison the less malleable plaintiff, who was becoming aware of your malpractice and incompetence, and retain the more malleable client, who often did not even look at your draft settlement papers, and who often heard of or received case papers from plaintiff Margrabe, rather than from plaintiff Rusciano's attorneys.
- You would retain the client who owned the valuable, "Class A", voting shares, after his sister, with her "Class B", non-voting shares, and her husband had financed plaintiff Rusciano's case with a loan of about $500,000, based on the agreement to split settlement proceeds, equally.

**Failed to Act Competently #2**

***Closing***

31. You've wasted more than seven months wrangling with A.J. over the omissions and ambiguities in the settlement language you read into the record on June 18, 2003. Relying on your legal advice to her, Plaintiffs allocuted to that settlement. Plaintiff Margrabe understands that she's bound by her allocutions.



359 -T



What she doesn't understand is why you permitted opposing counsel to dictate into the record, unchallenged, concessions that (a) were adverse to her, (b) were not in the deal as you had explained it to her, (c) were contrary to even your understanding of the deal, and (d) which allowed A.J. to drag out settlement discussions and use more than $8 million of Plaintiffs' money for free from about 7/18/03 through at least 2/27/04. Judge Donovan now has pointed out and given force to these ill-advised concessions.

**Interference with Other Attorneys**

After your repeated bungling, Betty hired other attorneys to help you do a competent job. You tried to keep them away from their clients at crucial moments when plaintiff Margrabe would have to make decisions.

32. After June 18, 2003, Mrs. Margrabe was forced to engage additional legal and business experts to assist you in concluding the negotiations.

33. One expert was Harry D. Lewis, now a named attorney in this case. Mr. Lewis has many years experience as a bankruptcy lawyer. This expertise was essential to Plaintiffs, since any default on Defendants' obligations to Plaintiffs would involve bankruptcy of some or all Rusciano entities and Defendant A.J. Rusciano.

34. On September 9, 2003 you were discourteous to Mr. Lewis in the courthouse in White Plains. You tried to discourage plaintiff Margrabe from having Mr. Lewis in the conference by lobbying plaintiff Margrabe's husband. On about that date you sent a letter to Mr. Lewis, asking him to "reconsider his position". **(get the quote)** Subsequently, you did not send your draft papers to Mr. Lewis for rewiew **except for ???** You did not serve Mr. Lewis with motion papers, which even defense counsel Josh Grauer did.

35. Her experts reviewed every motion, affidavit, and draft document you sent to the other side from July 3, 2003 to January 28, 2004.

36. Mr. Halpern proposed using CPLR Rule 2104(a?) to bring the ineffective settlement discussions to an end by asking Justice Donovan to complete the incomplete transcript.

37. Mr. Halpern and Mr. Lewis made numerous corrections and improvements to the draft stipulations that Mr. Present produced.

38. Mr. Lewis prepared a legal brief on "commercially reasonable security" and agreed to represent plaintiff Betty at conferences before Justice Donovan, providing a pair of trusted eyes, so plaintiff Betty could have a better idea of what Plaintiffs' attorneys David and Michael were saying in the conferences, since their accounts were becoming increasingly difficult to believe.







- You induced Phil Halpern not to show up on 9/9/03, on the pretext that Betty's attorney would show that the clients were divided, and upon the promise that you would keep him apprised of all facts, as he sat in his office, a few blocks away. You did not keep him in the loop. In an insulting fashion you kept him in the dark about the conference for more than a day, and you did not call him until after Betty had repeatedly urged you to do so.

We know that your expression of concern about showing divided clients was only a pretext, because within one week you were threatening to settle for one client, only.

You wrote your "buzz off" letter to Harry Lewis.

"quote"

**Lied to Clients**

On September 15, 2003, you wrote Betty:

"On September 9th, at Justice Donovan's "insistence," there was a clarification of two issues, namely the inclusion of the remaining (Secor and Vinrus) tax cert refunds and the allocation of the settlement amount as between "damages" and the "purchase price" for plaintiffis interests. Once again, we and both clients agreed to the clarification of these issues, including the accelerated payment scenario."

By information and belief, this was not "Justice Donovan's clarification". It was, instead, the result of unauthorized and unapproved negotiation by Plaintiffs' attorneys for the benefit of Plaintiffs' attorneys. Plaintiffs received some of the tax certs that their attorneys had told them before allocutions that they would get, anyway. Thus, Plaintiffs' attorney covered the tracks of their failure to perform at allocutions. Plaintiffs traded away some unknown amount of "purchase price" for "damages".

The statement that "we and both clients agreed to the clarification" is a lie. The clients didn't allocute, and at least plaintiff Betty never agreed to the "results" of 9/9/03. After this date you have repeatedly lied and claimed that she approved this, when she didn't, and she repeatedly told you that she hadn't approved it.

**Acted in Favor of Defendant's Attorney, Adverse to Client(s)**

On September 15, 2003, you wrote Betty:

"On September 9th, at Justice Donovan's "insistence," there was a clarification of two issues, namely the inclusion of the remaining (Secor and Vinrus) tax cert refunds and the allocation of the settlement amount as between "damages" and the "purchase price" for plaintiffis interests.







Once again, we and both clients agreed to the clarification of these issues, including the accelerated payment scenario."

By information and belief this "clarification" was an attempt by you to negotiate yourself out of a malpractice lawsuit, since you knew that you had inexcusably and incompetently failed to include the Secor and Vinrus tax cert refunds in the allocutions of 6/18/03.

In order to get that concession from Defendant for yourself, you offered A.J. the option to prepay, in which case "(b) the sum of $1,000,000 shall be allocated as payment by Defendants to Plaintiffs of damages recovered pursuant to the Rusciano Litigation." This would save A.J. some $300,000 in taxes and cost Plaintiffs some $300,000, both as rough approximations.

On 9/15/03 you wrote Betty:

"We are sending you a re-draft of the Settlement Stipulation which incorporates the agreed upon settlement terms ..."

That was a lie, because A.J. did not agree to those terms and that draft order and stipulation of settlement contained the following, which Betty and Tony had never approved, read, or even heard:

"6.3 Rusciano and Son Corp. may sell any or all of its real property on whatever terms the corporation and/or A.J. Rusciano deems appropriate, subject, however, to the understanding that upon the sale of **a majority of Rusciano and Son Corp.'s property** (whether in one transaction or in a series of transactions) the entire remaining balance of the Total Purchase Price shall accelerate and become due and payable at the closing on the sale of such property. " (emphasis added)

39. On or about September 15, 2003, when you delivered your ultimatum threatening to abandon her as a client if she did not agree to the draft order and stipulation of settlement that you falsely claimed A.J. and Tony had approved[1] (which draft made concessions to the other side which Mr. and Mrs. Margrabe believed to be directly contrary to Mrs. Margrabe's interests, and major one of which neither Mrs. Margrabe nor her brother were aware, before Mr. Margrabe discovered them upon reading the draft), you were happy to hand over a copy of that document for her consideration. Your false representation to Mrs. Margrabe that [WE CAN'T DOCUMENT THIS QUOTE]"A.J. and Tony have agreed to this

---

[1] I'm not sure that we can document that Michael had claimed that A.J. had approved the settlement. That was implied, not explicit. Michael said that Tony would "proceed with the settlement", which seems to indicate that A.J. was on board. Michael wrote: " Tony has advised us of his intention to proceed with the settlement as set forth in the Settlement Stipulation. Accordingly, it is imperative that Betty, Bill and Phil review the re-draft and advise us by no later than Wednesday, as to whether Betty desires to proceed with the settlement, or to preserve her claims. If Betty does not desire to proceed with the settlement, we will proceed to revise the Settlement Stipulation by deleting Betty as a party and by specifying that Tony is to be paid one-half of the amount which plaintiffs agreed to accept on June 18th and September 9th. Betty can then proceed to settle or prosecute her claims on such terms as she deems acceptable."



359-L



proposal, and you [Mrs. Margrabe] are the only holdout" was exposed after A.J. rejected it outright.

40. As part of that fraudulent scheme, you also threatened to proceed to settlement as Tony's lawyer alone, dividing your clients against themselves, and precipitating an egregious, actual conflict of interest between them. Your motivation for these extremely rough tactics seems to have been forcing a settlement that protected your fees, oblivious to the impact upon your own client. [One reason to believe this is that on 9/9/03 they came, breathless as school girls, into the courtroom, where Tony, Betty, and I sat, and the first substantial words out of their mouths were that the other side had an innovative idea, where A.J. would pay the S&W fees!]

41. In December, 2003, David acted against direct instructions to his firm, not to pay Alvin Goldstein without Betty's approval. When asked why a certain charge was on Betty's and Tony's statement for 12/03, David said that he had decided to pay Alvin. Of course, he had no authority to make such a decision, and had instructions not to make that payment without Betty's approval. The charge exceeds any statement of Alvin's charges that Betty has seen, and David has not kept his promise to explain the discrepancy. Betty declines to ratify David's payment to Alvin and disputes the idea that she should compensate David or S&W for David's insubordinate payment to Alvin.

42. As late as January, 2004, you persist in playing Mrs. Margrabe off againstTony, her co-plaintiff and her own brother, in writing. Aren't you aware that this tactic also disqualifies you from continuing with Tony's representation? [Which incident do you have in mind as an example?]

43. Under these circumstances, do you wonder why Mrs. Margrabe would want to review your work product before it goes over to the other side, and why your repeated violations of her specific, written instructions to this effect would be grounds for termination "with cause" (together with the other grounds already mentioned)?



359-M

**Crystal Massarelli**

2/8/04

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Sunday, February 08, 2004 8:36 AM
**To:** 'William Margrabe'
**Subject:** RE: Termination and Getting Money

We'll talk later.

-H

---

**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Sunday, February 08, 2004 7:13 AM
**To:** Harry Lewis, Esq.
**Subject:** Termination and Getting Money

Harry

I am laboring mightily on the termination letter. I think we can make the case. I'm concerned that what I've written is so much (eleven pages) and points out so many of their heinous acts (about a dozen) that it looks unfair. You'll need to edit it into a document that works.

I'm thinking that the way to go is for Betty to give me power of attorney and for me to send the termination letter. I wonder if it is possible to shield her from cross-examination by having her power of attorney. If possible, would it be desirable, or would it strengthen the S&W argument that I'm the anti-Christ?

I have a couple ideas for demanding immediate payment by Defendants of sizable amounts of cash. However, I don't want to mention them to Michael, for obvious reasons. Nor do I want to mention them to Phil, because I don't want them to get to Michael.

1. If you look at the proceedings of 6/18/03, page 12, it says

"In addition, it has been agreed by Anthony J. Rusciano and Rusciano & Son Corp., that when a tax certiorari refund is received by Rusciano & Son Corp., in connection with the proceeding commenced and settled by Eugene Albert, MAI and Esq., after payment of attorney's fees, and tenant reimbursements, the defendants, Rusciano & Son Corp. by Anthony J. Rusciano, II agree to immediately remit, after the deduction from the gross sum of the attorney's fees taken by Eugene Albert and after deduction of tenant reimbursements, Mr. Rusciano shall calculate 37.12 percent of those tax certiorari proceeds. And shall immediately send a check for 37.12 percent of those tax certiorari proceeds to the plaintiffs' attorneys for distribution to the plaintiffs."

Based on the above quote, I was going to ask Michael to demand immediate payment of the tax cert money, since the Transcript doesn't say that there needs to be a written settlement. Anyway, that's the argument. However, I don't want to try this until we fire S&W. I don't want them collecting the money, which would be used to pay their bills, first thing.

Josh's affidavit of 11/21/03 contains additional grist:

"... Defendants respectfully submit the Court should enforce the clear terms of the Stipulation of Settlement and declare that the initial payment of one million two hundred and fifty thousand dollars shall be paid by Defendants to Plaintiffs within thirty days of the signing of a formal settlement agreement consistent with the Stipulation (or within 30 days of a Decision on the Motion) ..."

Since Justice Donovan's order came down on 1/26/03, does this not mean that A.J. should pay $1,250,000 by 2/25/03? Isn't Josh estopped from arguing against this demand for money?

FYI:



245





**Crystal Massarelli**

---

**From:** William Margrabe [bill@margrabe.com]
**Sent:** Monday, February 09, 2004 12:54 AM
**To:** Harry Lewis
**Subject:** RE: Termination and Getting Money

**Tracking:** **Recipient** **Read**
Harry Lewis Read: 2/9/2004 9:19 AM

Harry

Also, here's an idea. Perhaps we mention in the termination letter that S&W must withdraw as Tony's counsel and escrow agent.
"Although in a technical, legal sense plaintiffs Tony Rusciano and Margrabe could have distinct escrow agents, as a practical matter Mrs. Margrabe's interests secure the notes for both plaintiffs, and so do Tony Rusciano's interests. Given the past losses that Plaintiffs have suffered due to your carelessness, Mrs. Margrabe cannot afford to let you be responsible for millions of dollars of Tony Rusciano's interests."

I will be looking for trust departments who might serve as escrow agents, because Phil wants indemnity against making a stupid mistake. Reasonable for him, but maybe not reasonable for Betty. That is, let's see what J.P. Morgan Chase says.

Bill
tel 914-738-3309
Bill@Margrabe.com

290





## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Monday, February 09, 2004 2:56 PM
**To:** 'William Margrabe'
**Subject:** Draft Termination letter

See attached. I've tried to hit the major points, while eliminating the "backup" evidence for now. (That would be presented to the Court at the hearing.)

Comments?

-H







"Bill - In answer to your first question, we are aware of the pending tax cert proceedings. The New York State Unified Court System maintains a "Future Court Appearance System" website, listing the status of pending cases. There are a number of proceedings pending on behalf of Rusciano & Son Corp., Secor Lane Corp., Vinrus Corp. and VER Building Corp. Since these proceedings are public records - and since A.J. believes he is fully entitled to the compensation he is receiving from the Rusciano Companies - our sense is that he is not "pocketing" the money into accounts that do not belong to the Rusciano Companies. We can of course, subpoena records from the attorneys A.J. uses , to obtain details of theses proceedings. Don't forget, the cert proceedings are for the purpose of lowering the assessed value of the properties - and if we go to trial we want high values. Michael."

William Margrabe,President
The William Margrabe Group, Inc.
31 Priory Lane
Pelham Manor, NY 10803

tel 914-738-3309
fax 914-738-3923
bill@margrabe.com
http://www.margrabe.com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Wednesday, February 11, 2004 9:28 AM
**To:** 'William Margrabe'
**Subject:** Answers to questions about termination letter

The answers to your questions are as follows:

1. We can address the letter jointly to David and Michael.
2. I actually intend topical organization, with chronology within each topic as best we can arrange it. This is imperfect, because there is overlap among topics and chronologies (as you note), but it makes the legal points more forcefully.
3. We'll include a bullet point about the 9/9/03 proposal that A.J. pay their fees. As the outline from N.Y. Jur. 2d I gave you points out, such agreements are inherently suspect, and subject to close scrutiny by the courts.
4. We'll include a bullet point about the 9/15 25%/50% proposal.
5. We'll include a bullet point about David's urging Betty to assist A.J.'s intended tax fraud.
6. As to "angering" Tony, firing these guys likely will do that anyway, and Betty should be prepared for such an outburst. Tony's rage will be the lesser of two evils.
7. To bounce them from representation of Tony, we must unequivocally claim the conflict was "actual", and I absolutely believe it became actual when they began playing Tony off against Betty for their own self-interest.
8. I usually use numbers, but bullet points do have a certain impact if there aren't too many of them. We'll switch over.
9. Didn't David clearly acknowledge your requests for more tax cert information, and say he would handle it later, rather than saying it was invalid or unnecessary? (an implied acknowledgement of validity)?
10. I'll qualify the statement about exacerbating divisions to protect their fee to clarify this point.
11. As to any alleged damage caused by my involvement, I told them and Josh I was a bankruptcy lawyer engaged to protect my client against the possibility of an A.J. bankruptcy. I didn't impede that conference by asking Josh my question about whether A.J. was solvent, or the subsequent exchange of papers that subsequently occurred, nor did I influence the judge's decision. Phil made the CPLR 2104 recommendation, not me.
12. Technically, you could call the agreement read into the record a "stipulation", although the term usually refers to a legal agreement about the facts of a case, rather than a settlement agreement. We'll change the wording slightly.

762





13. I would prefer not to dwell on the failure to serve me with papers. I don't want to become a witness if it can be avoided.

14. Your comments are very helpful. Thank you.

#141

**Unknown**

---

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Wednesday, February 11, 2004 11:00 AM
**To:** 'William Margrabe'
**Subject:** Transmittal of revised termination letter
**Attachments:** Termination Letter 2-11-04.doc

See attached revision (we're getting there!)

-H




[letterhead]

February 10, 2004

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe v. Rusciano et al.; Index No. 10032/2001, Termination of employment of law firm of Sexter & Warmflash, P.C. as counsel to Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my spouse, Elizabeth Margrabe, I hereby terminate the employment of the law firm of Sexter & Warmflash with cause in the above-styled litigation and related negotiations.

Further, on behalf of my spouse, Elizabeth Margrabe, I object to Sexter & Warmflash's continuing representation of her co-plaintiff and brother, Tony Rusciano, because of an actual conflict of interest which you yourselves have repeatedly noted, as well as an additional conflict of interest (between Sexter & Warmflash itself and its own clients in this case) which you have failed to mention. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Mrs. Margrabe has terminated your employment for the following causes:

1. From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays and a chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

**Formatted:** Centered

**Deleted:** [Just some thoughts: ¶ Is organization chronological, by topic, or an optimal combination of the two approaches?¶ I thought their giddy proposal on 9/9/03 that A.J. pay their fees (all fees) was unseemly. They held onto that as tenaciously as the BOE held onto keeping Charlie Wilson's office across the hall from the door to the boys' locker room door.

**Deleted:** <#>The surprise provision on 9/15/03 that A.J. could sell 25%?/50% of Son Corp. property, without triggering acceleration was really bad.¶ <#>David seemed eager to have Plaintiffs facilitate A.J.'s tax fraud. He showed guilty knowledge by saying he would tell me at the courthouse, but wouldn't put it in writing. It made me queasy, because I knew that he had a history of "suborning" illegitimate actions and letting other parties hold the bag, as with his employee, who illegally notarized a document that he handed her. ¶

**Deleted:** [What about David?]

**Deleted:** r.

**Deleted:** [What about David?]

**Deleted:** [1]

**Deleted:** I my spouse

**Deleted:** s

**Deleted:** f

**Deleted:** [2]

**Formatted:** Indent: Left: 0.25", No bullets or numbering

**Deleted:** ¶

**Deleted:** [Why do you use bullets and not paragraph numbers? They might help you to refer to other paragraphs. Maybe you don't do that.

**Deleted:**

**Deleted:** ]¶ From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony ... [1]

**Deleted:**

**Deleted:** and corporate looting over a decade, to "do the honorable ... [2]

**Deleted:** experienced

**Deleted:** litigators;[4]¶ ¶

**Formatted:** Bullets and Numbering




2. For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

Formatted: Bullets and Numbering

3. As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

Formatted: Bullets and Numbering

4. As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries, who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade, to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

Formatted: Bullets and Numbering

5. As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

Formatted: Bullets and Numbering

6. Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

Deleted: <#>¶

Formatted: Bullets and Numbering

Deleted:

7. Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

Deleted: <#>¶

Formatted: Bullets and Numbering

Deleted:

8. Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests.

Formatted: Bullets and Numbering

9. On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting

Formatted: Bullets and Numbering



141 - R



or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

10. On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed as trustee of trusts created under the wills of several relatives would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients thousands of dollars in the final settlement.

Formatted: Bullets and Numbering

11. After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR 2104 to bring the dispute to a conclusion.

Formatted: Bullets and Numbering

12. On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

Formatted: Bullets and Numbering

13. From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you by threatening to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby deliberately leveraged a conflict of interest between Plaintiffs to extract negotiating concessions from Elizabeth, adverse to her interests, that the desperate Tony, who was more vulnerable financially than his sister, was prepared to make on your advice alone. Your threat to abandon representation of her inflicted severe mental distress and sheer terror upon your client at that time.

Formatted: Bullets and Numbering

Formatted: Underline

14. In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fess, loans, and interest. You then attempted to exploit the divisions which you exacerbated by directly suggesting

Formatted: Bullets and Numbering



141-C




that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

15. The strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement. You abused your leverage as sole counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process which would expedite a settlement redounding to your firm's financial benefit at least, if not to the benefit of your clients.

Formatted: Bullets and Numbering

Formatted: Underline

16. Some of the concessions you offered to your adversaries ensured payment of your fees while consigning your client to likely insolvency.

Formatted: Bullets and Numbering

17. On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

Formatted: Bullets and Numbering

18. The fact that A.J. intended to take an illegal tax deduction for such a payment, and that your clients would be knowingly colluding in such an arrangement to cheat the taxing authorities upon your advice, seemed to bother you not in the least.

Formatted: Bullets and Numbering

19. On September 15, 2003, you presented a proposal under which A.J. could liquidate a large percentage (25% to 50%) of the real estate at issue without paying your clients. Even your strategy of offering concessions which the Defendants had not even requested failed to conclude the process. In short, you could not close the deal even upon the most abject terms, and apparently were unaware of your clients' right to approach the judge for relief.

Formatted: Bullets and Numbering

20. Only after Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did Mr. Halpern suggest an approach that allowed Judge Donovan to break the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to the client of Mr. Halpern's (and Mr. Lewis's) time and expenses.

Formatted: Bullets and Numbering






21. On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

22. On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23. Despite your obvious quandary, for which you continued to bill your hapless clients, Mr. Warmflash showed aggressiveness in telling Mr. Halpern and Mr. Lewis to "back off" that he never displayed to opposing counsel.

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all legal services, loans, interest, and other charges you assert are due and owing directly to your clients. Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,

William Margrabe

Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

**Formatted:** Bullets and Numbering

**Formatted:** Bullets and Numbering

**Formatted:** Bullets and Numbering

**Deleted:** ¶
Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement[5] of the validity of these requests.¶
¶
On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds as part of the settlement dictated into the record on that date, you neglected to dictate in open court the provisions necessary to accomplish this goal

**Deleted:** at that time

**Deleted:** , instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.¶
¶
On June 18, 2003, after assuring your clients that they would be able to pursue lawsuits against A.J. R... [3]

**Deleted:** ¶
On or about July 2, 2003 you (Michael) acted contrary to Pla... [4]

**Deleted:** created, or

**Deleted:** threatened to create

**Deleted:** ,

**Deleted:** an actual conflict of interest between Plaintiffs to extract further concessions from your ... [5]

**Deleted:**

**Deleted:** The strategy was egregiously cynical, coming as it did in the midst of delicate settleme... [6]

**Deleted:** to

**Deleted:** Judge Donovan to break

**Deleted:** about

**Deleted:** the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, an... [7]

**Deleted:** [13]

**Deleted:** [Would David go here? Would the letter be addressed to Michael and David?]



Page 1: [1] Deleted Harry Lewis 2/11/2004 9:32:00 AM

]
From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays and a chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file, immediately, although you had already filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.[1]

As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever;

As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries, who stood accused of breach of fiduciary duty, self-dealing,

Page 1: [2] Deleted Harry Lewis 2/11/2004 9:39:00 AM

and corporate looting over a decade, to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part, displaying a naivete astonishing in a firm who claimed to be

Page 5: [3] Deleted Harry Lewis 2/11/2004 9:57:00 AM

, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

On June 18, 2003, after assuring your clients that they would be able to pursue lawsuits against A.J. Rusciano II as an unfaithful trustee of trusts created under the wills of several relatives, you neglected to dictate in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients thousands of dollars in the final settlement.[2]

Page 5: [4] Deleted Harry Lewis 2/11/2004 10:05:00 AM

---

[1] Harry, FYI and possible future use, Josh noted this similarity in his reply to their complaint.

[2] Since S&W steadfastly refused to discover any information about the extent to which A.J. Rusciano II had abused his position as Betty's and Tony's trustee, they cannot demonstrate a precise dollar cost to them of his actions.

111 – F



On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

[Seems out of CHRONOLOGICAL order, which may not be relevant.] On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This was bad because ...

From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you by threatening to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby deliberately

**Page 5: [5] Deleted** **Harry Lewis** **2/11/2004 9:59:00 AM**

an actual conflict of interest between Plaintiffs to extract further concessions from your own clients in the negotiations with your adversaries to ensure that you would receive your fee.[3] Your threat to abandon representation of her inflicted severe mental distress and sheer terror upon your client at that time.

In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force a settlement upon terms advantageous to your law firm, if not to her and her brother. You then attempted to exploit the divisions which you exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

**Page 5: [6] Deleted** **Harry Lewis** **2/11/2004 9:59:00 AM**

The strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of

[3] How does this work? Does it matter if we can't "prove" this? "The Jesuits benefit from the excesses of their enemies, who say, 'The Jesuits killed three men and a dog.' Then they trot out the dog and say what liars their enemies are."

141- G

record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement.[4] You abused your leverage as an "indispensable" participant in those negotiations to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process which you hoped would result in a settlement redounding to your firm's benefit at least, if not to the benefit of your clients.

Further, you exploited Tony Rusciano's financial desperation by making, or offering to make, concessions to your adversaries which ensured payment of your fees while consigning your client to likely insolvency. Even your strategy of offering concessions which the Defendants had not even requested[5] failed to conclude the process. In short, you could not close the deal even upon the most abject terms, and apparently were unaware of your clients' right to approach the judge for relief.

Only after Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did Mr. Halpern suggest an approach that allowed

**Page 5: [7] Deleted** **Harry Lewis** **2/11/2004 10:00:00 AM**

the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to the client of Mr. Halpern's (and Mr. Lewis's) time and expenses.
[I think it might be possible to blend the paragraphs above and below this line. Part of the second of these paragraphs seems chronologically prior.]
After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the settlement to written stipulation[6], order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR 2104 to bring the dispute to a conclusion.

---

[4] I'm sure they are going to say we damaged things when we sent you to the conference. I think that claim is beyond wrong, well into the absurd territory, and they can't point to one damned problem. Betty didn't trust them and needed eyes and ears in the room, so no more mysterious results occurred. In fact, we were soon in motions re CPLR 2104 to end this thing. Josh did mention the extra attorney that indicated that parties were not "on the same page". As far as I know the only evidence of that is that when you expressed concern that A.J. didn't have the money, David sneered at you. Of course, he should have expressed concern, too.

[5] Which concessions were not requested?

[6] Wasn't the transcript an oral stipulation?

141-H

Despite your obvious quandary, for which you continued to bill your hapless clients, you[7] showed aggression in telling Mr. Halpern and Mr. Lewis to "back off" that you never displayed to opposing counsel.[8] You even refrained from serving Mr. Lewis, a named counsel in the case, with important motion papers and drafts, etc.

---

[7] Didn't David do most of the telling to "back off"? I asked Phil if S&W had tried to get him to "back off", and he denied it. However, I think that they clearly tried to freeze him out of the 9/9/03 meeting. First, they picked a day for conference when he wasn't available. Then, they said that his presence would "send the wrong message", with which Phil agreed. Then, they tried to get allocution without Betty speaking with Phil, which had been the plan.

[8] We weren't flies on the wall, but the correspondence seems exceedingly gentlemanly with Josh, who apparently pulled a fast one and if you believe David, lied.

141- I

**Crystal Massarelli**

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Wednesday, February 11, 2004 11:00 AM
**To:** 'William Margrabe'
**Subject:** Transmittal of revised termination letter

See attached revision (we're getting there!)

- H

2/11



[letterhead]

February 10, 2004

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe v. Rusciano et al.; Index No. 10032/2001,Termination of employment of law firm of Sexter & Warmflash, P.C. as counsel to Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my spouse, Elizabeth Margrabe, I hereby terminate the employment of the law firm of Sexter & Warmflash with cause in the above-styled litigation and related negotiations.

Further, on behalf of my spouse, Elizabeth Margrabe, I object to Sexter & Warmflash's continuing representation of her co-plaintiff and brother, Tony Rusciano, because of an actual conflict of interest which you yourselves have repeatedly noted, as well as an additional conflict of interest (between Sexter & Warmflash itself and its own clients in this case) which you have failed to mention. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Mrs. Margrabe has terminated your employment for the following causes:

1. From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays and a chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

**Formatted:** Centered

**Deleted:** [Just some thoughts: ¶
Is organization chronological, by topic, or an optimal combination of the two approaches?¶
I thought their giddy proposal on 9/9/03 that A.J. pay their fees (all fees) was unseemly. They held onto that as tenaciously as the BOE held onto keeping Charlie Wilson's office across the hall from the door to the boys' locker room door.
... [1]

**Inserted:** [Just some though ... [2]

**Deleted:** <#>The surprise ... [3]

**Deleted:** [What about David?]

**Inserted:** [What about David?]

**Deleted:** r.

**Deleted:** [What about David?]

**Deleted:** [1]

**Deleted:** I my spouse

**Deleted:** s

**Deleted:** f

**Deleted:** [2]

**Inserted:** [2]

**Deleted:** ¶

**Formatted** ... [4]

**Deleted:** [Why do you use bul ... [5]

**Inserted:** [Why do you use bu ... [6]

**Formatted:** Bullets and Numbering

**Deleted:**

**Deleted:** ]¶ ... [7]

**Inserted:** ]

**Inserted:** ,

**Inserted:** which both of them ... [8]

**Inserted:** [3]

**Inserted:** ;

**Deleted:**

**Deleted:** and corporate lootin ... [9]

**Deleted:** experienced

**Deleted:** litigators;[4]¶ ... [10]

**Inserted:** [4]







2. For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

Formatted: Bullets and Numbering

3. As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

Formatted: Bullets and Numbering

4. As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries, who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade, to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

Formatted: Bullets and Numbering

5. As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

Formatted: Bullets and Numbering

6. Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

Deleted: <#>¶

Formatted: Bullets and Numbering

Deleted:

7. Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

Deleted: <#>¶

Formatted: Bullets and Numbering

Deleted:

8. Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests.

Formatted: Bullets and Numbering

9. On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting

Formatted: Bullets and Numbering







or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

10. On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed as trustee of trusts created under the wills of several relatives would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients thousands of dollars in the final settlement.

Formatted: Bullets and Numbering

11. After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR 2104 to bring the dispute to a conclusion.

Formatted: Bullets and Numbering

12. On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

Formatted: Bullets and Numbering

13. From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you by threatening to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby deliberately leveraged a conflict of interest between Plaintiffs to extract negotiating concessions from Elizabeth, adverse to her interests, that the desperate Tony, who was more vulnerable financially than his sister, was prepared to make on your advice alone. Your threat to abandon representation of her inflicted severe mental distress and sheer terror upon your client at that time.

Formatted: Bullets and Numbering

Formatted: Underline

14. In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fess, loans, and interest. You then attempted to exploit the divisions which you exacerbated by directly suggesting

Formatted: Bullets and Numbering









that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

15. The strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement. You abused your leverage as sole counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process which would expedite a settlement redounding to your firm's financial benefit at least, if not to the benefit of your clients.

**Formatted:** Bullets and Numbering

**Formatted:** Underline

16. Some of the concessions you offered to your adversaries ensured payment of your fees while consigning your client to likely insolvency.

**Formatted:** Bullets and Numbering

17. On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

**Formatted:** Bullets and Numbering

18. The fact that A.J. intended to take an illegal tax deduction for such a payment, and that your clients would be knowingly colluding in such an arrangement to cheat the taxing authorities upon your advice, seemed to bother you not in the least.

**Formatted:** Bullets and Numbering

19. On September 15, 2003, you presented a proposal under which A.J. could liquidate a large percentage (25% to 50%) of the real estate at issue without paying your clients. Even your strategy of offering concessions which the Defendants had not even requested failed to conclude the process. In short, you could not close the deal even upon the most abject terms, and apparently were unaware of your clients' right to approach the judge for relief.

**Formatted:** Bullets and Numbering

20. Only after Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did Mr. Halpern suggest an approach that allowed Judge Donovan to break the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to the client of Mr. Halpern's (and Mr. Lewis's) time and expenses.

**Formatted:** Bullets and Numbering








21. On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

22. On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23. Despite your obvious quandary, for which you continued to bill your hapless clients, Mr. Warmflash showed aggressiveness in telling Mr. Halpern and Mr. Lewis to "back off" that he never displayed to opposing counsel.

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all legal services, loans, interest, and other charges you assert are due and owing directly to your clients. Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,

William Margrabe

Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

Formatted: Bullets and Numbering
Formatted: Bullets and Numbering
Formatted: Bullets and Numbering
Deleted: ¶ Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement[5] of the validity of these requests.¶ ¶ ... [11]
Inserted: [5]
Inserted: in open court
Deleted: at that time
Deleted: , instead permitting ... [12]
Inserted: On June 18, 2003 ... [13]
Deleted: ¶ ... [14]
Deleted: an actual conflict o ... [15]
Inserted: [7]
Deleted:
Deleted: The strategy was ... [16]
Deleted: Judge Donovan to break
Inserted: [Seems out of ... [17]
Inserted: On or about Janua ... [18]
Deleted: created, or
Deleted: threatened to create
Deleted: ,
Inserted: [8]
Inserted: [9]
Inserted: that allowed
Deleted: to
Inserted: to break
Deleted: about
Deleted: the impasse. With ... [19]
Inserted: [I think it might be ... [20]
Inserted: written
Inserted: [10]
Inserted: [11]
Inserted: [12] You even refrain ... [21]
Deleted: [13]
Inserted: [13]
Deleted: [Would David go he ... [22]
Inserted: [Would David go h ... [23]








**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Wednesday, February 11, 2004 9:28 AM
**To:** 'William Margrabe'
**Subject:** Answers to questions about termination letter

The answers to your questions are as follows:

1. We can address the letter jointly to David and Michael.
2. I actually intend topical organization, with chronology within each topic as best we can arrange it. This is imperfect, because there is overlap among topics and chronologies (as you note), but it makes the legal points more forcefully.
3. We'll include a bullet point about the 9/9/03 proposal that A.J. pay their fees. As the outline from N.Y. Jur. 2d I gave you points out, such agreements are inherently suspect, and subject to close scrutiny by the courts.
4. We'll include a bullet point about the 9/15 25%/50% proposal.
5. We'll include a bullet point about David's urging Betty to assist A.J.'s intended tax fraud.
6. As to "angering" Tony, firing these guys likely will do that anyway, and Betty should be prepared for such an outburst. Tony's rage will be the lesser of two evils.
7. To bounce them from representation of Tony, we must unequivocally claim the conflict was "actual", and I absolutely believe it became actual when they began playing Tony off against Betty for their own self-interest.
8. I usually use numbers, but bullet points do have a certain impact if there aren't too many of them. We'll switch over.
9. Didn't David clearly acknowledge your requests for more tax cert information, and say he would handle it later, rather than saying it was invalid or unnecessary? (an implied acknowledgement of validity)?
10. I'll qualify the statement about exacerbating divisions to protect their fee to clarify this point.
11. As to any alleged damage caused by my involvement, I told them and Josh I was a bankruptcy lawyer engaged to protect my client against the possibility of an A.J. bankruptcy. I didn't impede that conference by asking Josh my question about whether A.J. was solvent, or the subsequent exchange of papers that subsequently occurred, nor did I influence the judge's decision. Phil made the CPLR 2104 recommendation, not me.
12. Technically, you could call the agreement read into the record a "stipulation", although the term usually refers to a legal agreement about the facts of a case, rather than a settlement agreement. We'll change the wording slightly.
13. I would prefer not to dwell on the failure to serve me with papers. I don't want to become a witness if it can be avoided.
14. Your comments are very helpful. Thank you.



#39

...argrabe [bill@margrabe.com]
**Sent:** ...hursday, February 12, 2004 4:36 AM
Harry Lewis
RE: Transmittal of revised termination letter
**Attachments:** Termination Letter 2-12-04.doc

**Recipient Read**
Harry Lewis Read: 2/12/2004 5:56 PM

My 2/12/04 draft.

...com

-----Original Message-----
**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Wednesday, February 11, 2004 11:00 AM
'William Margrabe'
Transmittal of revised termination letter

See attached revision (we're getting there!)

-h




31 Priory Lane
Pelham Manor, New York 10803

February 12, 2004 Deleted: 0

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe v. Rusciano et al.; Index No. 10032/2001,Termination of employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On June 18, 2003, your clients (Plaintiffs Elizabeth Margrabe and Tony Rusciano) agreed in open court to sell their interests to their cousin A.J. for about $8.5 million. Some eight months later they have yet to receive the first penny from that sale. You have done little to bring them closer to a closing. Philip Halpern, a lawyer that Betty hired to help you produce a desirable closing, proposed the key idea that has brought Plaintiffs closer to that closing.

Now, you say that A.J. wants Josh to move to reargue Judge Donovan's decision. This motion could be just the first in a series of delaying tactics. Your clients need a vigorous, experienced, and effective litigation and negotiating team to complete this case. In contrast, you have shown yourselves to be languid, inexperienced, and ineffective at litigation and negotiation.

Consequently, on behalf of my wife, Elizabeth Margrabe, I hereby terminate the employment of the law firm of Sexter & Warmflash with cause in the above-styled litigation and related negotiations.

Deleted: O
Deleted: spouse

Further, on behalf of my wife, Elizabeth Margrabe, I object to Sexter & Warmflash's continuing representation of her co-plaintiff and brother, Tony Rusciano, because of an actual conflict of interest between clients, whichyou, yourselves, have repeatedly noted, as well as additional conflicts of interest (between Sexter & Warmflash, itself, and its own clients in this case) which you have failed to mention. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Deleted: spouse
Deleted: which
Deleted: an

Mrs. Margrabe has terminated your employment for the following causes:

216-A



1. From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

Deleted: a

2. For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

3. As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

4. As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

Deleted: ,

Deleted: ,

5. As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

6. Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

7. Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

8. Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests



that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients repeatedly requested, would have been the wiser course of action.

9. On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

10. On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

Deleted:

Deleted: , instead

Deleted: ing

11. After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

12. On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

13. From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby deliberately converted a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you attempted to extract negotiating concessions from

Deleted:

Deleted: by

Deleted: ing

Deleted: leveraged

Deleted: to extract




Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.

14. In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest. You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

15. Your strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement. You abused your leverage as sole counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, if not to the benefit of your clients.

16. Some of the concessions you offered to your adversaries ensured payment of your fees while consigning your client to likely insolvency.

17. On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

18. The fact that you believed that A.J. intended to take an illegal tax deduction for such a payment, and that the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate orally when your clients met you at the courthouse.

19. On September 15, 2003, without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you presented her with an ultimatum, demanding that she approve a proposal under which A.J. could liquidate 50% of the Son Corp. real estate without paying your clients in full. Even your strategy of offering concessions which the Defendants had not even demanded on June 18, 2003 failed to conclude the process. In

**Deleted:** that

**Deleted:** , who was more vulnerable financially than his sister, was prepared to make on your advice alone

**Deleted:** Your threat to abandon representation of her inflicted severe mental distress and sheer terror upon your client at that time.

**Deleted:** s

**Deleted:** divisions which

**Deleted:** The

**Deleted:** and that your clients would be knowingly colluding in such an arrangement to cheat the taxing authorities upon your advice,

**Deleted:** a large percentage (25% to 50%)

**Deleted:** at issue

**Deleted:** requested



short, you could not close the deal even upon the most abject terms, and apparently were unaware of your clients' right to approach the judge for relief.

20. Only after Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did Mr. Halpern suggest an approach that allowed Judge Donovan to break the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in your additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to Mrs. Margrabe of Mr. Halpern's (and Mr. Lewis's) time and expenses.

**Deleted:** the client

21. On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

22. On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel. As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23. During this extended period of ineffective advocacy, you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that he never displayed to opposing counsel.

**Deleted:** espite your obvious quandary, for which

**Deleted:** ,

**Deleted:** in telling Mr. Halpern and Mr. Lewis to "back off"

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all legal services, loans, interest, and other charges you assert are due and owing directly to your clients. Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,

William Margrabe

Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

## Unknown

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Friday, February 13, 2004 12:53 PM
**To:** 'William Margrabe'
**Subject:** FW: Revised termination letter 2-13-04
**Attachments:** Termination Letter 2-13-04.doc

Second transmission.

-H

---

**From:** Harry Lewis [mailto:hlewis8@nyc.rr.com]
**Sent:** Friday, February 13, 2004 11:30 AM
**To:** 'William Margrabe'
**Subject:** Revised termination letter 2-13-04

See attached. Although I understand your stylistic inclination to wait to "drop the bomb" until after several paragraphs of introduction, as a matter of legal clarity and style, it's better (and clearer) to do the job first, and not bury the most important part of the letter (the actual termination language) in the middle of the text. Once you're happy with the draft, send it to Phil and his associate for their comments.

Unless Phil and his associate (I'll call him H2 to avoid confusion) disagree, I wouldn't wait until Michael has completed his opposition papers. The longer you string them out, the more it looks like a set up, i.e., you cynically waited to extract all of their work product, and then fired them. Let H2 draft the opposition papers to take that issue off the table. (Or I can do it if necessary—just give me fair and prompt warning).

You certainly should consider how to manage Tony throughout this process.

-H