31 Priory Lane
Pelham Manor, New York 10803

February 13, 2004 Deleted: 2
Deleted: 0

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe v. Rusciano et al.; Index No. 10032/2001,Termination of
employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff
Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash
as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my wife, Elizabeth Margrabe, I hereby terminate the Formatted: Indent: First line: 0.5"
employment of the law firm of Sexter & Warmflash with cause in the above-styled
litigation and related negotiations.

Further, on behalf of my wife, Elizabeth Margrabe, I object to Sexter &
Warmflash's continuing representation of her co-plaintiff and brother, Tony
Rusciano, because of an actual conflict of interest between clients, which you,
yourselves, have repeatedly noted, as well as additional conflicts of interest
(between Sexter & Warmflash, itself, and its own clients in this case) which you
have failed to mention.  *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept.
1999)("An attorney who undertakes the joint representation of two parties in a
lawsuit [should] not continue as counsel for either one after an actual conflict of
interest has arisen.").  The relevant disciplinary rules are 22 NYCRR
§§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Mrs. Margrabe has terminated your employment for the following causes:

On June 18, 2003, your clients (Plaintiffs Elizabeth Margrabe and Tony
Rusciano) agreed in open court to a settlement in which they would sell their
interests to their cousin A.J. for about $8.5 million, subject to rapid
documentation and closing of the deal.  Some eight months later, the deal still
has not closed, and they have yet to receive the first penny from that sale.

Due to your ineffective responses to classic pettifogging and stalling on
the part of your adversaries, combined with your ineffective actions and
omissions at the June 18, 2003 hearing,  your efforts to close the deal have
failed miserably.  If anything, a closing seems further away than ever.  Philip
Halpern, a lawyer that Betty hired to help you produce a desirable closing,
proposed the only idea that has been effective in any way in expediting that
closing.

Deleted: Y
Deleted: have done little
Deleted: bring them
Deleted: r
Deleted: to a closing
Deleted: key
Deleted: has brought Plaintiffs closer to

110-A

Now, you say that A.J. wants Josh to move to reargue Judge Donovan's decision. This motion is just another in a series of delays to which your clients have been repeatedly subjected that is likely to continue indefinitely into the future, and against which you have proven yourselves unable or unwilling to respond effectively, either in litigation or in negotiation. You yourselves caused an inordinate delay at the time you were engaged, and the tactics employed by your adversaries have been highly effective in protracting matters to an intolerable extent. At this rate, this case is likely to drag on longer than the Second World War.

Casting matters in the light most favorable to you, you yourselves caused only some of the delays, due perhaps to langor, conflicting demands on your time, naivete about the nature of the challenges presented by your adversaries, or inexperience. Whatever the reasons, you have been utterly ineffective at the combination of litigation and negotiation necessary to bring matters to a speedy conclusion.

Further, you continue to play off Tony Rusciano's alleged "interests" (as you define them) against those of my wife, repeatedly challenging us to complain of an actual conflict of interest which you abused your position of trust and confidence with Tony to create. We are not required to complain of an actual conflict of interest in the context of litigation; rather, you are ethically required to depart the case as to both plaintiffs. Enough is enough.

In more detail:

1.    From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

2.    For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

**Deleted:** ,

**Deleted:** could be just

**Deleted:** the first

**Deleted:** ing tactics

**Deleted:**

**Deleted:** Your clients need a vigorous, experienced, and effective litigation and negotiating team to complete this case. In contrast,

**Deleted:** shown yourselves to be

**Deleted:** uid

**Deleted:** d, and

**Deleted:** O

**Deleted:** Consequently, on behalf of my wife

**Deleted:** spouse

**Deleted:** , Elizabeth Margrabe, I hereby terminate the employment of the law firm of Sexter & Warmflash with cause in the above-styled litigation and related negotiations.¶
¶
, Further, on behalf of my wife

**Deleted:** spouse

**Deleted:** , Elizabeth Margrabe, I object to Sexter & Warmflash's continuing representation of her co-plaintiff and brother, Tony Rusciano, because of an actual conflict of interest between clients, which

**Deleted:** which

**Deleted:** you, yourselves, have repeatedly noted, as well as

**Deleted:** an

**Deleted:** additional conflicts of interest (between Sexter & Warmflash, itself, and its own clients in this case) which you have failed to mention. Sidor v. Zuhoski, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

**Deleted:** Mrs. Margrabe has terminated your employment for the following causes:

**Deleted:** a



3.    As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

4.    As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

> Deleted: ,
>
> Deleted: ,

5.    As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

6.    Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

7.    Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

8.    Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients repeatedly requested, would have been the wiser course of action.

9.    On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

160- C



10.    On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

| Deleted: |
| Deleted: , instead |
| Deleted: ing |

11.    After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

12.    On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

13.    From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other.  You thereby deliberately converted a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you attempted to extract negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.



| Deleted: |
| Deleted: by |
| Deleted: ing |
| Deleted: leveraged |
| Deleted: to extract |
| Deleted: that |
| Deleted: , who was more vulnerable financially than his sister, was prepared to make on your advice alone |

14.    In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest.  You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

| Deleted: Your threat to abandon representation of her inflicted severe mental distress and sheer terror upon your client at that time. |
| Deleted: s |
| Deleted: divisions which |



15.    <u>Your</u> strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to <u>only one</u> of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement.  You abused your leverage as <u>sole</u> counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, if not to the benefit of your clients.

**Deleted: The**

16.    Some of the concessions you offered to your adversaries ensured payment of your fees while consigning your client to likely insolvency.

17.    On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

18.    The fact that <u>you believed that</u> A.J. intended to take an illegal tax deduction for such a payment, <u>and that the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate orally when your clients met you at the courthouse.</u>

**Deleted: and that your clients would be knowingly colluding in such an arrangement to cheat the taxing authorities upon your advice.**

19.    On September 15, 2003, <u>without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you</u> presented <u>her with an ultimatum, demanding that she approve</u> a proposal under which A.J. could liquidate <u>50%</u> of the <u>Son Corp.</u> real estate <u>without paying your clients in full.</u>  Even your strategy of offering concessions which the Defendants had <u>not even demanded on June 18, 2003</u> failed to conclude the process.  In short, you could not close the deal <u>even upon the most abject terms,</u> and apparently were unaware of your clients' right to approach the judge for relief.

**Deleted: a large percentage (25% to 50%)**

**Deleted: at issue**

**Deleted: requested**

20.    Only <u>after</u> Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did <u>Mr. Halpern</u> suggest an approach that allowed Judge Donovan to break the impasse.  With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed.  These errors and omissions have cost your clients many thousands of dollars in <u>your</u> additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to <u>Mrs. Margrabe</u> of <u>Mr. Halpern's (and Mr. Lewis's) time and expenses.</u>

**Deleted: the client**

160- C

21.    On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

22.    On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel.  As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23.    During this extended period of ineffective advocacy, you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that he never displayed to opposing counsel.

| Deleted: espite your obvious quandary, for which |
| --- |
| Deleted: . |
| Deleted: In telling Mr. Halpern and Mr. Lewis to "back off" |

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all legal services, loans, interest, and other charges you assert are due and owing directly to your clients.  Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,


William Margrabe


Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

 

## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Sunday, February 15, 2004 8:11 PM
**To:** 'William Margrabe'
**Subject:** RE: Proposed insertion in termination letter

Is Feb 4, 2003 the correct date? "Actual malice" is a legal conclusion. Why do you want to include it?

Otherwise OK..

-H

---

**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Sunday, February 15, 2004 5:34 PM
**To:** Harry Lewis, Esq.
**Cc:** Philip Halpern, Esq.; Harry Nicolay, Esq.
**Subject:** Proposed insertion in termination letter

What are your comments on the following? This insertion would go right after "Mrs. Margrabe has terminated your employment for the following causes":

Your message, sent February 13, 2004 at 2:35 p.m. was outrageous, and demands specific and emphatic response. It is a clear attempt to bamboozle your client, Betty, into approving your actions that would be adverse to her, and that would be unethical without her bamboozled approval. The idea that Betty would authorize you to send whatever papers you wanted, in response to Josh's motion to "FOR LIMITED RE-ARGUMENT" is ludicrous, as is the idea that she would authorize you to file papers on behalf of only Tony. She has done neither of those ridiculous acts.

- On June 18, 2003, your incompetence got your clients into a mess. Since then you have been totally incapable of the first step of extricating them. We are making progress only because of Phil Halpern's idea about CPLR § 2104.
- Amazingly, you opposed numerous, important security provisions that Phil recommended, both of your clients approved, and Justice Donovan ordered.
- Since around July 2, 2003, you have acted partly as an attorney, but largely as Phil Halpern's amanuensis or stenographer, except for your violation on or around February 4, 2003, of your written instructions to let them comment on and Betty approve documents before you send them to opposing counsel.
- You know very well that over the past three years, or so, Betty and I have spent more than $650,000 paying your fees and supporting Tony's family, and that the quid pro quo for that was and is the splitting of all money received from their lawsuit against A.J. and the Rusciano Companies.
- **Your efforts to create an actual conflict of interest between your clients** have been most obvious around September 15, 2003, and February 13, 2004. Those divisive efforts would definitely benefit A.J. and be adverse to your clients. **You have tried to create this actual conflict of interest between your clients,** because of an undeniable, **actual conflict of interest between you and your clients.** Namely, you want to get your fees paid sooner and with certainty, rather than later and subject to risk. Pursuing your own interests to the detriment of your clients, you are actively promoting a settlement that would reduce your clients' security on a six and one-half year loan, in order to receive your fees, as soon as possible.
- In addition, by information and belief, you have acted with actual malice toward your client, Betty.

Bill
tel 914-738-3309
Bill@Margrabe.com

# 113

## Unknown

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Tuesday, February 17, 2004 10:14 AM |
| **To:** | Harry Lewis, Esq.; Harry Nicolay, Esq. |
| **Cc:** | Philip Halpern, Esq. |
| **Subject:** | RE: CONFIDENTIAL: Termination letter (draft of 2/17/04) |
| **Importance:** | High |
| **Attachments:** | Termination Letter 2-17-04b.doc |

Here's my latest draft.

Bill
tel 914-738-3309
Bill@Margrabe.com

DRAFT
31 Priory Lane
Pelham Manor, New York 10803



February 13, 2004

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe v. Rusciano et al.; Index No. 10032/2001,Termination of
employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff
Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash
as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my wife, Elizabeth Margrabe, I hereby terminate the
employment of the law firm of Sexter & Warmflash with cause in the above-styled
litigation and related negotiations.

Further, on behalf of my wife, Elizabeth Margrabe, I object to Sexter &
Warmflash's continuing representation of her co-plaintiff and brother, Tony
Rusciano, because of an actual conflict of interest between clients, which you,
yourselves, have repeatedly noted, as well as additional conflicts of interest
(between Sexter & Warmflash, itself, and its own clients in this case) which you
have failed to mention. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept.
1999)("An attorney who undertakes the joint representation of two parties in a
lawsuit [should] not continue as counsel for either one after an actual conflict of
interest has arisen."). The relevant disciplinary rules are 22 NYCRR
§§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Mrs. Margrabe has terminated your employment for the following causes:

On June 18, 2003, your clients (Plaintiffs Elizabeth Margrabe and Tony
Rusciano) agreed in open court to a settlement in which they would sell their
interests to their cousin A.J. for about $8.5 million, subject to rapid
documentation and closing of the deal. Some eight months later, the deal still
has not closed, and they have yet to receive the first penny from that sale.

Due to your ineffective responses to classic pettifogging and stalling on
the part of your adversaries, combined with your ineffective actions and
omissions at the June 18, 2003 hearing, your efforts to close the deal have failed
miserably. If anything, a closing seems further away than ever. Philip Halpern, a
lawyer that Betty hired to help you produce a desirable closing, proposed the
only idea that has been effective in any way in expediting that closing.

Now you say that A.J. wants Josh to move to reargue Judge Donovan's decision. This motion is just another in a series of delays to which your clients have been repeatedly subjected, that is likely to continue indefinitely into the future, and against which you have proven yourselves unable or unwilling to respond effectively, either in litigation or in negotiation. You yourselves caused an inordinate delay at the time you were engaged, and the tactics employed by your adversaries have been highly effective in protracting matters to an intolerable extent. Already, your involvement in this case has lasted longer than the U.S.A. participated in hostilities in the Second World War.

Casting matters in the light most favorable to you, you yourselves have caused only some of the delays, due perhaps to languor, conflicting demands on your time, naivete about the nature of the challenges that your adversaries presented, or inexperience. Whatever the reasons, you have been utterly ineffective at the combination of litigation and negotiation necessary to bring matters to a speedy conclusion.

Further, you continue to play off Tony Rusciano's alleged "interests" (as you define them) against those of my wife, repeatedly challenging us to complain of an actual conflict of interest, which you abused your position of trust and confidence with Tony to create. We are not required to complain of an actual conflict of interest in the context of litigation: rather, you are ethically required to depart the case as to both plaintiffs. Enough is enough.

In more detail:

1.     From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

2.     For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

3.     As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

4.     As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

5.     As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

6.     Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

7.     Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

8.     Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients repeatedly requested, would have been the wiser course of action.

9.     On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

10.     On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the

record in open court the provisions necessary to accomplish this goal. Instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

11.    After June 18, 2003, due in part to your defective dictation of the terms of settlement into the record on that date, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, costing Plaintiffs more than $125,000 in lost interest. In desperation, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

12.    On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

13.    From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby deliberately converted a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you attempted to extract negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.

14.    In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest. You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

15.    Your strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement

agreement.  You abused your leverage as <u>sole</u> counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, if not to the benefit of your clients.

16.    Some of the concessions you offered to your adversaries ensured payment of your fees while consigning one of your clients to likely insolvency.

17.    On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

18.    The fact that you believed that A.J. intended to take an illegal tax deduction for such a payment, in which case the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate it orally when your clients met you at the courthouse.

19.    On September 15, 2003, without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you presented her with an ultimatum, demanding that she approve a proposal under which A.J. could liquidate 50% of the Son Corp. real estate without paying your clients in full.  Even your strategy of offering concessions that the Defendants had <u>not even demanded on June 18, 2003</u> failed to conclude the process.  In short, you could not close the deal <u>even upon the most abject terms</u>, and apparently were unaware of your clients' right to approach the judge for relief.

20.    Only <u>after</u> Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did <u>Mr. Halpern</u> suggest an approach that allowed Judge Donovan to break the impasse.  With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed.  These errors and omissions have cost your clients many thousands of dollars in your additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to Mrs. Margrabe of Mr. Halpern's (and Mr. Lewis's) time and expenses.

21.    On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.



22.     On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel.  As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23.     During this extended period of ineffective advocacy you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that he never displayed to opposing counsel.

        You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit a final bill for all legal services, loans, interest, and other charges you assert are due and owing directly to your clients.  Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

                                        Sincerely yours,



                                        William Margrabe


Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Tuesday, February 17, 2004 8:25 AM
**To:** 'William Margrabe'
**Subject:** RE: CONFIDENTIAL: Termination letter (draft of 2/17/04)

You're very stubborn, and this product is weaker than the previous one.  Most important, you've added unnecessary ambiguity, discrepancies, and uncertainty to it, giving your adversaries many opportunities to exploit.  (Are you trying to send me some sort of signal here?)  You're also trying to "shotgun" a bunch of legal remedies in an incoherent way.  I've already told you that threats of "ethical" sanctions are toothless, and I wouldn't even mention legal malpractice or usury directly.  You shouldn't lead with you weakest argument, but with your strongest.  In addition, you should stress the ugly facts, not legal theories.  State the unflattering facts boldly.  Let the legal theories suggest themselves more subtly at this juncture.

Believe me, there'll be plenty of opportunity to flesh out the rest of it as the process unfolds.

I'm doing a quick edit to illustrate my points.  I'll have it to you by 9:00 a.m.

-H





## Unknown

| | |
|---|---|
| **From:** | William Margrabe [bill@margrabe.com] |
| **Sent:** | Sunday, February 22, 2004 7:59 PM |
| **To:** | Harry Lewis, Esq. |
| **Subject:** | Termination Letter |
| **Attachments:** | Termination Letter 2-22-04a.doc |

**Tracking:**     **Recipient**          **Read**

Harry Lewis, Esq. Read: 2/23/2004 2:27 PM

Harry

I have attached my draft of the letter that terminates Betty's employment of S&W, with prejudice, and objects to Tony's continued employment of S&W.

1. On p. 1, line 8, we refer to the conflict of interest between Tony & Betty. I think we agreed that it was only potential, because either Betty, Tony, or S&W always backed down at the last moment. Is that a problem? I know that there are potential and actual conflicts, and that S&W likes to refer ambiguously to a conflict. Are you satisfied with the way the letter handles this?
2. I made changes on pages 1-3. That's it.

What do you suggest to make it more effective?

Bill
tel 914-738-3309
Bill@Margrabe.com

  

31 Priory Lane
Pelham Manor, New York 10803

February 17, 2004

David Warmflash, Esq.
Michael Present, Esq.
Sexter & Warmflash, P.C.          **VIA EXPRESS U.S. MAIL**
115 Broadway                      **CONFIDENTIAL AND PRIVILEGED**
New York, N.Y. 10006

Re: Margrabe et al. v. Rusciano et al.; Index No. 10032/2001; Termination of
employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff
Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash
as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my wife, Elizabeth Margrabe ("Betty"), I hereby terminate the
employment of the law firm of Sexter & Warmflash with cause in the above-styled
litigation and related negotiations.

Further, on behalf of Betty, I object to Sexter & Warmflash's continued
representation of her co-plaintiff and brother, Tony Rusciano, because of
potential conflicts of interest between clients, which you, yourselves, have
repeatedly threatened to convert into actual conflicts of interest and manipulate
to your advantage, as well as additional actual conflicts of interest (between
Sexter & Warmflash, itself, and (a) both of its clients in this case and (b) Betty)
which you have failed to mention to your clients. Now, either (a) Tony agrees
with me that we should both fire you, with cause, or (b) Tony and I have an actual
conflict of interest. If (a), then we agree to fire you, with cause. If (b), then an
actual conflict of interest exist and you must withdraw as counsel for both clients.
*Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who
undertakes the joint representation of two parties in a lawsuit [should] not
continue as counsel for either one after an actual conflict of interest has arisen.").
The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22
NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Mrs. Margrabe has terminated your employment for the following causes:

The events of the past week have confirmed that Betty cannot allow you to
represent Plaintiffs in the future. Since about July 1, 2003, the amount of
valuable (mine) and expensive (attorneys') time that required to monitored your
work, and keep it from being substandard, makes it clear that Betty should turn
the work over to more effective attorneys. The entire episode, including and after
June 18, 2003, raises serious questions about your legal skills and/or your
interest in the welfare of your clients. Your adverse and offensive actions toward
your client, Betty, make it clear that your continued involvement in this case is a
threat to her interests, and she cannot allow you to be involved in this case,






going forward, whether as a "litigator", as the agent handling the closing, or as "escrow agent".

Your messages, sent February 13, 2004 at 2:35 p.m. and Thursday, February 19, 2004 at 2:52 p.m., were offensive and terrified my wife. Unfortunately, your threat to dump one of your co-plaintiffs (my wife, Betty) in favor of the other (her brother Tony) has become disappointingly familiar. Also, it has become unacceptable.

The timing of your threats, which would have wrought maximum damage to the interests of your own vulnerable clients, also is unacceptable. Two Fridays ago (February 13, 2004), only one week before your deadline to file important papers on behalf of Betty and Tony, and last Thursday (February 19, 2004), only one day before that deadline, you sent Betty ultimatums, demanding, in essence, unfettered discretion to draft and submit whatever documents you pleased, on her behalf, without any input from me (as her agent) or from her. This demand was not only arrogant, but patently laughable. Your documents were replete with typographical errors, all of them embarrassing. Some of them required correction, so the Order and Stipulation of Settlement would make sense. Other errors could have cost your clients more than another half a million dollars, if not corrected. Sadly, that was par for your course, because (a) your performance on June 18, 2003, was full of errors, and (b) you had delivered similar ultimatums on 9/4/03 and 9/15/03, and in each case you were demanding the right to submit defective documents.

Worse, you aggravated the threat to Betty by sending that message late on the Friday afternoon before a long, holiday weekend, knowing that Philip Halpern, Esq. was out of town until February 23. Your timing appears calculated to make it difficult or impossible for him to participate in this process, as he has been doing, at our request, for more than eight months. This sort of behavior on your part is also familiar. From our perspective, you have been far more adept at thwarting the participation of those lawyers we have engaged to assist you than at foiling the machinations of opposing counsel.

As you know, after about July 2, 2003, when you disregarded her written instructions to let her (a) see all papers in this case and (b) approve them before you sent them to opposing counsel, she hired Mr. Halpern to improve communications with you and to add his expertise about the Westchester County bench and bar to your own. (On or about June 19, 2003, she had sent those clear, written instructions to you by fax, e-mailed attachment, and U.S. Mail with return receipt requested.)

We understand your February 13, 2004 message to be a threat to dump representation of Betty in favor of Tony unless we cease vetting your work product. That you are even contemplating such a step (and have been for some time, based upon your earlier, similar ultimatums) is no longer acceptable to us,

| Deleted: |
|---|





nor is your continuing representation of Tony under these circumstances. In your position of trust and confidence, you have learned the confidences and secrets both of Betty and of Tony. Playing off one against the other is unacceptable.

- Your demand that Betty authorize you to send whatever papers you choose to draft over to opposing counsel in your unfettered discretion and without discussion with me (as her agent) or with her ("If you insist on prior approval of what is to be filed - which we will not and cannot agree to ..."), in response to Josh's motion "FOR LIMITED RE-ARGUMENT" is offensive. Given the facts, you were demanding the right to send documents with numerous typos, some of them rendering the Order and Stipulation of Settlement undefined, and inviting further litigation, much as your performance on June 18, 2003, invited further litigation. One of your errors, *which I (a layperson) found*, was an invitation to A.J. Rusciano II to default after six years, and would have exposed your clients to a loss of more than $500,000 in that case. Eventually, after Betty threatened to fire you, you corrected that error. We do not accept your notion that you get to run this case for your own benefit, refuse to make obviously necessary corrections to your documents, and send ultimatums to enforce your autonomy, unless your client threatens credibly to fire you.
- It is equally offensive and threatening to Betty that you would suggest continuing to act in Tony's interests alone, exploiting your knowledge of Betty's confidences and secrets to benefit Tony alone, adverse to Betty's interests.
- We perceive that you have been "gaming" us more than you "game" adversary counsel. Two tactics you have employed in this respect are (1) "jamming" us by setting artificially short deadlines for your actions, so that we had no time to review your work product, or to comment on it before you submitted it; and (2) delaying your work product until the final moments of a genuine deadline, and then submitting it without giving us any reasonable opportunity to review or comment on it, based upon the real deadline. We then were left with Hobson's choice: either disavow your authority and work product publicly, and risk disintegration of the plaintiffs' united front and a precipitate weakening of our case, or ratify your actions, however adverse to our interests they appeared. These tactics of yours are unacceptable.

On June 18, 2003, your clients (Plaintiffs Elizabeth Margrabe and Tony Rusciano) agreed in open court to a settlement in which they would sell their interests to their cousin A.J. for about $8.5 million, subject to rapid documentation and closing of the deal. Some eight months later, the deal still has not closed, and they have yet to receive the first penny from that sale.

Due to your ineffective responses to classic pettifogging and stalling on the part of your adversaries, combined with your ineffective actions and omissions at the June 18, 2003 hearing, your efforts to close the deal have failed miserably. If anything, a closing seems further away than ever. Philip Halpern, a

| Deleted: |          |
|----------|----------|



lawyer that Betty hired to help you produce a desirable closing, proposed the only idea that has been effective in any way in expediting that closing.

Now Josh has moved to reargue Judge Donovan's decision. This motion is just another in a series of delays to which your clients have been repeatedly subjected, that is likely to continue indefinitely into the future, and against which you have proven yourselves unable or unwilling to respond effectively, either in litigation or in negotiation. You yourselves caused an inordinate delay at the time you were engaged, and the tactics employed by your adversaries have been highly effective in protracting matters to an intolerable extent. Already, your involvement in this case has lasted longer than the U.S.A. participated in hostilities in the Second World War.

Casting matters in the light most favorable to you, you yourselves have caused only some of the delays, due perhaps to languor, conflicting demands on your time, naivete about the nature of the challenges that your adversaries presented, or inexperience. Whatever the reasons, you have been utterly ineffective at the combination of litigation and negotiation necessary to bring matters to a speedy conclusion.

Further, you continue to play off Tony Rusciano's alleged "interests" (as you define them) against those of my wife, repeatedly challenging us to complain of an actual conflict of interest, which you abused your position of trust and confidence with Tony to create. We are not required to complain of an actual conflict of interest in the context of litigation: rather, you are ethically required to depart the case as to both plaintiffs. Enough is enough.

In more detail:

1.      From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

2.      For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit, which both of them requested that you file immediately, although you already were familiar with the facts, having filed a strikingly similar lawsuit (as Defense counsel noted in its response to your complaint) against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

| Deleted: |

435-D



3.      As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

4.      As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

5.      As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

6.      Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

7.      Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

8.      Specifically, from December 12, 2002 to June 18, 2003, you failed to seek disclosure of the details of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients repeatedly requested, would have been the wiser course of action.

9.      On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal, instead permitting opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those funds, and costing your clients hundreds of thousands of dollars in the final settlement.

Deleted:



10.    On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, the current settlement agreement notwithstanding, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal. Instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

11.    After June 18, 2003, due in part to your defective dictation of the agreed-upon terms of settlement into the record on that date, and in part by your passive acceptance of Josh Grauer's flood of ambiguous and pro-Defendant language, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, eventually costing Plaintiffs more than $125,000 in lost interest. In desperation, after your ineffective behavior became apparent, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

12.    On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

13.    From about July 2, 2003 through about November 28, 2003, you maliciously manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other.  You thereby deliberately converted a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you attempted to extract negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.

14.    In particular, in recent months <u>after</u> the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano <u>alone</u> (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest.  You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

Deleted:





15.    Your strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to <u>only one</u> of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement.  You abused your leverage as <u>sole</u> counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, even if not to the benefit of your clients.

16.    Some of the concessions you offered to your adversaries ensured payment of your fees while consigning one of your clients to likely insolvency.

17.    On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

18.    The fact that you believed that A.J. intended to take an illegal tax deduction for such a payment, in which case the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate it orally when your clients met you at the courthouse.

19.    On September 15, 2003, without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you presented her with an ultimatum, demanding that she approve a proposal under which A.J. could liquidate 50% of the Son Corp. real estate without paying your clients in full.  Even your strategy of offering concessions that the Defendants had <u>not even demanded on June 18, 2003</u> failed to conclude the process.  In short, you could not close the deal <u>even upon the most abject terms</u>, and apparently were unaware of your clients' right to approach the judge for relief.

20.    Only <u>after</u> Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did <u>Mr. Halpern</u> suggest an approach that allowed Judge Donovan to break the impasse.  With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed.  These errors and omissions have cost your clients many thousands of dollars in your additional legal fees as the meaning of the inadequate "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to Mrs. Margrabe of Mr. Halpern's (and Mr. Lewis's) time and expenses.



| Deleted: |  |
|---|---|





On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to ...dant's real estate attorney.

22.    On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel. As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

23.    During this extended period of ineffective advocacy you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that we believe he never displayed to ...posing counsel.

You are instructed to turn over all of your files in this matter to Mr. Halpern ...ediately upon receipt of this letter, and to prepare and submit a final bill for all ...gal services, loans, interest, and other charges you assert are due and owing ...rectly to your clients. Mrs. Margrabe then will consider her legal options in ...sultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,

William Margrabe

Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.

| Deleted: |
|---|

URS-H




## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Tuesday, February 24, 2004 8:26 AM
**To:** 'William Margrabe'
**Subject:** RE: What to do this week.

I'll be there.  We'll have to play it by ear after that.

Let me know what Michael says about the notice of appeal.

-H

---

**From:** William Margrabe [mailto:bill@margrabe.com]
**Sent:** Tuesday, February 24, 2004 1:35 AM
**To:** Harry Lewis, Esq.
**Cc:** Philip Halpern, Esq.
**Subject:** What to do this week.

The short answer is that we wait until Friday, then show up at 9:30 a.m. in the courthouse in White Plains.

Phil has read all the papers and thinks Michael's look pretty good. Michael used lots of the ideas from the standard Collier, Halpern opposition to a motion to re-argue. Phil thinks that Josh's chance of winning on his motion to re-argue is slim, although it could happen.

WE SHOULD FILE A NOTICE OF APPEAL OF JUSTICE DONOVAN'S DECISION
Phil thinks that the notice of appeal makes sense, and that we could always not use it. I think he said, "It's prophylactic." He didn't mention any downside. I didn't let him explain all about this, but I think it lets us appeal for interest (as you suggested to Michael) while A.J. is appealing for "no deal" or to "sell 50% or 99% of Son Corp. property". That means, if he appeals then he has some more downside. (Phil has said, either in this conversation, or earlier, that A.J. will need to put up money for the appeal. Previously, he said that he would argue for the entire $8.5 million.)

I am sending Michael a message, informing him that Phil and Harry think that filing the notice of appeal is good, and asking him why he thinks it is bad.

Last Friday morning I asked Michael about filing the notice of appeal of Justice Donovan's order of 1/26/04. He thought it didn't make sense, because we wanted the order.

DON'T FIRE S&W, NOW
I expressed an interest in firing S&W, immediately. Phil advised me not to fire them. First, he wants to get to a final order from Justice Donovan, which he thinks will come after Friday. After we have that order, we will know the fruits of Michael and David's work. Phil would step into the case and handle the appeals and escrow. I think he said, basically, that he doesn't want a scenario where they claim that everything was going fine, until Betty fired them and Phil stepped in. Maybe, I'm just filling in the blanks in my understanding. It seems that he wants them to make their bed, and then we'll let them lie in it.

I said that I didn't want them to claim that we waited until they finished their work, and then fired them to avoid paying fees. He doesn't think that firing on Monday versus firing on Friday makes much difference.

I said that Betty and I wanted to pay S&W everything that she owes them, but it wasn't clear what she owed them, given their poor performance, the way they terrorized Betty, what they had lost their clients in dollars, and their usurious interest on unpaid fees.

I told him I'd think about not firing them, right away. Let's discuss.

**147**

 

Phil wants Betty tied to Tony, and thinks that the final order will do that, beyond a shadow of a doubt. He wanted to know if they had a written agreement to split the settlement evenly. I said that they had an oral agreement, plus the agreement with S&W, plus much evidence that the settlement money would split equally between Betty and Tony, such as Michael's and Josh's draft order and stipulation of settlement.

FRIDAY
Friday, Justice Donovan will most likely deny Josh's motion. The chance that he will interpret "sale of Son Corp. property" as Josh wants is remote. If he does, then things have changed, and Betty can appeal that part of the order of 1/26/04 without a prior notice of appeal, but with a subsequent notice of appeal.

On Friday, after ruling on Josh's motion, Justice Donovan will try to broker a deal. I told Phil that I thought that Michael would go for something that got the down payment as soon as possible, leaving inadequate security. Michael has repeatedly claimed in his ultimatums that he can settle for Tony, leaving Betty in the dust. I'm concerned that he'll try that on Friday. I believe Phil said that couldn't or wouldn't happen, but I didn't ask why not.

I asked if I could instruct David to stay home. Phil said that David would appear for Tony. I have seen David in action a few times, and he has been a waste of space and words, with poor command of law and facts, and zero ability to predict the course of a case. He is good at controlling Tony, which is key in this case.

I said that the thought of Michael and David negotiating for their clients scared me, because (a) they were clearly antagonistic toward Betty (or me), (b) I thought that they didn't care if their malleable Tony went bankrupt, immediately, and (c) they cared only about getting their fees as soon as possible, because they weren't earning ordinary interest at an interest rate on their unpaid fees.

I said that I thought there could be a catfight on Friday, with David and Michael urging concessions that would favor quick cash up front, and pie in the sky after that, Tony saying okay, and you and me (POA for Betty, who doesn't plan to be there) saying no way. Phil said he didn't think that would happen. I don't think we discussed why not, except that I think your presence would put a damper on S&W's rush to throw their clients' interests over the side, so they could collect their fees as quickly as possible.

Bill
tel 914-738-3309
Bill@Margrabe.com

## Crystal Massarelli

**From:** Harry Lewis [hlewis8@nyc.rr.com]
**Sent:** Thursday, April 01, 2004 11:46 AM
**To:** 'William Margrabe'
**Subject:** RE: Termination letter

See attached revisions for your consideration. Our repeated drafts haves given rise to a lot of redundancy that I tried in part to clean up. "Voir dire" has a specific legal meaning referring to the process of selecting a jury. I'm not sure how you came to use it in this context.

Best wishes,

-H

---

**From:** William Margrabe [mailto:William@Margrabe.com]
**Sent:** Tuesday, March 30, 2004 7:01 PM
**To:** Harry Lewis, Esq.
**Subject:** Termination letter

Harry

Please look over the termination letter, again. Mainly I changed thru section I, par. 16.

Sincerely
Bill Margrabe
31 Priory Lane
Pelham Manor, NY 10803
914-738-3309

Please start sending and replying to William@Margrabe.com, because Bill@Margrabe.com is soon to vanish from the virtual world.



# Crystal Massarelli

**From:**     Harry Lewis [hlewis8@nyc.rr.com]
**Sent:**     Friday, April 09, 2004 8:28 AM
**To:**     'William Margrabe'
**Subject:** RE: Where do we go from here?

It opened this time.  I'll get to work.

Thanks,

-H

---

**From:** William Margrabe [mailto:William@Margrabe.com]
**Sent:** Friday, April 09, 2004 7:24 AM
**To:** Philip Halpern, Esq.
**Cc:** Harry Lewis, Esq.
**Subject:** FW: Where do we go from here?

Phil

Phil, I need to speak to you, urgently, by noon, today, Friday, April 9, 2004. I need to have your input about
David's message.  What do you advise that I do, given that David, Betty's attorney of record, but an attorney who
"can not, and will not, follow your [i.e., Betty's] orders"; wants to close a deal, even though

- he hasn't discussed Betty's legal options with her or me (her agent)
- the terms of closing are likely to be defective and adverse to Betty, given S&W's track record
- his client will be out of state at the proposed time of closing, and may be incommunicado?

Moreover, even before David's latest outrage, you said that it was dangerous to close this transaction, because
S&W had committed malpractice, and closing would shut off avenues of recourse against them.  You are
researching that law, and have gone back more than six decades to find a case that matches the fact pattern of
David's and Michael's incompetence.  I need to see the memorandum of law, and I'm willing to pay your associate
to write up his notes.

You said that it would be a mistake to let Harry close the deal, if he were my friend, because of liabilities that he
would incur.  Apparently, given your current legal opinion, closing would be risky for Betty.  Clearly, David is
pushing for an early closing.  Obviously, I need your advice before David closes the transaction, so I can
understand Harry's and Betty's potential legal problems.

I need legal advice of the sort that David is not inclined to give.  I need your memorandum.  I need some ideas for
dealing with David.

- Why shouldn't the closing occur?
- Why is it too dangerous for Harry to close, if he's my friend?
- On what terms are you willing to step in to replace S&W as counsel in Betty's case?
- Given Justice Donovan's decisions, orders, etc., what are Betty's legal options?

Betty needs your help, urgently. If you cannot step in to a mess, without certain assurances that Betty and I won't
sue you for some specific reasons, please make those reasons specific.  The obvious alternative is to ratify the
actions of an attorney who doesn't mind putting into writing that his client's lawful instructions don't matter to him.
Has the legal profession come to this?

As soon as possible, Betty needs to see your documents for acting as escrow agent.  I would like to pick up that
information, this afternoon, Friday, April 09, 2004.

As soon as possible, Betty needs to see your proposed agreement for redefined legal services, including



substituting for S&W as counsel in this case. Can I pick it up at your office, Friday afternoon about four p.m., when I'll be in White Plains?

What else should we discuss?

Sincerely
Bill Margrabe
31 Priory Lane
Pelham Manor, NY 10803
Tel 914-738-3309
Cel 914-720-6264

Please start sending and replying to William@Margrabe.com, because Bill@Margrabe.com is soon to vanish from the virtual world.

| From: | Harry Lewis [hlewis8@nyc.rr.com] |
|---|---|
| Sent: | Thursday, July 10, 2003 9:19 AM |
| To: | William Margrabe |
| Subject: | Re: Drafting settlement documents; settlement negotiations |

Last three bullet points: were these Tony's remarks, or recitations of what Present told Tony? (I'm not clear). They sound like the latter. The reasoning is flawed, because a bank can take a mortgage putting their debt ahead of ours in priority in a bankruptcy situation. That doesn't protect Betty or Tony at all. If Present is feeding Tony false or inaccurate information, and Tony is buying it, then Tony's goose is cooked.

-H

709

**Crystal Massarelli**

| | |
|---|---|
| **From:** | Harry Lewis [hlewis8@nyc.rr.com] |
| **Sent:** | Friday, April 09, 2004 10:58 AM |
| **To:** | 'William Margrabe' |
| **Subject:** | Revised termination letter |

See attached.  It's O.K. to leave Phil as the recipient of the files for the moment, because he remains Betty's attorney, and he can hold them safely in his office until the issue of subsequent representation is decided.

-H

 

31 Priory Lane
Pelham Manor, New York 10803

April 8, 2004

David Warmflash, Esq                    **VIA E-MAIL ATTACHMENT**
Michael Present, Esq.                    **VIA TELEFAX**
Sexter & Warmflash, P.C.                 **VIA EXPRESS U.S. MAIL**
115 Broadway                             **CONFIDENTIAL AND PRIVILEGED**
New York, N.Y.  10006

Re: Margrabe et al. v. Rusciano et al.; Index No. 10032/2001; Termination of
employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff
Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash
as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my wife, Elizabeth Anne Rusciano Margrabe ("Betty"), using
the power of attorney that she signed on February 13, 2004, I hereby terminate
her employment of the law firm of Sexter & Warmflash, with cause, in the above-
styled litigation and related negotiations. Further, on behalf of Betty, I object to
Sexter & Warmflash's continued representation of her co-plaintiff and brother,
Anthony J. Rusciano III ("Tony"). The rest of this letter discusses (I) the cause for
your termination, (II) why you cannot continue to represent Tony, and (III) Betty's
final instructions for you.

*I. THE CAUSE FOR YOUR TERMINATION*

*Your employment is terminated effective immediately for your refusal
to follow your client's specific, written instructions that you NOT begin
preparations for closing, and NOT schedule a hasty and early closing in
this case, until your client has had a reasonable opportunity to consider
her legal options at this juncture in consultation both with you, as her
attorneys, and with Philip Halpern, Esq. who already has cautioned us in
the strongest possible terms against a "rush to closing". You have refused
to present any legal options to your own clients, instead implying that no
options except a hasty closing now exist. Philip Halpern disagrees with a
hasty closing, and is preparing a written opinion setting out his concerns
in this respect. We think it imprudent to rush to closing, given that you
disagree with Mr. Halpern on a matter very important to our interests. We
already have suffered from your hasty actions in the past, as described in
detail, infra, and cannot tolerate them further.*

In addition, in advocating for a hasty closing, you seem to have succeeded in
turning Betty's co-plaintiff, her beloved brother Tony, against her on this
important issue after many prior efforts on your part to divide your clients against
each other (described in detail, infra). Your secret and unilateral communications
with Tony behind our backs to represent his interests (and your own interest in



grabbing your fees up front, leaving your clients twisting in the wind for six years) against ours is unethical and unacceptable.  This cruel and selfish act on your part likely will result in a serious conflict within our family for many years to come.  Your unseemly desire to cash in and collect your fee quickly seems to have trumped all other considerations.

*You wrote, "In my opinion, it is an act of bad faith to now attempt to reject, or try to disturb, his ruling."  This is the ONLY legal opinion you have offered us after Judge Donovan's recent, adverse ruling.  Such an opinion, with which Phil Halpern may or may not disagree, is irrelevant to the issue of rushing to close, which you never have addressed.  And why, pray tell, is it now "bad faith" to challenge a ruling that incorporates provisions adverse to our interests that clearly are NOT set out in the June 18 settlement?  Your adversaries successfully made such a challenge, you failed to accuse them of "bad faith" in your reply papers, and you now believe that identical action on our part is "bad faith?"  This is nonsense.*

*You insolently accuse us of a "delay" of which your yourselves were the architects.  For starters, the "settlement" of 6/18/03 you engineered gave A.J. the right to delay payment to Betty and Tony indefinitely and without consequence.  That's not my opinion.  That's what Justice Donovan said!  Phil's memorandum may evaluate aspects of your prior representation, including the inordinate delays after settlement.  Is that what you're afraid of?*

*You were unable to obtain money from A.J., even on the most abject terms, after June 18.  Typically, you had no ideas to stop A.J. from delaying payment until Kingdom comes. Only after Betty's consulting attorney, Philip Halpern, suggested using CPLR 2104 to force the case back into court, did we move toward a closing.  We weren't forced back into court because of our own delays.  We were forced back into court because your "settlement" of 6/18/03 was seriously flawed in multiple respects, one of which was the inordinate delay it occasioned.  Your own "representation", together with A.J.'s bad faith (which you never called to the attention of the court), forced Plaintiffs to spend even more money paying you to salvage the "settlement" you yourselves had engineered.*

Your ineffective representation, at and since the ambiguous and half-baked "settlement" you dictated into the record on Plaintiffs' behalf on June 18, 2003, has raised serious questions about the quality of your work and/or your interest in the welfare of your clients.  Your threats against Plaintiff Margrabe, and related actions, mainly around September 15, 2003 and since February 13, 2004, were adverse to her interests and unacceptable in and of themselves.  Justice Donovan's most recent decision and order, which rejects Plaintiffs' position in favor of the defendants' position (which you characterized as a "long shot") after





more than nine months of efforts to "settle the settlement" of June 18, 2003, again exposes the serious deficiencies in your "efforts" on June 18.

The ramifications of the ill-defined "settlement" include the delay in closing the contemplated transaction, the loss of interest that would compensate Plaintiffs for that delay, the loss of certain tax certiorari refunds that you assured us were "in the bag", and your failure to adequately define "commercially reasonable" security to ensure adequate collateral to secure the installment payments to which you also agreed on our behalf, leaving us exposed to exactly the adverse outcome which now has occurred. In addition, we list numerous other causes.

*Justice Donovan's Decision and Order, Filed and Entered 3/29/04*

Justice Donovan's decision focuses on "defendants' right or ability to sell or otherwise convey certain portions of their real estate holdings". As Justice Donovan put it: "… the court finds defendants' version to express the parties' original intent. The transcript demonstrates that defendants' counsel went to great pains in stating that defendants' ability to sell off certain parts of the Son Corp. properties was a material part of the settlement. … In each of these instances, counsel could have stated specifically that sale of part of the property would trigger the due on sale clause. He made no such statement, and, despite some colloquy, plaintiff's counsel never dictated any contrary assertion into the record."

In fact, Justice Donovan's order contains the provision that acceleration of the note would occur "in the event of the sale by Rusciano and Son Corp. of more than 50% of its real property, or the sale of more than 50% of any of its voting or non-voting stock" only because "defendants 'offered' [that] as a compromise at the conference on February 27, 2004." Otherwise, apparently, Son Corp. could have sold piece after piece of its property, until almost nothing remained, without any requirement to pay off Plaintiffs' note.

*The Events of February 13, 2004 through February 20, 2004*

The events of the 2/13/04 through 2/20/04, together with this additional adverse outcome, have persuaded Betty that she must replace you, because (a) they renewed pre-existing questions of your competence and motivation, (b) featured a rehash of earlier threats you had made aimed at dividing your clients, avoiding supervision, and pursuing your self-interest at the expense of your clients, and (c) have demonstrated that the cost of repairing your defective work, to the extent that repair remains possible, continues to rise.

1.  Your messages of February 13, 2004 at·2:35 p.m. and Thursday, February 19, 2004 at 2:52 p.m. were particularly offensive and terrified my wife. Unfortunately, your repeated threats to dump one of your co-

176



plaintiffs (my wife, Betty) in favor of the other (her brother, Tony) have become disappointingly familiar. Now, they have become unacceptable.

2.  The timing of your threats, which, if carried out, would have wrought maximum damage to the interests of both of your own vulnerable clients, also is unacceptable.

3.  On or about June 19, 2003, Betty had sent you clear, written instructions, by fax, e-mailed attachment, and U.S. Mail with return receipt requested, to let her (a) see all papers in this case and (b) approve them before you sent them to opposing counsel. As you know, after about July 2, 2003, when you disregarded those written instructions, she hired Philip Halpern, Esq. to improve communications with you and to add his expertise about litigation and the Westchester County bench and bar to your own expertise.

4.  These instructions notwithstanding, on Friday, February 13, 2004, only one week before your deadline to file important papers on behalf of Betty and Tony, and on Thursday, February 19, 2004, only one day before that deadline, you sent Betty ultimatums, demanding, in essence, unfettered discretion to draft and submit whatever documents you pleased, on her behalf, without any input from me (as her agent) or from her.

5.  Your ultimatums also employed two tactics we have seen from you before: (1) "jamming" us by setting artificially short deadlines for your actions, so that we had no time to review your work product, or to comment on it before you submitted it; and (2) delaying delivery of your work product to Betty's other attorneys and me, until the final moments of a genuine deadline, and then submitting it without giving us any reasonable opportunity to review or comment on it, based upon the real deadline.

6.  We then were left with Hobson's choice: either disavow your authority and work product publicly, and risk disintegration of the plaintiffs' united front and a precipitate weakening of our case, or ratify your actions, however adverse to our interests they appeared.

7.  Your ultimatums notwithstanding, your proposed drafts were replete with errors, both major errors costly to our interests, and typographical errors embarrassing to putatively "literate" persons. For example, just two of your errors in the documents that you demanded the right to send, unedited by us, could have cost your clients more than another half a million dollars, and/or could have invited future litigation. Some of them required correction, so the Order and Stipulation of Settlement would make sense. Sadly, that was typical of your work, because (a) your performance on and since June 18, 2003, has been full of errors and omissions, (b) previously, you had delivered similar ultimatums on 9/4/03

177

and 9/15/03, and (c) each ultimatum demanded the right to submit defective documents with adverse consequences for Betty.

8.   Worse, you aggravated the time pressure implicit in your threats of February, 2004 by sending them just before and during a long, holiday weekend and school vacation, knowing that Betty's consulting attorney, Philip Halpern, Esq., was out of town until February 23, 2004.  Your timing appeared calculated to make it difficult or impossible for him to participate in the litigation and negotiation, as he has been doing, at our request, for more than eight months. This sort of behavior on your part toward Mr. Halpern (and Mr. Lewis) is also familiar. From our perspective, you have been far more adept at thwarting the participation of those lawyers we have engaged to assist you than at foiling the transparent machinations of opposing counsel.

*The Delay in Closing since June 18, 2003*

Since June 18, 2003, attempting to get you to obey our most basic instructions, monitor and correct your error-laden work product, and explain your tactical and strategic decisions and actions to us, has cost us a great deal of money for supervisory lawyers. The delay and other negative outcomes that have flowed from the flawed "settlement" of June 18, 2003, have cost your clients hundreds of thousands of dollars, by your own admission. Your actions aggressively pressuring your own client, Betty, in part by playing her own brother against her, have caused her great distress.

9.   On June 18, 2003, your clients (Plaintiffs Betty and Tony) agreed in open court to a settlement in which they would sell their interests to their cousin A.J. for about $8.5 million, subject to rapid documentation and closing of the deal.  Some nine months later, the deal still has not closed, and they have yet to receive the first penny from that sale.

10.  Due to your ineffective responses to classic pettifogging and stalling on the part of your adversaries, combined with your ineffective actions and omissions at the June 18, 2003 hearing, your efforts to close the deal have failed miserably.

11.  Philip Halpern, a lawyer that Betty hired to help you produce a desirable closing, proposed the only idea that has been effective in any way in expediting that closing.

12.  Josh's motion to reargue Judge Donovan's decision seemed like just another in a series of delays to which your clients have been repeatedly subjected, and against which you have proven yourselves unable or unwilling to respond effectively, either in litigation or in negotiation.

178

> However, *he won a favorable decision in what we were told was a longshot motion.*

13. You, yourselves, caused an inordinate delay (of at least one year) at the time you were engaged by not promptly filing suit, and the tactics employed by your adversaries have been highly effective in protracting matters to an intolerable extent.

14. Casting matters in the light most favorable to you, you have caused only some of the delays, due perhaps to languor, conflicting demands on your time, naïveté about the nature of the challenges that your adversaries presented, or inexperience. Whatever the reasons, you have been utterly ineffective at the combination of litigation and negotiation necessary to bring matters to a speedy conclusion.

15. Further, you continued to play off Tony Rusciano's alleged "interests" (as you define them) against those of my wife, repeatedly challenging us to complain of an actual conflict of interest, which you abused your position of trust and confidence with Tony to create. We are not required to complain of an actual conflict of interest in the context of litigation to force your departure from the case as to both of your clients. If such a conflict arises, you are ethically required to depart the case as to both plaintiffs without prompting from us. You have insinuated that an actual conflict exists for some time now, a conflict that you helped to create. It's time for you to depart as counsel to both plaintiffs.

*A List of Further Causes for Terminating Your Employment*

16. From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

17. For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit (which both clients requested that you file immediately), although you already were familiar with the facts, having filed a strikingly similar lawsuit (as Defense counsel noted in his response to your complaint) against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

179




18.    As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

19.    As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

20.    As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

21.    Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

22.    Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

23.    Specifically, from December 12, 2002 to at least March 31, 2004, you failed to obtain disclosure of the details (including dollar amounts) of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients had repeatedly requested, would have been the wiser course of action. As a result of your failure to gather relevant information, Plaintiffs cannot at this time provide a dollar figure for the cost of your negligence with respect to tax certiorari refunds for Secor Lane Corp. and Vinrus Corp. However, by information and belief it is between zero dollars and $50,000, and a precise figure could be calculated, given time and cooperation of defendants.

24.    Before June 18, 2003, you pooh-poohed my request to prepare for a flurry of settlement discussions on the scheduled first day of trial, because: "This case is going to trial." As a result, clients—and apparently you—had not

120



prepared sufficiently to negotiate a clear and unambiguous settlement agreement that provide plaintiffs with what you had promised them just prior to allocution. Justice Donovan's most recent decision and order, which reverses important aspects of his earlier decision and order in adopting defendants' position on an important issue evidences your shoddy workmanship on June 18 beyond any doubt..

25.    On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal.

26.    Instead, you permitted opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those tax certiorari refunds, and costing your clients hundreds of thousands of dollars in the final settlement. Typically, the 37.12% share dictated into the record was not even Plaintiffs' direct 37.32% ownership proportion for even Rusciano & Son. Corp. property, by your own expert's figures, much less the correct direct ownership share for the property of other Rusciano Companies. Moreover, it gave no consideration to Plaintiffs' indirect ownership, e.g. in Secor Lane Corp. via Rusciano Associates and vice versa.

27.    On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal. Instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

28.    After June 18, 2003, due in part to your defective dictation of the agreed-upon terms of settlement into the record on that date, and in part by your passive acceptance of Josh Grauer's flood of ambiguous and pro-Defendant language, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, eventually costing Plaintiffs more than $125,000 in lost interest. In desperation, after your ineffective behavior became apparent, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

29.    On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an

unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

30.    From about July 2, 2003 through about November 28, 2003, you manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby threatened to deliberately convert a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you extracted negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.

31.    In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest. You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

32.    Your strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement. You abused your leverage as sole counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, even if not to the benefit of your clients.

33.    Some of the concessions you offered to your adversaries ensured earlier payment of your fees while consigning one of your clients to likely insolvency.



34.     On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

35.     The fact that you believed that A.J. intended to take an illegal tax deduction for such a payment, in which case the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate it orally when your clients met you at the courthouse.

36.     On September 15, 2003, without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you presented her with an ultimatum, demanding that she approve a proposal under which A.J. could liquidate 50% of the Son Corp. real estate without paying your clients in full.  Even your strategy of offering concessions that the Defendants had <u>not even demanded on June 18, 2003</u> failed to conclude the process.  In short, you could not close the deal <u>even upon the most abject terms</u>, and apparently were unaware of your clients' right to approach the judge for relief.

37.     Only <u>after</u> Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did <u>Mr. Halpern</u> suggest an approach that allowed Judge Donovan to break the impasse.  With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed.  These errors and omissions have cost your clients many thousands of dollars in your additional legal fees as the meaning of the ambiguous and shoddy "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to Mrs. Margrabe of Mr. Halpern's (and Mr. Lewis's) time and expenses.

38.     On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

39.     On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel.  As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

102



40.   During this extended period of ineffective advocacy you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that we believe he never displayed to opposing counsel.

## II. WHY YOU CANNOT CONTINUE REPRESENTING TONY

Further, on behalf of Betty, I object to Sexter & Warmflash's continued representation of her co-plaintiff and brother, Tony. Your adverse and offensive actions toward your client, Betty, have caused her great distress and make it clear that your continued involvement in this case in any capacity is a threat to her interests. Consequently, she cannot allow you to be involved in this case, going forward, whether as a "litigator" for either plaintiff, as the agent handling the closing, or as "escrow agent" over the six and one-half years after the closing.

You are well aware of the potential conflicts of interest between clients, because you have repeatedly used them to try to manipulate your clients. Now, the clients have some actual conflicts of interest. These actual conflicts of interest, plus New York State case law imply that you must withdraw as counsel for both clients. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Your involvement in the case as Tony's attorney is an unacceptable threat to Betty for several reasons:

41.   The plaintiffs have an actual conflict of interest over employing you. Plaintiff Margrabe has fired you for the reasons stated in this letter. Plaintiff Rusciano wants to employ you.

42.   Since about February 2000, in your position of trust and confidence as Plaintiffs' counsel, you have learned the confidences and secrets both of Betty and of Tony. You have knowledge of Betty's bargaining strategy and financial strength. You could use all this information to Tony's advantage, and adverse to Betty.

43.   You have failed to mention to your clients several longstanding, continuing, and actual conflicts of interest between Sexter & Warmflash and Betty, and you have actively pursued your interests at the expense of your clients' interests.

44.   You have a record of manipulating your clients to further your own interests, and have had particular success with the more pliable Tony. Your continued playing of one plaintiff against the other is unacceptable.



45.     You have insinuated repeatedly that the continuing potential conflicts of interest between your clients have become actual conflicts of interest. Rather than discussing these issues jointly with both clients, however, in an effort to amicably resolve them, you have simply threatened to withdraw at sensitive times during the negotiations, to coerce Betty into adopting Tony's position on several issues. If you represent Tony in future, you are likely to succeed in creating additional actual conflicts of interest between Betty and Tony, further exacerbating a strained family relationship to which you contributed.

## III. FINAL INSTRUCTIONS

You are instructed to turn over all of your files in this matter to Mr. Halpern immediately upon receipt of this letter, and to prepare and submit directly to your clients a final bill for all legal services, loans, interest, and other charges you assert are due and owing from them. Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,


William Margrabe

Cc:     Elizabeth Margrabe
        Philip Halpern, Esq.
        Harry D. Lewis, Esq.
        Anthony J. Rusciano III



| Page 2: [1] Deleted | Harry Lewis | 4/9/2004 10:16 AM |
|---|---|---|

*Betty has no choice, but to terminate your employment with cause, immediately, because you have written (4/8/04 6:28 p.m.) that*
*1.you "can not and will not" follow your client's (i.e., Betty's) lawful and reasonable instructions*
*2. "TONY WANTS TO CLOSE A/S/A/P and we will do everything in our power to accomplish that goal")*
*You thereby stated that you are not going to advocate for Betty, your client of four years. You thereby stated that you plan to advocate against her and in favor of her brother. What you didn't mention, and which is unethical and adverse to Betty, is that you are acting in a way that helps you collect your fees, in full, up front, even though your representation was incompetent and it reduced the probability that Betty would receive her agreed settlement money, and closing on your terms would reduce her legal claims against you for your obvious malpractice in this case.*

Thanks for putting on the record the fact that you think that your cryptic comments ("I did and essentially told you that the case is SETTLED") constitute competent legal advice about Betty's options. Obviously, your comments are non-responsive and incompetent.

| Page 2: [2] Deleted | Harry Lewis | 4/9/2004 10:17 AM |
|---|---|---|

(1) David, Michael told me that he and Josh had filed notices of appeal, and pursuing that would appear to be an option. What are the pros and cons of that appeal? Were you writing, ignorant of your partner's actions?
(2) I'm not a lawyer, but couldn't you appeal Justice Donovan's latest ruling?
(3) You could move to reargue or reconsider Justice Donovan's decision.

What are the pros and cons of just these three, obvious actions, proposed by a layman, which are three possibilities more than you have even mentioned? David, you have two possible appeals and a possible motion to reconsider, and all you can say is that Betty's case is "SETTLED"? You call that legal advice? Are you willfully ignorant? Are you disabled? Have you been struck dumb?

| Page 2: [3] Deleted | Harry Lewis | 4/9/2004 10:18 AM |
|---|---|---|

*How interesting, that you did not express the same opinion of Josh's previous, successful attempt to do exactly the same thing. Whose side are you on? Maybe, you're on David's side, without disclosure, acting in your own favor and adversely to your clients', because you would receive your fees in full, up front, at closing, even if A.J. never made a second payment to Plaintiffs. Apparently, you're on Tony's side, acting adversely to Betty. As you write, "TONY WANTS TO CLOSE A/S/A/P and we will do everything in our power to accomplish that goal." However, the one sure thing is that you are not willing to even prepare a competent discussion of Plaintiffs' current legal options, beyond settling on possibly adverse terms.*

| Page 2: [4] Deleted | Harry Lewis | 4/9/2004 10:27 AM |
|---|---|---|

*You claim that I have delayed "the receipt moneys [sic] which is properly due AND IN FACT OVERDUE, to tony and betty." David, you and*

*Michael are the architect of the disastrous 6/18/03 "settlement" that you have been trying to settle and close for nearly ten months, costing your clients hundreds of thousands of dollars of interest. Your malpractice was of such disastrous and unique incompetence that a search for similar cases has resulted in no results since World War II began! In plain words, no other lawyer has done anything this stupid since you were born, some sixty years ago!*

| Page 2: [5] Deleted | Harry Lewis | 4/9/2004 10:29 AM |
|---|---|---|

*Yet, you claim that I have delayed the settlement? David, I have no standing in this case. I can't do anything, except act as your client's agent.*

127