SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 54
--------------------------------------------------------------X

SEXTER & WARMFLASH, P.C., DAVID
WARMFLASH and MICHAEL PRESENT,

       Plaintiff,        Index No.: 107569/04

                **DECISION and**
                **ORDER**

   -against-

WILLIAM MARGRABE and
ELIZABETH MARGRABE,

       Defendants.
--------------------------------------------------------------X

KORNREICH, SHIRLEY WERNER, J.:

   This is an action for defamation arising from a letter terminating legal representation.

Plaintiffs, a law firm and two of its attorneys, represented defendant Elizabeth Margrabe and her

brother Anthony J. Rusciano III, in a 2001 action in Westchester County[1] against their cousin

Anthony J. Rusciano II, in connection with disputes regarding the family business. The litigation

led to a settlement of over $8 million for Mrs. Margrabe and her brother, the terms of which were

read into the record in open court on June 18, 2003. However, the settlement closing was

delayed due to disagreements between the parties and resultant motion practice. As events

unfolded, Mrs. Margrabe and her husband, co-defendant William Margrabe (to whom she had

given power of attorney), "became concerned about the progress of the litigation," and, therefore,

retained first, Philip Halpern and, then, Harry Lewis as additional counsel "to act along with

Sexter Warmflash" in representing Mrs. Margrabe's interests in the litigation. Affidavit of W.

---

[1] Elizabeth Margrabe and Anthony J. Rusciano, III, et al. v. Anthony J. Rusciano, II et al.,
Supreme Court, Westchester County, Index No. 10032 (the "Westchester Action").

Margrabe, ¶ 11.  On April 9, 2004, Mr. Margrabe, as his wife's attorney-in-fact, sent a letter to

S&W terminating their representation of Mrs. Margrabe.  This letter, which was signed by Mr.

and Mrs. Margrabe, forms the basis of this action, since copies were simultaneously sent to Mrs.

Margrabe's brother, as well as to Halpern and Lewis.[2]

I.      Motions

Defendants now move to dismiss the complaint pursuant to CPLR 3211(a)(1) and (7) and

to permanently seal the record.  In support of their motion, defendants submit the affirmation of

their attorney William Greenberg, the affidavits of William Margrabe, Elizabeth Margrabe and

Harry Lewis, and documentary evidence.  Plaintiffs oppose the motion to dismiss, and cross-

move for summary judgment as to liability.  In support of their motion and in opposition to

defendants' motion, plaintiffs submit the affidavit of David Warmflash, together with

documentary evidence.

II.     Factual Background

A.      The Joint Representation Agreement between S&W, Elizabeth Margrabe and

Anthony J. Rusciano, II

The parties submit a copy of a retainer letter, dated February 4, 2000, between S&W,

Elizabeth Margrabe and Anthony J. Rusciano, III.  In the letter, S&W stated, inter alia, that it

would attempt to:

> extricate [Mrs. Margrabe and Mr. Rusciano] from the businesses,
> either by having the businesses redeem your interests or by having
> your cousin, Anthony, or his nominee, purchase your interests in

---

[2]The letter is addressed to David Warmflash, Esq., Michael Present, Esq., Sexter & Warmflash, P.C., and is marked "cc:" to Elizabeth Margrabe, Philip Halpern, Esq., Harry D. Lewis, Esq. and Anthony J. Rusciano III.  See Affirmation of W. Greenberg, Exhibit A.

2

the businesses, or a combination thereof.  We have indicated to you that a cursory view of some of the documents indicates , theoretically, [there] may be a conflict of interest between the two of you relating to the value of each of your interests and that you have advised us that, irrespective of the agreements, any and all benefits to be derived shall be shared between you equally.

Affidavit of W. Margrabe, Exhibit C.

With regard to fees, the retainer letter provides as follows:

> (a) During the course of this litigation, you shall pay us on a monthly basis, fifty percent (50%) of our current legal fees as calculated by multiplying the number of hours spent working on your matter by our regular and customary billing rates for similar services performed by this firm;
> (b) Upon conclusion of the litigation and your receipt of payment for your interest in the Rusciano business entities, you shall pay us an additional amount equal to one hundred percent (100%) of our total legal fees accrued during the course of our representation of you during this matter, as calculated by multiplying the number of hours spent working on your matter by our regular and customary billing rates.  Accordingly, upon conclusion of this litigation—whether by settlement or following trial—the total legal fees to which we shall be entitled shall equal one and one-half times the actual legal fees accrued.

Margrabe Aff., Ex. C.

> B.     The Underlying Westchester Action

On June 18, 2003, after "extensive discovery, motion practice and extensive trial preparation," (see Affirmation of E. Finkelstein, Exhibit 2 (Affidavit of M. Present, ¶ 4)),[3] the parties to the Westchester Action appeared before Judge W. Denis Donavan.  The transcript of these proceedings reflects that the parties "met with the Court and endeavored to come up with

---

[3] Mr. Margrabe acknowledges that "some pre-trial work was done in gaining readiness for the trial of the Rusciano Lawsuit," but also attests to his belief that "Sexter Warmflash were never properly or adequately prepared to try the case... ."  Margrabe Aff., ¶ 21.

3

the basic and fundamental financial terms for a complete and comprehensive settlement of every claim" in the action. Margrabe Aff., Ex. H, p. 2. The record reflects that "the long form settlement stipulation is not being dictated by either attorneys [sic] today on the record, as it is contemplated that it will be a long form agreement, which will be subject to review and approval of the accountants and corporate attorneys..." Id., p. 4-5. Nevertheless, it was determined before Judge Donovan that, as part of the settlement, Anthony J. Rusciano II would pay to Mrs. Margrabe and her brother "the total sum during the term of [the] settlement of eight million three hundred seventy-five thousand dollars." Id. at p. 9. At the conclusion of the proceedings, the court inquired of Mrs. Margrabe whether she understood the terms of the settlement, thought it fair and equitable, and was satisfied with her representation by Messrs. Warmflash and Present. Mrs. Margrabe answered in the affirmative to each of these inquiries. Id., p. 36-40.

Now, Mrs. Margrabe avers that she is a social worker with "no business experience." Affidavit of E. Margrabe, ¶ 3. Because of her lack of experience, Mrs. Margrabe claims she "had little direct contact with the prosecution of the action against [her cousin] except that [she] did what the Warmflash firm directed [her] to do... ." Id. at ¶ 4. Mrs. Margrabe further avers that she "was not entirely satisfied with the money [she] would be receiving [pursuant to the settlement that was to be entered onto the record]," but "nevertheless elected to settle the case on these terms because [she] was anxious to end the anxiety and trauma both personal and familial associated with the three year litigation process through June 18, 2003." Id. at ¶ 5. Moreover, Mrs. Margrabe avers that several of the terms placed on the record on June 18, 2003 did not accord with her prior understanding, as related to her by S&W, of the settlement to which she had agreed. Id. at ¶ 6. However, she avers that she "took the stand and went along with the

4

settlement anyway, because [her] lawyers had told [her] that day that [she] had 'no choice' at that

point to change any word of the stipulation that went into the record." Id. at ¶ 8.

According to Mrs. Margrabe, "Michael Present of the Warmflash firm specifically told

[her] that were [she] not to go along with the Settlement that the Warmflash firm had worked out

with A.J.'s counsel on behalf of [her and her brother], as joint clients, the Warmflash firm would

continue to prepare papers selling only the interests of [her] brother to A.J. leaving [her] to

continue with the litigation with separate attorneys. The Warmflash firm's threat faced [her]

with a dilemma...stop being 'joined at the hip' with Tony and continue litigation from a much

weaker position, or ... accept a deal that [she] would not accept if Tony and [she] went ahead,

'joined at the hip.'" Id. at ¶ 10. This dilemma would be caused because "Tony's interest was

potentially more valuable than [Mrs. Margrabe's], but only if his financial distress did not force

him to sell at a bargain price." Id. at ¶ 10, n.1.

Michael Margrabe, her husband, avers that, as the terms of settlement were being entered

onto the record before Justice Donovan on June 18, 2003, he "became concerned about the actual

nature of the terms of settlement." Margrabe Aff., ¶ 23. He thought back to his and his wife's

"history of trying to communicate with [S&W]," in which they "had often failed to get a straight

answer... ." Id. at ¶ 23. The next day, Mr. Margrabe consulted with "a friend, Harry Lewis,

Esq." Id. After reviewing the settlement transcript, Lewis apparently advised Mr. Margrabe that

the settlement provided "no adequate security" for "seven million dollars of future payments to

be made to [Mrs. Margrabe] and her brother... ." Id. Lewis further advised Mr. Margrabe that

the settlement was ambiguous, possibly non-binding, and requiring further negotiation, with no

provision made for an award of interest during such negotiation. Id. at 24. At this point, Mr.

Margrabe felt that he and Mrs. Margrabe "could probably have fired Sexter Warmflash for cause... ." Id. at 25. However, they did not do so because Mr. Rusciano, whose "financial circumstances were desperate," was eager to close the settlement and Mrs. Margrabe "wanted to maintain a united front with her brother... ." Id.

Mr. Margrabe avers that the "enormity of the inadequacy of the June 18, 2003 Stipulation of Settlement" led to a series of "[f]ruitless court conferences,"and the submission of "[v]oluminous papers" by S&W on its clients behalf, none of which were able to cure the "horrific defects" of the settlement. Id. In a March 29, 2004 decision on the parties' motions to enforce their respective versions of the June 18, 2003 settlement, Justice Donovan found that the proposed settlement agreement submitted by the defendants accurately "express[ed] the parties' original intent." Id., ¶ 28.

When Mr. Margrabe inquired as to Mrs. Margrabe's legal options regarding the "catastrophic adverse terms of the settlement agreement," "serious disagreements" arose between S&W and Mr. Margrabe, who was acting in his capacity as Mrs. Margrabe's attorney-in-fact. Margrabe Aff., Ex. U (February 25, 2004 letter from S&W to the court). In light of the disagreements, S&W "repeatedly offered to resign as Mrs. Margrabe's counsel," but was "repeatedly asked by Mrs. Margrabe not to resign as her counsel, notwithstanding the disagreements with her husband, to avoid jeopardizing the settlement." Id.

Mr. Margrabe submits copies of various e-mail communications with S&W regarding Justice Donovan's March 29, 2004 decision, in which Margrabe sought legal advice to avoid entry of a final settlement pursuant to Justice Donovan's decision. See id. at ¶¶ 31-41. During these e-mail communications, a conflict arose surrounding the timing of the proposed closing.

6

On April 8, 2004, David Warmflash sent an e-mail to Mr. Margrabe ("cc-ing" Mr. Rusciano, and Mrs. Margrabe's additional attorneys Halpern and Lewis), stating that "the signing/closing will occur on Thursday 4/15 ... the end of the long ordeal appears to be in sight ... ." Margrabe Aff., Ex. M. Mr. Margrabe wrote back that the proposed closing date was impossible because Mrs. Margrabe would be out of town. Mr. Margrabe offered as an alternative "any day the following week... ." Id., Ex. O. After an increasingly contentious exchange of emails, Mr. Warmflash wrote to Mr. Margrabe:

> You have no right to delay, as you have in the past, the receipt moneys [sic] which is properly due AND IN FACT OVERDUE, to Tony and Betty. If I remember correctly, it was YOU who wanted, and agreed, to let Donovan decide. Donovan has decided! In my opinion, it is an act of bad faith to now attempt to reject, or try to disturb, his ruling. I know the [sic] YOU said Betty was unavailable...Bill do you understand that the case is SETTLED and there is a stipulation Donovan has directed to be used to finalize the settlement? It is time to collect the money and get on with everyone's lives!

Id., Ex. R (emphasis in original).

In response to the foregoing e-mail message, Mr. Margrabe wrote to Mr. Warmflash: "Next week, there will be no closing, because Betty will be out of town." Id., Ex. S. Warmflash replied: "Bill you will not prevent the closing ... I will show up with Tony and we will close." Id., Ex. T. In light of this exchange, it was "clear to [Mr. Margrabe] that [his] wife had no choice but immediately to fire Sexter Warmflash and direct that the firm not continue to represent Tony, in that [his] wife and Tony now had an absolute conflict as to how to proceed." Id. at ¶ 41. The allegedly defamatory April 9, 2004 letter followed.

C.     The April 9, 2004 Letter

On April 9, 2004, the Margrabes wrote a letter to "terminate [Mrs. Margrabe's]

employment of the law firm of Sexter & Warmflash, with cause, in [the Westchester Litigation],"

and to "object to [S&W's] continued representation of [Mr. Rusciano]." Id. at p. 1.  The letter,

which is marked "Personal and Confidential," states, in pertinent part, as follows:

> Your employment is terminated effective immediately for your
> refusal to follow your client's specific, written instructions that you
> NOT begin preparations for closing, and not schedule a hasty and
> early closing in this case, until your client has had a reasonable
> opportunity to consider her legal options at this juncture in
> consultation both with you, as her attorneys, and with Philip
> Halpern, Esq. who already has cautioned us in the strongest
> possible terms against 'rush to closing.'

Greenberg Aff., Ex. A (emphasis in original).

In further explaining the reasons for the discharge, the letter accused S&W of, inter alia:

> refus[ing] to present any legal options to [its] own clients...
> [engaging in] secret and unilateral communications with [Mrs.
> Margrabe's brother] behind our backs to represent his interests
> (and your own interest in grabbing your fees up front, leaving your
> clients twisting in the wind for six years)... [providing] ineffective
> representation, at and since the ambiguous and half-baked
> 'settlement' you dictated into the record on Plaintiffs' behalf on
> June 18, 2003, [which] has raised serious questions about the
> quality of your work and/or your interest in the welfare of your
> clients... [making] repeated threats to dump one of your co-
> plaintiffs (my wife, Betty) in favor of the other (her brother,
> Tony)... [preparing] proposed drafts [that] were replete with errors,
> both major errors costly to our interests, and typographical errors
> embarrassing to putatively 'literate' persons... continu[ing] to play
> off Tony Rusciano's alleged 'interests' (as you define them)
> against those of my wife, repeatedly challenging us to complain of
> an actual conflict of interest, which you abused your position of
> trust and confidence with Tony to create... communicat[ing]
> inaccurate messages to Tony Rusciano alone (deliberately failing to
> communicate those same messages to Elizabeth) with respect to
> ongoing settlement negotiations to exacerbate division between
> Elizabeth and her own brother to force an earlier settlement at
> which you expected to collect all of your fees, loans and interest...
> contract[ing] to charge your own clients interest in excess of that
> permitted by New York law on loans related to your fees.

8

Greenberg Aff., Ex. A (emphasis in original).

In alleging that S&W could not legitimately continue representing Mrs. Margrabe's brother, the letter stated:

> The plaintiffs have an actual conflict of interest over employing you. Plaintiff Margrabe has fired you ... Plaintiff Rusciano wants to employ you. ...You have a record of manipulating your clients to further your own interests, and have had particular success with the more pliable Tony. Your continued playing of one plaintiff against the other is unacceptable.

Id.

Mrs. Margrabe avers that she and her husband sent the letter "as a privileged and confidential communication to Warmflash [and] Present [of S&W, to] Lewis, [to] Halpern, and [to her] brother Tony ... expecting that it would remain confidential and privileged, and would not be used by the Warmflash firm against us, except possibly in a dispute ... over fees they might claim were due... ." E. Margrabe Aff. at ¶ 19. Mrs. Margrabe further avers that she "had no intention to harm [S&W] or injure them in any way, except to cause them to stop being my lawyers (and Tony's) and to record why I was firing them, so that I could always state that they were fired for cause in the event that issue should arise in a fee dispute in the future." Id.

Subsequently, S&W moved to fix a lien on the settlement proceeds, Mrs. Margrabe cross-moved to disqualify S&W, and separately moved to seal a portion of the file. In a September 2004 decision and order, Justice Donovan granted S&W's fee motion, finding that although the stipulation of settlement entered after its March 29, 2004 clarification "may not have been perfect," it was "substantially the same stipulation dictated onto the record on June 18, 2003... ." Id. The court granted the motion to disqualify S&W prospectively from representing Mrs.

Margrabe's brother, without opposition, noting that "the existence of a potential conflict of interest between the co-plaintiffs was disclosed in the very first paragraph of the retainer agreement executed on April 18, 2001. Plaintiff Elizabeth Margrabe 'lived' with the potential conflict for over three years of litigation before making this application." Id. Finally, the court granted the request to seal the file only as to the April 9, 2004 letter, noting that the "confidences and family secrets contained in the termination letter [were] difficult for the court to discern. However, given plaintiff Elizabeth Margrabe's sensitivity to the contents of a letter she co-signed and the absence of any general public interest in this matter, sealing appears to be indicated." Id.

Among the papers submitted on S&W's fee motion was the affirmation of Joshua Grauer, the attorney for the defendants in the Westchester Action, wherein Mr. Grauer opined that:

> Plaintiff Margrabe has suggested that the fact that the final settlement agreement was not achieved until May 2004 was somehow due to S&W. This is not accurate.
>
> I personally know that the delays were not attributable to S&W. At all times, S&W was promptly responsive and was continually and diligently attempting to resolve all differences between the parties without further delay and motion practice. The reason that the final agreement could not be achieved during that period was because of the parties' positions. For example, plaintiff Margrabe and her husband were continually demanding that S&W seek to add new terms and conditions to the settlement. ...
>
> S&W did an excellent job on behalf of the Plaintiffs. At all time, [sic] I found S&W to be highly competent, professional and skilled advocates on behalf of their clients. In fact, I believe that it was only because of S&W's superior representation of their clients that the settlement even materialized. ...
>
> S&W did everything possible in the effective representation of their clients and achieved an extremely favorable result on their behalf. Indeed, given the positions taken by the parties in this action, I can say that had I been representing the plaintiffs in this action, I would have followed the same course of action as S&W.

Finkelstein Aff., Ex. 3.

D.      The Margrabes' Agreements with Additional Counsel

The Margrabes' retainer agreement with Philip Halpern, dated July 2, 2003, provided that

Halpern would represent the Margrabes "limited to a review of the settlement documents

generated by ... [S&W] in connection with [the Westchester Action]."  Greenberg Aff., Ex. F.  In

a further agreement, dated April 19, 2004, Halpern warned:

> [A]s I have explained to you, early in my career I worked for David
> Warmflash, Esq.  I have told you and am reconfirming to you that I
> will not and cannot participate in any applications, motions,
> plenary actions or proceedings brought by David Warmflash's firm
> concerning his legal fees, nor can I negotiate on your behalf any
> resolution of the outstanding legal fees which may be due David
> Warmflash's firm.

Greenberg Aff., Ex. G.

The retainer agreement between the Margrabes and Mr. Lewis, dated November 17, 2003,

provided as follows:

> Given the concern of the Margrabes about the status of
> negotiations occurring in chambers...Lewis will enter an
> appearance as special bankruptcy counsel on behalf of Elizabeth
> Margrabe only in [theWestchester Action].... Lewis is entering a
> special appearance as bankruptcy counsel to Elizabeth Margrabe
> only, and will not be replacing existing counsel of record ...  His
> duties shall be to advise the Margrabes about matters within his
> area of expertise, and to assist counsel of record and Philip
> Halpern, Esq. to the extent his expertise permits.  He has informed
> the Margrabes that he is not expert in state court litigation, or in
> structuring or closing settlements in state court, and that he advises
> use of other counsel for that purpose.

Greenberg Aff., Ex. E

In an affidavit submitted in support of the Margrabes' motion, Mr. Lewis avers that he

was brought in to review the settlement terms in the Westchester Action, and subsequently

represented Mrs. Margrabe in a fee dispute proceeding arising from that action.  Affidavit of H.

11

Lewis, ¶ 6. According to Lewis, "the settlement dictated into the record on June 18, 2003 ...

disclosed serious omissions and shortfalls in the agreement Warmflash had made on behalf of

Betty and Tony, exposing them to inordinate insolvency risks in a number of respects." Id. at ¶

9. Lewis also avers that S&W's negligence caused the Margrabes to lose $340,000 in potential

recovery due to the expiration of the statute of limitations relative to some of their claims. Id. at

18. According to Lewis, the "retainer agreement was not a contingency fee contract, and did not

provide for a fee contingent upon a successful outcome," and therefore, the additional 100%

charge was usurious. Id. at ¶ 19-20.

In conclusion, Mr. Lewis avers as follows:

> I had reviewed drafts of the letter dated April 9, 2004 from Bill and
> Betty to Warmflash (the "Communication") which Warmflash
> contends constitutes defamation per se, prior to its release. To the
> extent I have personal knowledge of the matters discussed in the
> Communication, I can state without qualification that the
> statements made in the Communication are true, that I cautioned
> Bill that the contents of the letter must be absolutely true, that I
> told him that a good faith argument could be made that the
> Warmflash Retainer Agreements were usurious under New York
> law, and that my and Philip Halpern, Esq.'s receipt of a copy of the
> communication was consistent with our roles as advisors to Bill
> and Betty in the case, and that sending Tony, as joint plaintiff, a
> copy of the letter, was privileged.

Id. at ¶ 23.

III.    Conclusions of Law

The Court's task in a CPLR 3211 motion is "to determine whether plaintiff's pleadings

state a cause of action." See 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144

(2002). The motion must be denied if from the pleadings' four corners factual allegations are

discerned which taken together manifest any cause of action cognizable at law." Id. (citations

omitted). The Court must "accept the facts as alleged in the complaint as true, accord plaintiff

the benefit of every possible favorable inference, and determine only whether the facts as alleged

fit within any cognizable legal theory." Leon v. Martinez, 84 N.Y.2d 83, 87-88 (1994).

On the other hand, a request for summary judgment requires the Court to decide whether

the moving party has established its cause of action or defense sufficiently to warrant the court as

a matter of law in directing judgment in its favor, and done so by tender of evidentiary proof in

admissible form. Zuckerman v. City of N.Y., 49 N.Y.2d 557 (1980). If the movant makes out a

prima facie case, the opponent must come forward and "lay bare his proofs" of any alleged triable

issues of fact. See In re Dissolution of Rencor Controls, Inc., 263 A.D.2d 845 (3rd Dept. 1999)

citing Hanson v. Ontario Milk Producers Coop., Inc., 58 Misc.2d 138 (Sup.Ct. Oswego County

1968)(Aronson, J.). For the reasons that follow, the Court concludes that defendants are not

entitled to dismissal of the action pursuant to CPLR 3211. On the other hand, plaintiffs are

entitled to partial summary judgment on liability as to the usury allegation. Moreover,

defendants' motion to seal the record herein is denied.

A.    Libel

Where the plaintiff is a private person and the speech raises a matter of private concern,

the elements of a libel claim are: (1) the statement was defamatory; (2) the statement referred to

the plaintiff; and (3) the statement was published (i.e., communicated to someone other than the

plaintiff). Where a statement is libelous per se, special damages need not be claimed. Chiavarelli

v. Williams, 256 A.D.2d 111 (1st Dept. 1998). In order to be libelous per se, the challenged

statements "must be more than a general reflection upon [the plaintiff's] character or qualities"

and must suggest improper performance of his duties or unprofessional conduct. Id. at 113. It is

13

apparent (and undisputed in defendants' moving papers) that various statements in the April 9, 2004 are libelous per se. It hardly need be said that the allegations that S&W, inter alia, created, exacerbated and manipulated the conflict of interest between Mrs. Margrabe and her brother for its own pecuniary motives, produced work product riddled with errors, and charged its clients a usurious interest rate "suggest improper performance" of S&W's duties. Defendants argue that they are entitled to dismissal because: (1) the April 9, 2004 letter was protected either by privilege or by Disciplinary Rule 4-101 of the Code of Professional Responsibility; and (2) the letter was not "published" as to Halpern and Lewis. The Court disagrees.

    1.    Absolute Privilege

        CPLR § 4503(1) provides that an attorney may not disclose any "confidential communication made between the attorney or his or her employee and the client in the course of professional employment[.]" However, "[n]ot all communications to an attorney are privileged. In order to be privileged, it must be shown that the information sought to be protected from disclosure was 'confidential communication' made to the attorney for the purpose of obtaining legal advice." Matter of Priest v. Hennesy, 51 N.Y.2d 62, 68-69 (1980). Accord People v. Osorio, 75 N.Y.2d 80, 84 (1989) (attorney-client privilege attaches when information is "disclosed in confidence to the attorney for the purpose of obtaining legal advice or services"). Moreover, the burden of demonstrating the elements of privilege falls on the party asserting such privilege. See Osorio, supra. Defendants have failed to meet this burden.

        The April 9 letter manifestly was not sent to S&W for the purpose of seeking legal advice. To the contrary, the letter terminated any relationship whereby S&W could dispense such advice. At the time the letter was sent, it was clear that Mrs. Margrabe's interests had

significantly diverged from her brother's to the extent that Mr. Margrabe perceived an "actual conflict" between them. Consequently, the Margrabes' communications to Mr. Rusciano were not privileged. Although Mr. Lewis advised Mr. Margrabe that sending the letter to Mrs. Margrabe's brother would be protected by privilege, the Margrabes' reliance on that advice was not reasonable given that Lewis had specifically stated in the retainer agreement that he was "not expert in state court litigation" and advised the Margrabes to seek advice of "other counsel for that purpose." The Margrabes would have been better served by heeding to this admonition.

As to the Margrabes' additional attorneys, the letter (which did not include any direct requests for advisement by Halpern or Lewis), could only have been "disclosed in confidence to the attorney for the purpose of obtaining legal advice or services" to the extent that it contained information relevant to their ongoing representation. Mrs. Margrabe avers that the reason for the letter (in addition to terminating S&W's representation) was to make a record of termination for cause to be used in a subsequent fee dispute. Thus, the Margrabes cannot plausibly argue that the letter was privileged as to Halpern, who specifically warned them in his retainer that he could not represent them in any fee dispute with S&W.

As to Mr. Lewis, who was retained for his bankruptcy expertise and disclaimed any expertise in "state court litigation, or in structuring or closing settlements in state court," there is, perhaps, a plausible argument that the letter contained information relevant to his representation of the Margrabes. Even if this were so, and the Court does not so hold, any privilege that may have existed with Lewis was destroyed by the concomitant publication of the letter to other parties–Mr. Rusciano and Mr. Halpern. The Margrabes did not have a "reasonable expectation of confidentiality under the circumstances." See Osorio, supra at 84 (privilege destroyed by

15

publication to third party with whom client has no reasonable expectation of confidentiality).

    2.    <u>Qualified Privilege</u>

    A "'communication made by one person to another upon a subject in which both have an interest'" may be protected by a qualified privilege. <u>Liberman</u> v. <u>Gelstein</u>, 80 N.Y.2d 429, 439 (1992) (citing <u>Stillman</u> v. <u>Ford</u>, 22 N.Y.2d 48, 53 (1968)). "The rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded." <u>Liberman</u>, <u>supra</u> at 437. However, a qualified privilege will not apply to statements made with "malice." <u>Id.</u> A statement is made with malice if it was spoken with "spite or ill will," or in cases governed by the First Amendment, where the speaker had "'knowledge that [the statement] was false or ... reckless disregard of whether it was false or not.'" <u>Id.</u> quoting <u>New York Times Co.</u> v. <u>Sullivan</u> 376 U.S. 254, 279-280 (1964). Here, defendants claim that they legitimately sent the letter to Mr. Rusciano, Mrs. Margrabe's brother, as well as her attorneys Halpern and Lewis, because those individuals shared with her a common interest in the conduct of the Westchester Litigation. An issue is raised as to whether the Margrabes indeed shared a common interest with Mr. Rusciano. The joint representation letter with S&W referred to potential conflicts of interest between Mrs. Margrabe and her brother. Indeed, Mrs. Margrabe admits that her brother's interest in the Rusciano entities were more valuable than hers, but for his need to settle quickly due to financial straits. Moreover, the record suggests that the Margrabes did not conduct themselves <u>vis a vis</u> Mr. Rusciano in a manner one would expect for persons united in interest. To the contrary, the Margrabes concealed their strategy from him and even hired additional counsel without his knowledge and instructed the new counsel not to make their presence known.

Mr. Margrabe avers that defendants initially did not tell Mr. Rusciano that they had retained

additional counsel in order to "maintain a united front with her brother and co-plaintiff... ." But,

a jury could reasonably conclude that the Margrabes concealed their strategy from Mr. Rusciano

for their own ends, thus raising a triable issue as to whether the purpose of sending the April 9,

2004 letter to him was malicious.  See Stukuls v. State of New York, 42 N.Y.2d 272, 282 (1977).

Moreover, defendants present no convincing reason why Halpern and Lewis would have

had an interest in receiving a catalog of S&W's alleged failings leading up to the June 18, 2003

settlement on the record.  By the terms of their respective retainer agreements, Lewis and

Halpern were brought in to review the settlement and advise as to closing.  As noted above,

Halpern specifically disclaimed any ability to represent defendants in any fee disputes with

S&W.  Thus, defendants have failed to meet their burden of proving privilege.

3.    Disciplinary Rule 4-101

Disciplinary Rule 4-101 of the Code of Professional Responsibility, which is codified at

22 NYCRR § 1200.19, provides in pertinent part that:

> (a) Confidence refers to information protected by the
> attorney-client privilege under applicable law, and secret refers to
> other information gained in the professional relationship that the
> client has requested be held inviolate or the disclosure of which
> would be embarrassing or would be likely to be detrimental to the
> client.
>
> (b) Except when permitted under section 1200.19(c) of this Part, a
> lawyer shall not knowingly:
>
> (1) reveal a confidence or secret of a client;
>
> (2) use a confidence or secret of a client to the disadvantage of the
> client; and
>
> (3) use a confidence or secret of a client for the advantage of the

17

wrongful conduct." See Meyerhofer v. Empire Fire & Marine Ins. Co., 497 F.2d 1190 (2d Cir. 1974) (attorney properly revealed confidences in order to defend against claim that he knowingly participated in filing of false and misleading registration statement); accord General Realty Assocs. v. Walters, 136 Misc. 2d 1027 (Civ. Ct. New York Cty, 1987) (Klein, J.) (in nonpayment summary proceeding, where petitioner averred that she had not received notice of judgment entered against her, her attorney was not barred from testifying that he had notified her of judgment to extent necessary to clear his name of implication of wrongdoing). Considering that the letter defendants claim is privileged was actually a termination letter, and that it was simultaneously published to three other parties, the Court concludes that S&W was not prohibited by Rule 4-101 from instituting this action based on the allegations contained in the letter.

    **4.**    **Publication**

    Also unavailing is defendants' argument that the April 9, 2004 letter was not "published" to Halpern and Lewis because Mrs. Margrabe and her attorneys are "treated as the same person" for the purposes of libel claims. In support of this questionable proposition, defendants cite a Civil Court case from 1933, where the court, in turn, cited a 1909 Louisiana case holding that "the mailing of a private letter by a person charged with libel, addressed to the attorneys of complainant in answer to questions relating to matters in which both are concerned, does not constitute a publication within the law of libel." See Fingerhut v. Weiner, 147 Misc. 269, 271 (City Ct. Kings Co.)(Russell, J.) (citing Dickinson v. Hathaway, 122 La. 644 (1909)). Aside from the fact that Fingerhut does not even support the proposition for which it is here cited, the Court notes that in New York, a person's agent is considered a third party for the purposes of

19

publication of defamatory statements. <u>See</u> <u>Teichner</u> v. <u>Bellan</u>, 7 A.D.2d 247 (1st Dept. 1959).

Accordingly, the Court concludes that Lewis and Halpern were separate persons from Mrs.

Margrabe, and as such, they were capable of receiving defamatory statements about S&W. For

the foregoing·reasons, defendants' motion to dismiss is denied.

    <u>B.</u>    <u>Usury</u>

    The April 9, 2004 letter alleged that S&W "contracted to charge [its] own clients interest

in excess of that permitted by New York law on loans related to [its] fees." Greenberg Aff., Ex.

A. Mr. Lewis' affidavit specifies that this allegation referred to the fee provisions of the retainer

agreement with S&W. The Court concludes that the S&W fee provisions are not usurious as a

matter of law. Therefore, defendants·cannot rely on truth as a defense to the usury allegation, and

summary judgment must be granted to plaintiffs as to that allegation.

    Pursuant to General Obligation Law § 5-501, "[n]o person or corporation shall, directly or

indirectly, charge, take or receive any money, goods or things in action as interest on the loan or

forbearance of any money, goods or things in action at a rate exceeding the [statutorily prescribed

rate]." "The rudimentary element of usury is the existence of a loan or forbearance of money."

<u>In re Binghamton</u>, 133 A.D.2d 988 (3rd Dept. 1987) (citations omitted). On its face, the S&W

retainer agreement was not a "loan or forbearance" and did not call for the payment of any

"interest." Even looking "beyond the standard form of the transaction and attempt[ing] to

ascertain its true nature," as courts are required to do in analyzing a usury claim (<u>see</u> <u>Feinberg</u> v.

<u>Old Vestal Rd. Assoc., Inc.</u>, 157 A.D.2d 1002, 1003-1004 (N.Y. App. Div., 1990) (citations

omitted), the retainer agreement was not a usurious transaction. Contrary to the averments of Mr.

Lewis, the additional "100%" payment was contingent upon the clients' "receipt of payment for

20

[their] interest in the Rusciano business entities." It is well settled that a contingent payment contract cannot be a loan or forbearance subject to the usury law, even where the effect of the agreement is to provide for "a return in excess of the legal rate of interest." See O'Farrell v. Martin, 161 Misc. 353, 354 (N.Y. Misc., 1936) (citing Orvis v. Curtiss, 157 N.Y. 657 (1899)); cf. Waterbury v. City of Oswego, 251 A.D.2d 1060 (4th Dept. 1998) (late fee provision in service contract not tantamount to "interest" with respect to usury law). Thus, the Margrabes' allegation of usury was false as a matter of law, and therefore, partial summary judgment must be granted to plaintiffs as to that allegation.

On the other hand, summary judgment is denied plaintiffs as to the remaining allegations in the April 9, 2004 letter. The essence of these is that S&W improperly manipulated and even fostered the conflict of interest between Mrs. Margrabe and her brother for the purpose of advancing S&W's own interest in collecting its fee, and otherwise committed malpractice as to its client Mrs. Margrabe. In an action such as this, involving private plaintiffs and speech relating to matters of purely private concern, truth is an absolute defense to a libel claim. See White v. Barry, 288 N.Y. 37 (1942). The record submitted, which lacks, inter alia, any deposition by Mr. Rusciano II, is insufficient to establish whether, and to what extent, the allegations of abuse and inappropriate representation in the April 9, 2004, were true.

C.    Sealing of the Record

Pursuant to 22 NYCRR § 216.1, "[e]xcept where otherwise provided by statute or rule, a court shall not enter an order in any action or proceeding sealing the court records, whether in whole or in part, except upon a written finding of good cause, which shall specify the grounds thereof. In determining whether good cause has been shown, the court shall consider the

21

interests of the public as well as of the parties." Because of New York's tradition of public access to judicial proceedings, the proponent of a sealing order bears the burden of proving that there is a "'sound basis or legitimate need to take judicial action... .'" Danco Lab., Ltd. v. Chemical Works of Gedeon Richter, Ltd., 274 A.D.2d 1, 8 (citations omitted). As did Justice Donovan, the Court finds it difficult to discern the family confidences allegedly contained in the Margrabes' letter, especially where they have already disseminated it. Moreover, there is a "clear public interest" in allegations of professional misconduct by attorneys. See Liapakis v. Sullivan, 290 A.D.2d 393 (1st Dept. 2002). Thus, the Court concludes that there is no legitimate need for a sealing order here. Accordingly, it is

    ORDERED that defendants' motion to dismiss the action is denied; and it is further

    ORDERED that plaintiffs' cross-motion for summary judgment is granted as to the cause of action related to defendants' allegations that plaintiffs contracted to charge its clients interest in excess of the maximum rate permitted by New York law, and otherwise denied; and it is further

    ORDERED that defendants' request to permanently seal the file in this action is denied; and it is further

    ORDERED that the action shall continue.

The foregoing constitutes the Decision and Order of this Court.

FILED

MAR 17 2005

NEW YORK
COUNTY CLERK'S OFFICE

Date: March 14, 2005
      New York, New York                _____

                               SHIRLEY WERNER KORNREICH

22