31 Priory Lane
Pelham Manor, New York 10803

April 9, 2004

David Warmflash, Esq
Michael Present, Esq.
Sexter & Warmflash, P.C.
115 Broadway
New York, N.Y. 10006

**VIA TELEFAX**
**VIA EXPRESS U.S. MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Re: Margrabe et al. v. Rusciano et al.; Index No. 10032/2001; Termination of employment of law firm of Sexter & Warmflash, P.C. as counsel to co-plaintiff Elizabeth Margrabe with cause; disqualification of law firm of Sexter & Warmflash as counsel to co-plaintiff Tony Rusciano

Dear Messieurs Warmflash and Present:

On behalf of my wife, Elizabeth Anne Rusciano Margrabe ("Betty"), using the power of attorney that she signed on February 13, 2004, I hereby terminate her employment of the law firm of Sexter & Warmflash, with cause, in the above-styled litigation and related negotiations. Further, on behalf of Betty, I object to Sexter & Warmflash's continued representation of her co-plaintiff and brother, Anthony J. Rusciano III ("Tony"). The rest of this letter discusses (I) the cause for your termination, (II) why you cannot continue to represent Tony, and (III) Betty's final instructions for you.

## I. THE CAUSE FOR YOUR TERMINATION

Your employment is terminated effective immediately for your refusal to follow your client's specific, written instructions that you NOT begin preparations for closing, and NOT schedule a hasty and early closing in this case, until your client has had a reasonable opportunity to consider her legal options at this juncture in consultation both with you, as her attorneys, and with Philip Halpern, Esq. who already has cautioned us in the strongest possible terms against a "rush to closing". You have refused to present any legal options to your own clients, instead implying that no options except a hasty closing now exist. Philip Halpern disagrees with a hasty closing, and is preparing a written opinion setting out Plaintiffs options for closing, consistent with Justice Donovan's decision, order, and judgment. We think it imprudent to rush to closing, given that you disagree with Mr. Halpern on a matter very important to our interests. We have suffered from your hasty actions in the past, as described in detail, infra, and cannot tolerate them further.

In addition, in advocating for a hasty closing, you seem to have succeeded in turning Betty's co-plaintiff, her beloved brother Tony, against her on this important issue after many prior efforts on your part to divide your clients against each other (described in detail, infra). Your secret and unilateral communications with Tony behind our backs to represent his interests (and your own interest in

grabbing your fees up front, leaving your clients twisting in the wind for six years) against ours is unethical and unacceptable. This cruel and selfish act on your part likely will result in a serious conflict within our family for many years to come. Your unseemly desire to cash in and collect your fee quickly seems to have trumped all other considerations.

You wrote, "In my opinion, it is an act of bad faith to now attempt to reject, or try to disturb, his ruling." This is the ONLY legal opinion you have offered us after Judge Donovan's recent, adverse ruling. Such an opinion, with which Phil Halpern may or may not disagree, is irrelevant to the issue of rushing to close, which you never have addressed. And why, pray tell, is it now "bad faith" to challenge a ruling that incorporates provisions adverse to Plaintiffs interests that clearly are NOT set out in the June 18 settlement? Your adversaries successfully made such a challenge, you failed to accuse them of "bad faith" in your reply papers, and you now believe that identical action on our part is "bad faith?" This is nonsense.

You insolently accuse us of a "delay" of which you, yourselves, were the architects. For starters, the "settlement" of 6/18/03 you engineered gave A.J. the right to delay payment to Betty and Tony indefinitely and without consequence. That's not my opinion. That's what Justice Donovan said! Are you rushing to closing, before Plaintiffs can evaluate the implications of your prior representation, including the inordinate delays after settlement.

You were unable to obtain money from A.J., even on the most abject terms, after June 18. Typically, you had no ideas to stop A.J. from delaying payment until Kingdom comes. Only after Betty's consulting attorney, Philip Halpern, suggested using CPLR 2104 to force the case back into court, did we move toward a closing. We weren't forced back into court because of our own delays. We were forced back into court because your "settlement" of 6/18/03 was seriously flawed in multiple respects, one of which was the inordinate delay it occasioned. Your own "representation", together with A.J.'s bad faith (which you never called to the attention of the court), forced Plaintiffs to spend even more money paying you to salvage the "settlement" you yourselves had engineered.

Your ineffective representation, at and since the ambiguous and half-baked "settlement" you dictated into the record on Plaintiffs' behalf on June 18, 2003, has raised serious questions about the quality of your work and/or your interest in the welfare of your clients. Your threats against Plaintiff Margrabe, and related actions, mainly around September 15, 2003 and since February 13, 2004, were adverse to her interests and unacceptable in and of themselves. Justice Donovan's most recent decision and order, which rejects Plaintiffs' position in favor of the defendants' position (which you characterized as a "long shot") after more than nine months of efforts to "settle the settlement" of June 18, 2003, again exposes the serious deficiencies in your "efforts" on June 18.

The ramifications of the ill-defined "settlement" include the delay in closing the contemplated transaction, the loss of interest that would compensate Plaintiffs for that delay, adverse tax consequences, the loss of certain tax certiorari refunds that you assured us were "in the bag", and your failure to adequately define "commercially reasonable" security to ensure adequate collateral to secure the installment payments to which you also agreed on our behalf, leaving us exposed to exactly the adverse outcome which now has occurred. In addition, we list numerous other causes.

*Justice Donovan's Decision and Order, Filed and Entered 3/29/04*

Justice Donovan's decision focuses on "defendants' right or ability to sell or otherwise convey certain portions of their real estate holdings". As Justice Donovan put it: "... the court finds defendants' version to express the parties' original intent. The transcript demonstrates that defendants' counsel went to great pains in stating that defendants' ability to sell off certain parts of the Son Corp. properties was a material part of the settlement. ... In each of these instances, counsel could have stated specifically that sale of part of the property would trigger the due on sale clause. He made no such statement, and, despite some colloquy, plaintiff's counsel never dictated any contrary assertion into the record."

In fact, Justice Donovan's order contains the provision that acceleration of the note would occur "in the event of the sale by Rusciano and Son Corp. of more than 50% of its real property, or the sale of more than 50% of any of its voting or non-voting stock" only because "defendants 'offered' [that] as a compromise at the conference on February 27, 2004." Otherwise, apparently, Son Corp. could have sold piece after piece of its property, until almost nothing remained, without any requirement to pay off Plaintiffs' note.

*The Events of February 13, 2004 through February 20, 2004*

The events of the 2/13/04 through 2/20/04, this additional adverse outcome, and your recent, frightening threats to close on a day when, as you know, Betty cannot attend, and possibly before she receives competent legal advice about Plaintiffs' situation, have persuaded Betty that she must replace you. Those events, that outcome, and your threats (a) renewed pre-existing questions of your competence and motivation, (b) featured a rehash of earlier threats you had made aimed at dividing your clients, avoiding supervision, and pursuing your self-interest at the expense of your clients, and (c) have demonstrated that the cost of repairing your defective work, to the extent that repair remains possible, continues to rise.

1.  Your messages of February 13, 2004 at 2:35 p.m. and Thursday, February 19, 2004 at 2:52 p.m. were particularly offensive and terrified my

wife. Unfortunately, your repeated threats to dump one of your co-plaintiffs (my wife, Betty) in favor of the other (her brother, Tony) have become disappointingly familiar. Now, they have become unacceptable.

2. The timing of your threats, which, if carried out, would have wrought maximum damage to the interests of both of your own vulnerable clients, also is unacceptable.

3. On or about June 19, 2003, Betty had sent you clear, written instructions, by fax, e-mailed attachment, and U.S. Mail with return receipt requested, to let her (a) see all papers in this case and (b) approve them before you sent them to opposing counsel. As you know, after about July 2, 2003, when you disregarded those written instructions, she hired Philip Halpern, Esq. to improve communications with you and to add his expertise about litigation and the Westchester County bench and bar to your own expertise.

4. These instructions notwithstanding, on Friday, February 13, 2004, only one week before your deadline to file important papers on behalf of Betty and Tony, and on Thursday, February 19, 2004, only one day before that deadline, you sent Betty ultimatums, demanding, in essence, unfettered discretion to draft and submit whatever documents you pleased, on her behalf, without any input from me (as her agent) or from her.

5. Your ultimatums also employed two tactics we have seen from you before: (1) "jamming" us by setting artificially short deadlines for your actions, so that we had no time to review your work product, or to comment on it before you submitted it; and (2) delaying delivery of your work product to Betty's other attorneys and me, until the final moments of a genuine deadline, and then submitting it without giving us any reasonable opportunity to review or comment on it, based upon the real deadline.

6. We then were left with Hobson's choice: either disavow your authority and work product publicly, and risk disintegration of the plaintiffs' united front and a precipitate weakening of our case, or ratify your actions, however adverse to our interests they appeared.

7. Your ultimatums notwithstanding, your proposed drafts were replete with errors, both major errors costly to our interests, and typographical errors embarrassing to putatively "literate" persons. For example, just two of your errors in the documents that you demanded the right to send, unedited by us, could have cost your clients more than another half a million dollars, and/or could have invited future litigation. Some of them required correction, so the Order and Stipulation of Settlement would make sense. Sadly, that was typical of your work, because (a) your performance on and since June 18, 2003, has been full of errors and

omissions, (b) previously, you had delivered similar ultimatums on 9/4/03 and 9/15/03, and (c) each ultimatum demanded the right to submit defective documents with adverse consequences for Betty.

8. Worse, you aggravated the time pressure implicit in your threats of February, 2004 by sending them just before and during a long, holiday weekend and school vacation, knowing that Betty's consulting attorney, Philip Halpern, Esq., was out of town until February 23, 2004. Your timing appeared calculated to make it difficult or impossible for him to participate in the litigation and negotiation, as he has been doing, at our request, for more than eight months. This sort of behavior on your part toward Mr. Halpern (and Mr. Lewis) is also familiar. From our perspective, you have been far more adept at thwarting the participation of those lawyers we have engaged to assist you than at foiling the transparent machinations of opposing counsel.

*The Delay in Closing since June 18, 2003*

Since June 18, 2003, attempting to get you to obey our most basic instructions, monitor and correct your error-laden work product, and explain your tactical and strategic decisions and actions to us, has cost us a great deal of money for supervisory lawyers. The delay and other negative outcomes that have flowed from the flawed "settlement" of June 18, 2003, have cost your clients hundreds of thousands of dollars, by your own admission. Your actions aggressively pressuring your own client, Betty, in part by playing her own brother against her, have caused her great distress.

9. On June 18, 2003, your clients (Plaintiffs Betty and Tony) agreed in open court to a settlement in which they would sell their interests to their cousin A.J. for about $8.5 million, subject to rapid documentation and closing of the deal. Some nine months later, the deal still has not closed, and they have yet to receive the first penny from that sale.

10. Due to your ineffective responses to classic pettifogging and stalling on the part of your adversaries, combined with your ineffective actions and omissions at the June 18, 2003 hearing, your efforts to close the deal have failed miserably.

11. Philip Halpern, a lawyer that Betty hired to help you produce a desirable closing, proposed the only idea that has been effective in any way in expediting that closing.

12. Josh's motion to reargue Judge Donovan's decision seemed like just another in a series of delays to which your clients have been repeatedly subjected, and against which you have proven yourselves unable or unwilling to respond effectively, either in litigation or in negotiation.

> However, he won a favorable decision in what we were told was a longshot motion.

13. You, yourselves, caused an inordinate delay (of at least one year) at the time you were engaged by not promptly filing suit, and the tactics employed by your adversaries have been highly effective in protracting matters to an intolerable extent.

14. Casting matters in the light most favorable to you, you have caused only some of the delays, due perhaps to languor, conflicting demands on your time, naïveté about the nature of the challenges that your adversaries presented, or inexperience. Whatever the reasons, you have been utterly ineffective at the combination of litigation and negotiation necessary to bring matters to a speedy conclusion.

15. Further, you continued to play off Tony Rusciano's alleged "interests" (as you define them) against those of my wife, repeatedly challenging us to complain of an actual conflict of interest, which you abused your position of trust and confidence with Tony to create. We are not required to complain of an actual conflict of interest in the context of litigation to force your departure from the case as to both of your clients. If such a conflict arises, you are ethically required to depart the case as to both plaintiffs without prompting from us. You have insinuated that an actual conflict exists for some time now, a conflict that you helped to create. It's time for you to depart as counsel to both plaintiffs.

*A List of Further Causes for Terminating Your Employment*

16. From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ("Tony"), has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients, exacerbated by your long delays in filing the lawsuit and your chronic inability to get either a favorable judgment or an unambiguous deal with the Defendants that you could close.

17. For example, from the signing of your retainer agreement with your clients on February 4, 2000 until approximately June 22, 2001, your firm delayed the filing of your clients' lawsuit (which both clients requested that you file immediately), although you already were familiar with the facts, having filed a strikingly similar lawsuit (as Defense counsel noted in his response to your complaint) against many of the same defendants on behalf of A.J. Rusciano's sisters during the first half of the 1990s.

18. As a direct consequence of this delay, the statute of limitations ran on more than a year's worth of your clients' claims on the earnings of the Rusciano Companies, time-barring them forever.

19. As a direct consequence of this delay, you were unable to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, in effect "trusting" your clients' adversaries—who stood accused of breach of fiduciary duty, self-dealing, and corporate looting over a decade—to "do the honorable thing", even after all the evidence pointed to a classic "stall" on their part.

20. As a direct consequence of this delay, you subjected your clients to more than a year of legal bills without any resulting progress in the case, added to the unnecessary financial pressure on them, and then demanded usurious interest as part of your revised compensation arrangement to exploit their financial distress.

21. Specifically, after this inordinate and harmful delay, beginning on or about April 5, 2001, you contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees.

22. Even after litigation finally commenced, you neglected to utilize the disclosure permitted under the CPLR to obtain information critical to effective negotiations and/or or trial preparation, and/or closing after a "deal" was struck, despite repeated requests from your clients throughout the litigation process that you request specific and important information, particularly about tax cert refunds.

23. Specifically, from December 12, 2002 to at least March 31, 2004, you failed to obtain disclosure of the details (including dollar amounts) of the tax certiorari refunds to which your clients were entitled at least in part (or so you said), despite your client's repeated requests that you obtain this information, and your acknowledgement of the validity of these requests. Judge Donovan's ruling of January 26, 2004, on the motions about the oral agreement of June 18, 2003, made it clear that gathering specific information about the tax cert refunds, as your clients had repeatedly requested, would have been the wiser course of action. As a result of your failure to gather relevant information, Plaintiffs cannot at this time provide a dollar figure for the cost of your negligence with respect to tax certiorari refunds for Secor Lane Corp. and Vinrus Corp. However, by information and belief it is between zero dollars and $50,000, and a precise figure could be calculated, given time and cooperation of defendants.

24. Before June 18, 2003, you pooh-poohed my request to prepare for a flurry of settlement discussions on the scheduled first day of trial, because: "This case is going to trial." As a result, clients—and apparently you—had not

prepared sufficiently to negotiate a clear and unambiguous settlement agreement that provide plaintiffs with what you had promised them just prior to allocution. Justice Donovan's most recent decision and order, which reverses important aspects of his earlier decision and order in adopting defendants' position on an important issue evidences your shoddy workmanship on June 18 beyond any doubt..

25. On June 18, 2003, after assuring your clients that they would receive their share of all the tax certiorari refunds not reflected in the Rusciano Companies' financial statements that you had received, as part of the settlement dictated into the record on that date, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal.

26. Instead, you permitted opposing counsel to dictate radically different provisions into the record, severely restricting or eliminating your clients' rights to those tax certiorari refunds, and costing your clients hundreds of thousands of dollars in the final settlement. Typically, the 37.12% share dictated into the record was not even Plaintiffs' direct 37.32% ownership proportion for even Rusciano & Son. Corp. property, by your own expert's figures, much less the correct direct ownership share for the property of other Rusciano Companies. Moreover, it gave no consideration to Plaintiffs' indirect ownership, e.g. in Secor Lane Corp. via Rusciano Associates and vice versa.

27. On June 18, 2003, after assuring your clients that their claims against A.J. Rusciano II for breach of fiduciary duties he owed, as trustee of trusts created under the wills of several relatives, would be preserved for later prosecution, you neglected to dictate into the record in open court the provisions necessary to accomplish this goal. Instead, you permitted opposing counsel to dictate radically different provisions into the record that eliminated all of these claims, costing your clients tens of thousands of dollars in the final settlement.

28. After June 18, 2003, due in part to your defective dictation of the agreed-upon terms of settlement into the record on that date, and in part by your passive acceptance of Josh Grauer's flood of ambiguous and pro-Defendant language, you were unable to move the oral settlement to written agreement, order, and closing despite the passage of several months, eventually costing Plaintiffs more than $125,000 in lost interest. In desperation, after your ineffective behavior became apparent, my spouse hired Philip Halpern, Esq., another lawyer, who suggested using CPLR § 2104 to bring the dispute to a conclusion.

29. On or about July 2, 2003 you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and oral instructions by sending an

unauthorized and defective draft stipulation of settlement to Defendant's Counsel. This weakened your clients' negotiating position during settlement discussions by disclosing unauthorized concessions and other flaws in the document to opposing counsel prematurely in the negotiating process, as well as failing to insert language essential to protecting your clients' interests.

30. From about July 2, 2003 through about November 28, 2003, you manipulated the trust and confidence that plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you. Namely, you threatened to abandon representation of Elizabeth in favor of representation of the more pliable Tony, playing off one of your clients against the other. You thereby threatened to deliberately convert a potential conflict of interest between Plaintiffs into an actual conflict of interest. Repeatedly, you extracted negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loan of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony.

31. In particular, in recent months after the June 18, 2003 allocution, you or your colleagues apparently have communicated inaccurate messages to Tony Rusciano alone (deliberately failing to communicate those same messages to Elizabeth) with respect to ongoing settlement negotiations to exacerbate divisions between Elizabeth and her own brother to force an earlier settlement at which you expected to collect all of your fees, loans, and interest. You then attempted to exploit the divisions, which you had exacerbated by directly suggesting that you withdraw as Elizabeth's attorney due to conflict of interest, continuing on in Tony's representation alone.

32. Your strategy was egregiously cynical, coming as it did in the midst of delicate settlement negotiations during which your abrupt withdrawal as counsel to only one of the plaintiffs (retaining your seat at the bargaining table as counsel of record to the other to protect your fees) likely could have damaged or destroyed the show of client unity essential to conclude a satisfactory settlement agreement. You abused your leverage as sole counsel to both parties to force concessions from Elizabeth Margrabe during the interminable and protracted settlement process, which would expedite a settlement redounding to your firm's financial benefit at least, even if not to the benefit of your clients.

33. Some of the concessions you offered to your adversaries ensured earlier payment of your fees while consigning one of your clients to likely insolvency.

34. On September 9, 2003, for example, you presented a proposal to your clients under which A.J. Rusciano (your clients' primary adversary) would pay your attorney's fees directly as part of the settlement, strongly advocating for such an arrangement.

35. The fact that you believed that A.J. intended to take an illegal tax deduction for such a payment, in which case the taxing authorities might conclude that your clients had colluded in tax fraud, seemed to bother you not in the least. Of course, you didn't want the tax officials suggesting that you were involved, so on November 17, 2003 you declined to advocate that course of action in writing, offering instead to advocate it orally when your clients met you at the courthouse.

36. On September 15, 2003, without warning Mrs. Margrabe that you were going to make a major concession that the transcript had not contemplated, you presented her with an ultimatum, demanding that she approve a proposal under which A.J. could liquidate 50% of the Son Corp. real estate without paying your clients in full. Even your strategy of offering concessions that the Defendants had <u>not even demanded on June 18, 2003</u> failed to conclude the process. In short, you could not close the deal <u>even upon the most abject terms</u>, and apparently were unaware of your clients' right to approach the judge for relief.

37. Only <u>after</u> Elizabeth was forced to engage two additional attorneys (Philip Halpern, Esq. and Harry Lewis, Esq.) did <u>Mr. Halpern</u> suggest an approach that allowed Judge Donovan to break the impasse. With the issuance of Judge Donovan's recent order, the errors, omissions, and gaps in your earlier settlement agreement (to which Mrs. Margrabe and her brother allocuted, to be sure) also have been exposed. These errors and omissions have cost your clients many thousands of dollars in your additional legal fees as the meaning of the ambiguous and shoddy "settlement" dictated into the record on June 18 underwent Talmudic scrutiny, not to mention the cost to Mrs. Margrabe of Mr. Halpern's (and Mr. Lewis's) time and expenses.

38. On or about December 12, 2003, you acted contrary to your client Margrabe's specific written and/or oral instructions by paying a disputed fee to Defendant's real estate attorney.

39. On or about January 29, 2004, you (Michael) acted contrary to Plaintiff Margrabe's specific and earlier written and/or oral instructions by sending an unauthorized, unreviewed, and defective draft stipulation of settlement to Defendant's Counsel. As in July, 2002, disclosing your draft to opposing counsel prematurely weakened your clients' negotiating position.

40. During this extended period of ineffective advocacy you continued to bill your hapless clients. In telling Mr. Halpern and Mr. Lewis to "back off", Mr. Warmflash showed aggressiveness that we believe he never displayed to opposing counsel.

## II. WHY YOU CANNOT CONTINUE REPRESENTING TONY

Further, on behalf of Betty, I object to Sexter & Warmflash's continued representation of her co-plaintiff and brother, Tony. Your adverse and offensive actions toward your client, Betty, have caused her great distress and make it clear that your continued involvement in this case in any capacity is a threat to her interests. Consequently, she cannot allow you to be involved in this case, going forward, whether as a "litigator" for either plaintiff, as the agent handling the closing, or as "escrow agent" over the six and one-half years after the closing.

You are well aware of the potential conflicts of interest between clients, because you have repeatedly used them to try to manipulate your clients. Now, the clients have some actual conflicts of interest. These actual conflicts of interest, plus New York State case law imply that you must withdraw as counsel for both clients. *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."). The relevant disciplinary rules are 22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32.

Your involvement in the case as Tony's attorney is an unacceptable threat to Betty for several reasons:

41. The plaintiffs have an actual conflict of interest over employing you. Plaintiff Margrabe has fired you for the reasons stated in this letter. Plaintiff Rusciano wants to employ you.

42. Since about February 2000, in your position of trust and confidence as Plaintiffs' counsel, you have learned the confidences and secrets both of Betty and of Tony. You have knowledge of Betty's bargaining strategy and financial strength. You could use all this information to Tony's advantage, and adverse to Betty.

43. You have failed to mention to your clients several longstanding, continuing, and actual conflicts of interest between Sexter & Warmflash and Betty, and you have actively pursued your interests at the expense of your clients' interests.

44. You have a record of manipulating your clients to further your own interests, and have had particular success with the more pliable Tony. Your continued playing of one plaintiff against the other is unacceptable.

45. You have insinuated repeatedly that the continuing potential conflicts of interest between your clients have become actual conflicts of interest. Rather than discussing these issues jointly with both clients, however, in an effort to amicably resolve them, you have simply threatened to withdraw from representing Betty at sensitive times during the negotiations, to coerce Betty into adopting Tony's position on several issues. If you represent Tony in future, you are likely to succeed in creating additional actual conflicts of interest between Betty and Tony, further exacerbating a strained family relationship to which you contributed.

### III. FINAL INSTRUCTIONS

You are instructed to turn over all of your files in this matter to Plaintiff Margrabe, immediately upon receipt of this letter, and to prepare and submit directly to your clients a final bill for all legal services, loans, interest, and other charges you assert are due and owing from them. Mrs. Margrabe then will consider her legal options in consultation with Mr. Halpern and with Mr. Lewis.

Sincerely yours,

*William Margrabe*
William Margrabe

I have read and approved this letter.

*Elizabeth Margrabe*   4-9-07
Elizabeth Margrabe   Date

Cc: Elizabeth Margrabe
Philip Halpern, Esq.
Harry D. Lewis, Esq.
Anthony J. Rusciano III