**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

———————————————————————X

ELIZABETH MARGRABE AND ANTHONY J.
RUSCIANO, III, AS SHAREHOLDERS OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND VINRUS CORP., SUING IN THE RIGHT OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND SUBSIDIARIES, AND VINRUS CORP.,
ELIZABETH MARGRABE AND ANTHONY RUSCIANO,
III, INDIVIDUALLY,

**Elizabeth
Margrabe's
Memorandum in
Opposition to
Order to Show
Cause**

**ORAL ARGUMENT
REQUESTED**

Index No.10032/01

(Justice W. Denis
Donovan)

                                    Plaintiffs,

            -against-

ANTHONY J. RUSCIANO, II, RUSCIANO & SON
CORP., VINRUS CORP., SECOR LANE CORP.,
AND SUBSIDIARIES, PVE COMPANY JOINT VENTURE,
PVE II CO., AND TONGENE REALTY COMPANY,
AND RUSCIANO ASSOCIATES, INC.,

                                    Defendants.

———————————————————————X

Upon the affidavits of William Margrabe ("Bill"), Elizabeth Margrabe, and Harry D.

Lewis, Esq. sworn to on June 24, 2004, and the annexed exhibits, Elizabeth

Margrabe submits this Memorandum in Opposition to the relief that Sexter &

Warmflash, P.C. ("S&W"), Michael Present, Esq. ("Present") and David

Warmflash, Esq. ("Warmflash"), seek in the Affidavit annexed to the Order to

Show Cause, as follows:

1

and other benefits, leaving nothing for the joint plaintiffs, from about April 28,

1992, when Betty's and Tony's father died and relinquished control of the

Rusciano Companies to their cousin, until the closing conducted by Philip

Halpern, Esq. that finally settled this case on May 10, 2004.

**III.    SEXTER & WARMFLASH NOW HAVE BETRAYED JOINT CLIENT
SECRETS BY INITIATING AN ACTION FOR DEFAMATION AGAINST
ELIZABETH MARGRABE AND HER HUSBAND IN THE SUPREME COURT,
COUNTY OF NEW YORK, ANNEXING A COPY OF THE SECRET LETTER OF
TERMINATION <u>IN FULL TEXT</u> TO THE COMPLAINT, THEREBY SPREADING
IT UPON THE PUBLIC RECORD IN THAT ACTION.**

Not content to attempt to collect their disputed fees by proceeding by

Order to Show Cause in this Court, the law firm of Sexter & Warmflash ("S&W")

and attorneys Michael Present and David Warmflash (hereinafter the "*pro se* law

firm plaintiffs") also now have betrayed the joint secrets of their hapless joint

clients by initiating a *pro se* action for defamation[2] in the Supreme Court, County

of New York.  In that action, the *pro se* law firm plaintiffs seek damages from Bill

and Betty totaling at least <u>one million dollars</u> ($1,000,000).

The complaint in that action maliciously discloses the joint secrets (as

defined in DR 4-101(a) [22 NYCRR section 1200.19(a)]) of the joint plaintiffs

(although Tony is not a party to the action for defamation) in the complaint, by

incorporating the <u>full text</u> of the letter terminating the employment of Sexter &

Warmflash dated April 9, 2004 (hereinafter "letter of termination", attached as the

sole exhibit to the action for defamation).  The *pro se* law firm plaintiffs thereby

---

[2] SEXTER & WARMFLASH, P.C., DAVID WARMFLASH and MICHAEL PRESENT, Plaintiffs v.
ELIZABETH MARGRABE and WILLIAM MARGRABE, Defendants, Index No. 107569/2004,
Supreme Court, New York County, served and filed shortly after May 14, 2004.

4

spread the letter of termination unprotected on a public record, contrary to their fiduciary duty to preserve the joint secrets of their joint clients contained in the letter of termination, contrary to DR 4-101(b) [22 NYCRR sections 1200.19(b)], and DR 7-102(a)(1) [1200.33(a)(1)], and contrary to the law of the state of New York against malicious disclosure by attorneys at law of the joint secrets[3] of their joint clients by initiating litigation[4] (as opposed to defending themselves against client accusations of wrongful conduct, as permitted by DR 4-101(c)(4) [22 NYCRR section 1200.19(c)(4))], using joint client secrets to inflict malicious injury on those same clients.[5]

The pro se law firm plaintiffs themselves initiated that complaint, as they did the pending Order to Show Cause in this action.  It was not prepared in response to any legal proceeding initiated by Bill and Betty (the "Margrabe Defendants"), or in defense of any accusations of wrongful conduct made against the pro se law firm plaintiffs in any public forum.

---

[3] "The Code of Professional Responsibility, however, prohibits the disclosure not only of "confidences", defined as "information protected by the attorney-client privilege," but also of "secrets," described as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client" (Code of Professional Responsibility DR 4-101[a],[b[[22NYCRR 1200.19(a),(b)].  Thus, an attorney's duty of confidentiality is substantially broader than that reflected in CPLR 4503."  Lightman v. Flaum, 97 N.Y.2d 128, 135.  (emphasis added).

[4] Such initiation of litigation by an attorney using client secrets against his own client clearly is proscribed by the rule of Wise v. Consolidated Edison Company of New York, Inc., 282 A.D.2d 335, 723 N.Y.S.2d 462 (1st Dept. 2001), of which the pro se law firm plaintiffs were, or should have been, aware.  The action for defamation is therefore both vexatious and the appropriate object of a formal grievance.

[5] By contrast, Sexter & Warmflash disingenuously has filed only a "redacted" (incomplete) version of the letter of termination dated April 9, 2004 with this Court for its consideration, creating a false impression of solicitude for the joint secrets of their joint clients belied by their actions in the related action for defamation filed in Supreme Court, County of New York.  Exhibit "C" to Affidavit of Michael Present, Esq. in support of Order to Show Cause ("Present Affidavit").  A true and exact copy of the complaint for defamation and attached exhibit (letter of termination dated April 9, 2004) is annexed to the Affidavit of William Margrabe as Exhibit 2.

With respect to their brazen public disclosure of the client secrets contained in the letter of termination[6], the *pro se* law firm plaintiffs never made a "full disclosure" to their joint clients as required by DR 4-101(c)(1) [22 NYCRR section 1200.19(c)(1)] before disclosure.[7]    Margrabe Defendants <u>never</u> have consented to the *pro se* law firm plaintiffs' disclosure of the letter of termination in a public record, or waived confidentiality.[8]    Upon information and belief, Tony also <u>never</u> has consented to disclosure of the letter of termination in a public record, or waived confidentiality.[9]

In fact, the action for defamation is a vexatious sham concocted by the *pro se* law firm plaintiffs to force the Margrabe Defendants and Tony (whom the *pro se* law firm plaintiffs apparently continue to represent) to waive their right to preservation of Betty's and Tony's joint secrets as joint plaintiffs *de facto*, Betty's termination of the *pro se* law firm plaintiffs' employment for cause notwithstanding.

Finally, the *pro se* law firm plaintiffs have announced their intention to call Tony as a witness against his own sister and her husband in the action for defamation, further evidence of how effectively the *pro se* law firm plaintiffs have turned their own joint clients against each other (and brother against sister) in this case.[10]    The *pro se* law firm plaintiffs have extremely odd notions of their fiduciary duties to their own former clients when collection of their fees, and of

---

[6] E.g., In re Holley, 285 A.D.2d 216, 729 N.Y.S.2d 128 (1st Dept. 2001)
[7] Affidavit of William Margrabe at ¶ 15; Affidavit of Elizabeth Margrabe at ¶ 13.
[8] Affidavit of William Margrabe at ¶ 15; Affidavit of Elizabeth Margrabe at ¶ 16.; DR 4-101(c)(1).
[9] Affidavit of William Margrabe at ¶ 18; Affidavit of Elizabeth Margrabe at ¶ 17; DR 4-101(c)(1).
[10] Affidavit of Harry D. Lewis, Esq. at 2.

the addition million dollar "premium" they seek in the action for defamation,

become their sole concerns.

## IV.     BILL AND BETTY JUSTIFIABLY TERMINATED S&W'S EMPLOYMENT WITH CAUSE.

As the letter of termination dated April 9, 2004 itself[11] recites (exhibit

annexed to Exhibit 2 to Affidavit of William Margrabe), the deterioration in the

relationship between Betty, Bill, and S&W hardly was "sudden", "surprising",

"belated", "purported", or a matter of "pretext", contrary to the disingenuous

recitations in paragraphs 3, 7, 10, 17, and 20 of the Present Affidavit.

Rather, Bill and Betty terminated the relationship for cause based upon

<u>the direct confrontation with her own brother and joint plaintiff, Tony, and with</u>

<u>S&W</u>, that Warmflash provoked in a belligerent confrontation that echoed at least

three earlier incidents, described in detail, *infra*, during which Present proposed

to dump Betty as a client, consistent with the inherent conflicts of interests S&W

had created, in favor of sole representation of the passive and pliant Tony, with

whom it shared an economic interest in rapid settlement.

Specifically, beginning on April 7, 2004, the following sequence of e-mail

messages[12] occurred between Bill and Warmflash, which is excerpted as follows:

Wednesday, April 7, 2004-- Warmflash: "Bill  my understanding is that, prior to

Michael leaving on vacation (last Friday to return this Friday) he attempted on

numerous occasions to communicate with either of the Joshes to set up a signing

---

[11] Contemporaneous with this Memorandum, Elizabeth Margrabe also cross moves the Court to place the contents of the letter of termination dated April 9, 2004, together with all other attorney-client communications and client secrets necessarily disclosed in this pleading, under seal to protect them from further public disclosure for good cause.
[12] Affidavit of William Margrabe, Collective Exhibit 1.

. . . To my knowledge there are no "hard" deadlines . . . I advise that we wait until Monday/Tuesday (April 12--13, 2004) to see if a closing can be scheduled for next week" (emphasis added).

After receipt of this message, on April 8, 2004, Bill told Tony by phone that Bill was preparing an e-mail message to David, informing David that Bill and Betty previously had scheduled a trip out of town for the week of April 12, 2004 and hence would be unavailable to close the settlement during that week, but that they would return by April 18, 2004. Unknown at that time to Bill and Betty, who had been loaning Tony money to support him and his family for a period of years prior to this date, Tony desperately needed a closing by April 15, 2004, so he would have money to pay his taxes. Upon information and belief, immediately after his phone conversation with Bill, Tony communicated this need to Warmflash (but not to Betty or Bill). Upon information and belief, Tony also communicated his desperate desire to Warmflash to close the deal on or prior to April 15 to get the money he needed to pay his taxes.[13]

Betty and Bill knew none of this information until April 15, 2004, and Warmflash never told them.

Instead, the following e-mail exchange occurred between Warmflash and Bill after Tony apparently made Warmflash aware both that Betty and Bill had planned to be out of town the week of April 12, and that Tony desperately wanted to close the deal on or before April 15, 2004:

April 8 (2:39 p.m.) Warmflash: "Folks I am pleased to report that josh kimerling is back in his office, that I have spoken to him and that we have agreed that the

---

[13] Affidavit of William Margrabe ¶¶ 23-26; Affidavit of Elizabeth Margrabe at ¶ 22.

8

signing/closing will occur on Thursday 4/15 at 11:00AM at the offices of Cuddy &
Feder 90 Maple Street White Plains 914-761-1300 . . .

April 8 (5:13 PM) Bill: "I don't see how a closing during the week of the 12th would
be possible, because Betty will be out of state on family business, not vacation.
She plans to return to New York by the 18th, and would be available any day the
following week, the 19th through the 23rd."

April 8 (5:17 PM) Warmflash: "Bill I fully expect that the documents will be ready
sufficiently in advance to be reviewed, signed and fed-exed to betty, in sufficient
time to close on Thursday. Frankly, Bill, after all of AJ's stalling and delays, it
would be a shame to allow him to use" betty and Tony's money for even one
extra day. Best david" (sic)

April 8 (5:08 PM) Bill: "David

"I'm amazed that you would try to schedule a closing without first checking the
availability of your clients. As you know, Betty is not available, next week. Since
you and Michael have provided essentially no legal advice about Plaintiffs current
legal options, despite my repeated requests, Phil Halpern is now preparing such
a memorandum. Closing without seeing Phil's memorandum, which will address
issues related to closing, would be imprudent. Don't begin work on the closing
and don't set a date for closing until I have a chance to consider Phil's
memorandum."

April 8 (6:28 PM) Warmflash:

"Bill I can not and will not follow your orders. You have no right to delay,
as you have in the past, the receipt (sic) moneys (sic) which is (sic) properly due

9

AND IN FACT OVERDUE, to tony and betty. If I remember correctly, it was YOU who wanted, and agreed, to let Donovan decide. Donovan has decided! In my opinion it is an act of bad faith to now attempt to reject, or to try to disturb, his ruling.

"I know the (sic) YOU said betty was unavailable . . . Bill do you understand that the case is SETTLED and there is a stipulation which Donovan has directed be used to finalize the settlement? It is time to collect the money and get on with everyone's lives!

"David

"By the way, I resent your reference to a failure to advise you of your options..I did and essentially told you that the case is SETTLED apparently you do not want to "let go" (frankly for reasons unknown to me) and you have now asked phil to advise you of your "current legal options" how that relates to "issues relating to the closing" is also unknown. TONY WANTS TO CLOSE A/S/A/P and we will do everything in our power to accomplish that goal (sic)"

April 9 (10:27 AM) Bill:

"David

"Next week there will be no closing, because Betty will be out of town."

April 9 (10:57 AM): Warmflash: "Bill you will not prevent the closing.... I will show up with tony and we will close david" (emphasis added)

Bill and Betty thereupon terminated the employment of Sexter & Warmflash by letter dated April 9, 2004. Exhibit 2 to Affidavit of William Margrabe.

10

Given David Warmflash's direct refusal to obey Betty's instructions (through Bill, who held her power of attorney with respect to such matters) not to prepare closing documents or to schedule a closing until Betty's return from her trip out of town during the week of April 12, 2004, and David's specific threat to close the deal <u>solely</u> for Tony on April 15, 2004, letting Betty (his other joint client) fend for herself with the Defendants, Betty's termination of the employment of the law firm of S&W was <u>with cause</u>. Warmflash's insubordination was the <u>direct and proximate</u> cause of Bill and Betty's termination of the employment of S&W, and the significant and manifest actual conflicts between Betty and Tony created an ethical obligation for S&W to withdraw as Tony's attorneys as well. Despite this ethical obligation, S&W failed and refused to withdraw as Tony's attorneys, and plan to call him as a witness against his own sister (their former client and joint plaintiff with Tony) in the action for defamation they now have commenced pro se.

It is well-settled that if discharge of an attorney is <u>for cause</u>, the attorney is <u>not</u> entitled to fees.[14]

Further, if discharge is for cause, then compensation on the basis of *quantum meruit*, contingency fee, or Judiciary Law section 475 is wholly unwarranted.[15]

---

[14] *Campagnola v. Mulholland*, 76 N.Y.2d 38, 556 N.Y.S.2d 239, 555 N.E.2d 611 (1990); *Carbonara v. Brennan*, 300 A.D.2d 528, 752 N.Y.S.2d 559 (2d Dept. 2002); *Squeri v. Fournarakis*, 170 A.D.2d 444, 565 N.Y.S.2d 232 (2d Dept. 1991); *Teichner v. W & J Holsteins, Inc.*, 64 N.Y.2d 977, 489 N.Y.S.2d 36, 478 N.E.2d 177 (1985). *See Cruz v. Olympia Trails Bus Co.*, 2003 U.S. Dist. LEXIS 2221 (S.D.N.Y. 2003).

[15] *See EMC Iron Works, Inc. v. Regal Construction Corp.*, 775 N.Y.S.2d 853 (1st Dept. 2004); *Shalom Toy, Inc. v. Each and Every One*, 239 A.D.2d 96, 658 N.Y.S.2d 1 (1st Dept. 1997).

11

In addition to this <u>direct and proximate</u> cause for termination, however, there were additional conflicts that had increasingly strained the relationship between Betty, Bill, and S&W up to the breaking point on April 9, 2004, some of which were recited in the letter of termination, and others of which are identified here for the first time.

Of the undisclosed conflicts, the most important was S&W's deliberate creation of an inherent conflict of interest as against the interests of their own joint clients, which should have disqualified them as counsel from the inception of this litigation, a conflict of interest that perniciously skewed the *pro se* law firm plaintiffs' representation of their joint clients from the time S&W first contemplated this litigation.

In short, as will be shown in the next two sections, S&W's fiduciary relationship with the joint plaintiffs was tainted from its inception both by an undisclosed conflict of interest deliberately created by S&W itself <u>and</u> by its increasingly aggressive actions in rejecting Betty's and Bill's attempts to exercise some degree of control over S&W's activities during the settlement negotiations after June 18, 2003, the date S&W placed the incomplete settlement agreement on the record.

## V.    S&W CONCEALED ITS ACTUAL AND INHERENT CONFLICTS FROM THE JOINT PLAINTIFFS

Throughout its representation, S&W created actual and inherent conflicts of interest between itself and the joint plaintiffs, conflicts which it either concealed from them or deliberately exacerbated in its own self-interest:

12

1.     At the time the joint plaintiffs first engaged S&W (February 4, 2000),
various of their claims (related to their share of income in the Rusciano
Companies) were about to become time-barred by the applicable statute of
limitations.  Warmflash never took the precautions necessary to protect the joint
clients by seeking to toll the statute by consent of the defendants or otherwise.
His failed strategy of "amicable" resolution through negotiation dragged on for
some sixteen (16) months, during which claims of the joint plaintiffs became time-
barred.[16]  It was in S&W's self-interest to conceal the resulting claim for
negligence against S&W from their own joint clients, to continue representation of
the joint plaintiffs in the ensuing litigation so as to continue the concealment
further.  As a consequence, the joint plaintiffs suffered losses totaling
$340,000.00.

2.     As discussed in detail, *infra*, S&W drafted the engagement letters dated
April 5 and 10, 2001 to forbear 50% of their monthly fees, and to charge 100%
interest on the fees forborne at the <u>conclusion</u> of the case, illegally acquiring an
interest in the litigation, and profiting from an excessive, usurious rate of interest,
both of which are inherent conflicts of interest.[17]  Equally important, as a
consequence of this fee arrangement, S&W's <u>own</u> economic interests in a quick
settlement (so as to arrive at the <u>conclusion</u> of the case more rapidly, and receive

---

[16] Justice Donovan confirmed Warmflash's error when he sustained a defense based on the time
bar of the statute of limitations in his Decision and Order dated February 26, 2003, cutting off
claims of the joint plaintiffs that were viable as of February 4, 2000, but were time barred when
litigation finally commenced in late June, 2001.  Affidavit of William Margrabe, Exhibit 4.
[17] Whether conceived of as <u>an interest charge of 100% on the amounts forborne</u>, or as a huge
increase in the hourly rates they were to be paid based only on <u>the passage of time</u> (until
conclusion of the case), <u>not upon any contingency fee arrangement whatsoever</u>, such a
compensation arrangement was illegal, excessive, and usurious under the Penal Law 190.40 and
General Obligations Law 5-501 and 5-511.  To repeat, <u>there was no contingency here</u>
<u>whatsoever</u>.

the 100% interest charge or huge increase in hourly rates <u>without any contingency</u> <u>justifying such increases</u> for which it had contracted) became aligned with those of Tony, and against those of Betty.  As a consequence of the illegal forbearance of fees and excessive interest charge (or illegal increase in hourly rates without any contingency whatsoever), S&W now claims that Betty owes it an additional $121,000.

3.    S&W failed to prepare adequately for trial, including failure to gather information necessary to value or prove their clients claims.  To conceal their inadequate preparation and weakness, S&W settled the case by selling their clients' ownership interests (minority on the date of settlement, but majority when Tony's future interest in the block of controlling stock ripened) to defendants at a bargain price (too cheaply) while abandoning other claims that the clients had been told would be preserved as part of the settlement[18], avoiding trial.  As a consequence, the joint plaintiffs suffered losses totaling at least $6,940,242 (their $12,435,242 proportionate share of value of Rusciano properties plus the $2,580,000 loss of their claims for breach of fiduciary duty related to their cousin's looting of the Rusciano Companies and looting of family trusts of which they were beneficiaries, loss of $300,000 of claims because of S&W's failure to obtain information about the amounts of multiple tax cert refunds that the Rusciano Companies had received, or were, or were to become, due and owing, and S&W's failure to value various other claims of the joint settlement, so that they were not

---

[18] As paragraph 5 of the Present Affidavit recites, Betty acquiesced in open court to the "settlement" S&W had dictated into the record on June 18, 2003.  In doing so, she was maintaining unity with her joint plaintiff, and had received S&W's behind the scenes assurances about collateral, about preservation of her other claims, about receipt of the full array of tax cert refunds, and about other and similar matters, assurances that later were proved unfounded.

14

even considered as part of settlement negotiations, less the $8,375,000[19] amount of settlement[20]). In short, S&W's failure to prepare caused them to act against their joint clients interests (forcing a settlement on terms far less favorable than if they had bothered to value all of their clients' claims and been fully prepared) to avoid trial.

4.      To conceal these weaknesses, S&W sacrificed claims of the joint plaintiffs without their clients' prior knowledge or consent on the record on June 18. As a consequence, the joint plaintiffs suffered losses as already noted.

5.      As to substantive matters, at allocution on June 18, 2003, S&W bungled its joint clients' claims to a proportionate share of multiple tax certiorari refunds totaling approximately $1.25 million, as described in detail in the next paragraph, failed to define "commercially reasonable security" for the installment promissory notes to be delivered to the joint plaintiffs with any precision on the record, depriving them of any real collateral for these instruments, and failed to provide for interest on the unpaid balance of the amount of the settlement if the period of negotiations to conclude settlement extended beyond thirty (30) days. As a consequence, the joint plaintiffs suffered losses totaling $535,954.83.

6.      During the allocution on the record on June 18, 2003, S&W failed to make clear on the record that the joint plaintiffs were entitled to their proportionate share of multiple tax certiorari refunds (estimated to total over $1.25 million) from

---

[19] Paragraphs 3, 5, 7, 14, and 18 of the Present Affidavit repeatedly refer to the "multi-million dollar" price tag S&W obtained for the ownership interests of the joint plaintiffs in the settlement. In fact, this was a bargain price, given the actual value of the properties, and Tony's sale of his future interest in the controlling block of voting stock, which would have vested absolute control of all of the Rusciano Companies in him upon the death of his much older cousin. Affidavit of William Margrabe at ¶ 62.

[20] Affidavit of William Margrabe at ¶ 62.

multiple properties owned by the Rusciano Companies, refunds either (1) already paid to the Rusciano Companies, (2) due and owing, but as yet unpaid or (3) to become due and owing, once the proper claims were submitted by the Rusciano Companies.  Instead, S&W permitted opposing counsel to limit the claims of the joint plaintiffs to a narrow subset of such refunds, substantially depriving the joint plaintiffs of monies S&W had led them to believe were included in the settlement. As a consequence, the joint plaintiffs suffered losses as described in the preceding paragraph.

7.       S&W's procedural management of the allocution on the record on June 18, 2003 was defective, and well below the standard of practice for attorneys in Supreme Court, Westchester County.  Prudence dictated that rather than leaving multiple terms and conditions of settlement unsettled at allocution and open to further, intractable negotiations between the parties that extended for an additional eleven (11) months, interest free to the defendants, S&W should have made the allocuted settlement an order of court, directing the attorneys to prepare the order, and submitting any disputes about the wording of the order to the Court for its determination.  This simple procedure, standard in such situations, would have avoided S&W's interminable and <u>unsuccessful</u> negotiations <u>after</u> June 18, 2003 that eventually reached stalemate, required court intervention on at least three occasions, threatened the entire settlement, and greatly exacerbated the tensions and conflicts between S&W, Betty, Bill, and Tony, tensions S&W managed by bludgeoning the increasingly frustrated and anxious Betty and Bill into submission with threats to withdraw as her attorneys while continuing to represent Tony's

16

interests without her. As a consequence, the joint plaintiffs suffered losses as described in the preceding two paragraphs.

8.      All of these errors, omissions, and conflicts cost the joint plaintiffs time and money, in additional attorney's fees incurred, monies lost, claims unintentionally surrendered or waived, inadequate consideration for the settlement, and interest unpaid on the use of their money. S&W exploited the continuing family tensions and conflicts to keep Betty and Bill under control, and continues to exploit these tensions and conflicts in the action for defamation, causing untold heartbreak to their own joint clients. As a consequence, the joint plaintiffs suffered losses as already described, and S&W also claims an additional $1 million in damages in the action for defamation.

### V.     S&W CREATED AN INHERENT CONFLICT OF INTEREST AS BETWEEN ITSELF AND ITS CLIENTS IN A LITIGATION CONTEXT BY ACQUIRING AN INTEREST IN THE LITIGATION, CONTRARY TO DR 5-103(b) [22 NYCRR SECTION 1200.22(b)].

In the later April 5 and 10, 2001 engagement letters[21], which replaced the earlier February 4, 2000 engagement letter[22], S&W added an economic incentive that created an _inherent conflict_ between the co-plaintiffs and S&W, itself, _undisclosed_ to the clients, contrary to DR 5-103(b)[23], and granted it either 100% interest on its 50% forebearance to collect its fees, or a huge increase in the rate of its fees _without any contingency_ justifying such an increase, clearly an illegal and excessive fee arrangement.

---

[21] Exhibits F and G to Present Affidavit.
[22] Exhibit 3 to William Margrabe Affidavit.
[23] S&W also may have entered into a "transaction between lawyer and client" covered by DR 5-104 [22 NYCRR section 1200.23]. If so, S&W failed to follow the requirements of DR 5-104(a)(1), (2), and (3) [22 NYCRR section 1200.23(a)(1), (2), and (3)], despite the obvious conflict of interest between S&W and its own clients _inherent_ in the situation.

17

The economic incentive resulted from S&W's advance of financial assistance (namely, forbearance of legal fees that would otherwise be due within 30 days after the rendering of S&W's monthly statement, described as reducing "your financial burden" in pages 1-2 of the April 5 and 10, 2001 letters) to the joint plaintiffs in the context of litigation, contrary to DR 5-103(b) [22 NYCRR section 1200.22(b)], giving S&W a direct financial interest in the litigation.[24], as well as the 100% interest charge, or the huge increase in their hourly rates without any contingency justifying such an increase.

To the extent that joint plaintiff Tony's financial difficulties became increasing pressing with the passage of time[25], his interests in a quick conclusion

_____

[24] The February 4, 2000 engagement letter contracted for compensation on a straight hourly basis without contingencies of any kind. The April 5 and 10, 2001 engagement letters that replaced the earlier letter again contracted for compensation on a straight hourly basis without contingencies, but permitted Betty, at her option, to forbear payment on 50% of the fees billed at S&W's regular hourly rates until conclusion of the case, at which time the clients would owe S&W both the amount forborne, plus a sum equal to 100% of the amount forborne, an interest charge. (Tony, by contrast, was forced into this arrangement without any such option). Contrast Exhibit F to Present Affidavit with Exhibit G. S&W's advance of financial assistance to the joint plaintiffs over the time period of the litigation (to the extent of forbearing to collect 50% of their fees for any periods during which the clients opted to pay only 50%) was therefore compensated for with an additional 100% interest charge for the clients' use of 50% of S&W's money over the time period leading up to conclusion of the case. S&W failed to disclose that by advancing financial assistance in the context of litigation (both the 50% forbearance of its fees and the 100% interest charge imposed by paragraph (b) on page two of the April 5 and 10, 2001 engagement letters, Exhibit F and G to Present Affidavit), it had acquired an interest in the litigation, contrary to DR 5-103(b) [22 NYCRR section 1200.22(b)]. As many months passed and the 50% balance of fees forborne by S&W ballooned (together with their anticipated 100% interest charge in addition to the 50%), S&W had an increasing economic incentive to conclude the case as quickly as possible to collect both the balance of their fees they had forborne and the 100% interest charge. Once again, neither the underlying fee arrangement, the forbearance of fees (optional in the case of Betty, but not in the case of Tony), nor the 100% interest charge were in any way contingent. This arrangement should have disqualified S&W as counsel from the inception of the litigation. Schmidt v. Magnetic Head Corp., 101 A.D.2d 268, 476 N.Y.S.2d 151 (2d Dept. 1984); People v. Csabon, 103 Misc. 2d 1109, 427 N.YS. 2d 571 (S. Ct. Suffolk Co. 1980).

[25] Prior to engaging S&W on or about February 4, 2000, Tony had experienced increasing financial difficulties for a number of years, borrowing hundreds of thousands of dollars from Betty to support his standard of living, and to stay afloat financially. Throughout the entire time the underlying litigation was pending, Tony remained financially dependent on Betty, Bill, and S&W. The joint plaintiffs wanted S&W to keep this fact secret, both to avoid the public embarrassment and humiliation incident to it, and so that their cousin could not use knowledge of this secret against them. Bill and Betty never expected S&W to use it against them.

18

of the case[26] increasingly coincided with the direct financial interests of S&W itself, and increasingly diverged from those of his sister, joint plaintiff Betty.

## VI.    DESPITE CONFLICTS OF INTEREST, S&W FAILED OR REFUSED TO WITHDRAW AS COUNSEL TO THE JOINT PLAINTIFFS, REPEATEDLY ATTEMPTING INSTEAD TO DUMP BETTY IN FAVOR OF TONY.

As noted supra, when actual conflicts of interest arose between the joint plaintiffs, S&W improperly refused to withdraw as counsel to both joint plaintiffs, instead trying to represent one against the other. Both prior to and after the June 18, 2003 "settlement"[27] of the litigation on the record, there had been potential conflicts of interest between the two joint plaintiffs, conflicts that S&W failed to disclose[28] or address in the initial February 4, 2000 engagement letter or the later engagement letters of April 5 and 10, 2001.

Tony's participation in the litigation as Betty's equal partner was important to her, because he owned a block of voting shares that his sister lacked, and had a remainder interest in a controlling block of voting stock that would pass control of the family business to him upon death of his greedy cousin (a defendant

---

[26] Tony needed quick cash with which to extricate himself from his financial predicament, establish his financial independence, and maintain his standard of living. With the passage of time, this need increased, and increasingly coincided with S&W's own interests.

[27] Because the "settlement" was incomplete in a number of material respects, Transcript of hearing held June 18, 2003 at 4, l 20-25, and 5, l 1-14, post-settlement negotiations continued through and including May 10, 2004, at which time Philip Halpern, Esq. (not S&W) closed the transaction.

[28] Full disclosure "of the implications of simultaneous representation and the advantages and risks" involving simultaneous representation of multiple clients is required by DR 5-105(c) [22 NYCRR section 1200.24(c)]. In the February 4, 2000 engagement letter, the only potential conflict disclosed was that "theoretically, [there] may be a conflict of interest between the two of you relating to the value of each of your interests, and you have advised us that, irrespective of the agreements, any and all benefits to be derived shall be shared between you equally". In the April 5 and 10, 2001 engagement letters, S&W's only disclosure to the clients was virtually identical, despite the inherent conflicts created in these letters, as described, supra. Further, as the discussion of S&W's malicious use and disclosure of client secrets, infra, points out, there were many other potential and actual conflicts that S&W failed to disclose.

herein). <u>Without</u> Tony's participation as a joint plaintiff, the potential recovery that Betty could expect would be substantially less than the agreed-upon 50% of the value of a recovery <u>with</u> his participation. Thus, Betty would go to great lengths to remain "joined at the hip with Tony", to maintain her agreement with Tony to split equally the proceeds of their action against their greedy cousin.[29]

As an added consequence, however, she also was extremely vulnerable to S&W's recurring threats (which occurred whenever she and Bill insisted on taking a "hard line" in the negotiations) to abandon her in favor of exclusive representation of Tony, bludgeoning her into submission time after time consistent with Tony, who was prepared to defer to S&W's "soft line" approach, no matter the circumstances.

The unity of the joint plaintiffs in litigation was essential to maximizing their recovery. Without that unity, Betty and Tony could not obtain joint full value for their interests in the Rusciano Companies.

On June 18, 2003, since S&W and Tony ignored Betty's and Bill's repeated requests for an agreement that would align the interests of Tony and Betty, Betty decided that she must accede to the settlement S&W recommended to avoid the very serious risk of an open split with Tony, a split which S&W repeatedly threatened on behalf of themselves and of Tony.[30]

---

[29] See the affidavit of Elizabeth Margrabe, ¶ 31.
[30] See the affidavit of Elizabeth Margrabe, ¶ 32.

After June 18, 2003, those "potential" conflicts manifested themselves as a result of Tony's increasing financial difficulties[31]. Tony's interests were in alleviating these with the quick cash generated by a rapid settlement, contrasted with Betty's desire that she and her brother proceed to trial if necessary to accomplish what she had been led to believe was encompassed by the settlement.[32]

On July 9, 2003, just three weeks after the "settlement" in open court, Present acknowledged in an e-mail message to Betty, via Bill, that he had disobeyed Betty's repeated, written instructions[33] to let her approve closing documents, before Present sent them to opposing counsel. "Bill – I am sorry, but I had already sent a draft of the documents (with the proviso that you had not yet seen them and they were subject to modification) before your prior e-mail." Also, S&W was already offering to dump Betty as a client: "However, if you feel that your 'negotiating position' has been compromised by my actions, I will advise Josh Grauer that the settlement documents were only sent on behalf of Tony – and that you now have retained separate counsel and wish to enter into a separate settlement agreement on behalf of Betty." Finally, Present reveals an actual conflict of interest between his joint clients, Betty and Tony: "Contrary

---

[31] A situation exacerbated by the long passage of time caused both by David Warmflash's failed strategy of "amicable" resolution by negotiation, described in Affidavit of William Margrabe ¶¶ 30-35, and by the subsequent and protracted litigation.

[32] Betty wanted Tony and herself to receive their fair share of the multiple tax certiorari refunds S&W had assured them were part of the settlement (a notion of which she later was disabused by the Court, because Michael Present had failed to put it on the record), interest on the defendants' continuing use of their money during the interminable settlement negotiations after June 18, 2003, and "commercially reasonable security", consistent with the terms dictated into the record on June 18, 2003 as S&W had led her to understand them, that would reduce the risk inherent in S&W's settlement that provided for installment payments of the proceeds of settlement over a six and a half year period, rather than for a lump sum payment at closing.

[33] Betty's letter of instruction, dated June 19, 2003, attached as Collective Exhibit 5 to Affidavit of William Margrabe.

21

(and prior) to your instructions to withhold distribution of a draft agreement, Tony advised me on several occasions that he was happy with the terms of the settlement as encompassed in the draft – and that I should make every attempt to expedite the settlement as quickly as possible."[34]

No later than September 4, 2003, when S&W threatened in writing to dump representation of Betty in favor of exclusive representation of Tony in the litigation, an actual conflict clearly had emerged with respect to those interests, combined with the pre-existing inherent conflict created by the law firm itself, a toxic combination for Betty.[35]

In other words, S&W never contemplated withdrawal as counsel to both joint plaintiffs even after they identified an actual conflict of interest, as the ethical rules demand[36]. Instead, S&W contemplated only withdrawal as to Betty, retaining representation of Tony, who shared their desire for quick cash and relative lack of concern about the risk to the joint plaintiffs inherent in a six and one-half year payout.

The conflict of interest issue recurred on February 19, 2004 when Michael Present again threatened (via e-mail) to file papers only on behalf of Tony, and

---

[34] A true and exact copy of Present's July 9, 2003 message to Betty and Bill is attached as Collective Exhibit 6 to Affidavit of William Margrabe.

[35] A true and exact copy of the September 4, 2003 letter to Elizabeth and William Margrabe from S&W, in which Michael Present, Esq., after reciting that a conflict of interest between the co-plaintiffs had arisen as of August 21, 2003 states, "If, however, no settlement is reached [so that going to trial becomes necessary] or, in the alternative, Tony agrees to settle, but Elizabeth decides to proceed to trial, we reserve the right to bring a motion for leave to resign as Elizabeth's trial counsel [only], due to the foregoing conflicts and problems discussed herein" is annexed to the Affidavit of William Margrabe as Collective Exhibit 6. *Compare* Exhibits F and G to Present Affidavit *with* Exhibits 3, 4, and 5 annexed to Affidavit of William Margrabe.

[36] *Sidor v. Zuhoski*, 690 N.Y.S.2d 637, 638 (2d Dept. 1999)("An attorney who undertakes the joint representation of two parties in a lawsuit [should] not continue as counsel for either one after an actual conflict of interest has arisen."); (22 NYCRR §§1200.19(b)(3), 1200.24(a), 22 NYCRR 1200.28(b), and 22 NYCRR §1200.32).

not for Betty, and to "move for leave to resign as Betty's counsel [only],"
remaining in the case exclusively as Tony's attorney.[37]

Further evidence of S&W's plans to rid themselves of Betty as a client
exists in the form of their letter to Justice Donovan (never sent), dated February
25, 2004, that S&W erroneously faxed to undersigned counsel on April 12, 2004
at 4:42 p.m.[38]

The last straw in this escalating confrontation was the exchange of e-mail
messages between David Warmflash and William Margrabe beginning on April 7,
2004, *supra*, leading to Betty's termination of S&W's employment, and her
objection to S&W's continuing representation of her joint plaintiff and brother
Tony, an objection that S&W rejected.

**S&W IS CHARGING, OR ATTEMPTING TO CHARGE, AN ILLEGAL OR
EXCESSIVE FEE IN THIS CASE, CONTRARY TO DR 2-106 [22 NYCRR
SECTION 1200.11(b)].**

---

[37] A true and exact copy of the e-mail message dated February 13, 2004 is annexed to the
Affidavit of William Margrabe as Collective Exhibit 6.
[38] A true and exact copy of which is annexed to the Affidavit of William Margrabe as Collective
Exhibit 7. February 25, 2004 was a date of significant conflict between S&W and Betty for two
reasons: (1) Betty (on advice of her attorneys, Halpern and Lewis) wanted to file a notice of
appeal of Justice Donovan's decision of late January, 2004, and Present was resisting that
action; and (2) Present was preparing his papers in response to Josh Grauer's motion to clarify
Justice Donovan's January decision, and Present's preparation of papers always led to tension
between Present and Bill (for Betty).  On April 12, 2004 at 4:51 p.m., S&W faxed a revised
version of that letter to correct the date, but this time placed another erroneous date, October 30,
2003, at the top of pages two and three.  October 30 was also a time of significant conflict
between Betty, Tony, and S&W.  On October 26, 2003 Tony had told Bill that Tony didn't want to
sign an agreement to split equally with Betty all money coming from proceeding to trial.  He said
that Present and Warmflash had advised him not to sign such an agreement, aligning themselves
directly with Tony and against Betty.  Apparently anticipating an opportunity to dump Betty based
upon the advice they themselves had rendered, or a letter of termination from Betty based upon
their obvious provocation of her, S&W had drafted a letter accomplishing this goal on October 30,
2003 (also never sent).

excess of 25% per annum contrary to Penal Law section 190.40, and General Obligations Law sections 5-501 and 5-511.

S&W attempts to evade the doubly tainted terms and conditions in their own engagement letters[44] (terms tainted both by S&W's illegal advance of financial assistance in a litigation context (through forbearance in the collection of 50% of the amount of its fees) and by the excessive and usurious rate of interest charged or collected as S&W's reward for those forbearances (the 100% interest charge on the amount of forbearance). Instead it now seeks compensation on a quantum meruit or contingency fee basis, seeking to profit from a risk of non-recovery that they never assumed. Given that Betty justifiably terminated S&W for cause, any award of additional fees is illegal and excessive, and the Court may order S&W to disgorge any fees already collected that it finds to have been excessive or illegal. Specifically, the amount of fees forborne (illegal under DR 5-103(b), and the 100% interest charge on the amounts forborne (excessive under the Penal Law 190.40, General Obligations Law 5-501 and 5-511, and DR 2-106) were contrary to law, and should be disgorged to the clients.

Further, S&W caused losses, totaling $701,913.69, to the joint plaintiffs during their representation, as set out in paragraphs 79-90 of the Affidavit of William Margrabe.

Because S&W already has received compensation of $329,455.44,[45] which is in excess of their stated hourly rates multiplied by the time incurred, the joint

---

[44] The engagement letters clearly are not contingency fee arrangements (e.g., DR 2-106(b)(8) and (d) [22 NYCRR section 1200.11(b)(8) and (d)].

[45] Affidavit of William Margrabe ¶ 91.

<u>contingency</u> S&W contracted for in the engagement letters dated April 5, 2001 and April 10, 2001, refunding those amounts to the joint plaintiffs.

DATED: June 24, 2004

*Hary D. Lewis*

Harry D. Lewis, Esq.
Attorney for William and Elizabeth Margrabe
P.O. Box 2567
Grand Central Station
New York, N.Y.  10163
(718)-360-0759

TO:    Edward R. Finkelstein, Esq.
       Attorney for Sexter & Warmflash, P.C.
       115 Broadway
       New York, N.Y.  10006

29

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

————————————————————————X

ELIZABETH MARGRABE AND ANTHONY J.
RUSCIANO, III, AS SHAREHOLDERS OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND VINRUS CORP., SUING IN THE RIGHT OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND SUBSIDIARIES, AND VINRUS CORP.,                   **AFFIDAVIT OF**
ELIZABETH MARGRABE AND ANTHONY RUSCIANO,              **HARRY D.**
III, INDIVIDUALLY,                                    **LEWIS**

                                                      Index No.10032/01

                        Plaintiffs,

                                                      (Justice W. Denis
                                                      Donovan)

            -against-

ANTHONY J. RUSCIANO, II, RUSCIANO & SON
CORP., VINRUS CORP., SECOR LANE CORP.,
AND SUBSIDIARIES, PVE COMPANY JOINT VENTURE,
PVE II CO., AND TONGENE REALTY COMPANY,
AND RUSCIANO ASSOCIATES, INC.,

                        Defendants.

————————————————————————X

STATE OF NEW YORK     )
                      : ss. :
COUNTY OF NEW YORK )

HARRY D. LEWIS, being duly sworn, deposes and says:

1.      I am special counsel to Elizabeth Margrabe ("Betty"), a joint plaintiff in this

action, and counsel to William Margrabe ("Bill"), her husband.

2.      Within a week after Betty's termination of the employment of the law firm

of Sexter & Warmflash, P.C. ("S&W") for cause by letter dated April 9, 2004

("letter of termination"), I met with Michael Present, Esq. at the Westchester

County Courthouse.

1

3.    Mr. Present informed me that his opinion was that the letter of termination was defamatory, that he was considering suing Betty and Bill for defamation, and that liability was a "slam dunk" if suit were brought.

4.    He also stated that he would call Tony Rusciano, Betty's brother and joint plaintiff, as a witness against Betty and Bill in such litigation.

Further affiant sayeth not.

DATED: June 24, 2004

_Harry D. Lewis_
Harry D. Lewis

Sworn to and subscribed before me this 24 day of June, 2004.

_____
Notary Public

My commission expires:

Jan 10, 2006

MARK EHRLICH
Notary Public, State of New York
No. 41-4909340
Qualified in Queens County
Commission Expires Jan. 10, 2006

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF WESTCHESTER**

————————————————————————————X

ELIZABETH MARGRABE AND ANTHONY J.
RUSCIANO, III, AS SHAREHOLDERS OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND VINRUS CORP., SUING IN THE RIGHT OF
RUSCIANO & SON CORP., SECOR LANE CORP.            **AFFIDAVIT OF**
AND SUBSIDIARIES, AND VINRUS CORP.,               **ELIZABETH**
ELIZABETH MARGRABE AND ANTHONY RUSCIANO,          **MARGRABE**
III, INDIVIDUALLY,

                                                  Index No.10032/01
                              Plaintiffs,

                                                  (Justice W. Denis
                                                  Donovan)

      -against-

ANTHONY J. RUSCIANO, II, RUSCIANO & SON
CORP., VINRUS CORP., SECOR LANE CORP.,
AND SUBSIDIARIES, PVE COMPANY JOINT VENTURE,
PVE II CO., AND TONGENE REALTY COMPANY,
AND RUSCIANO ASSOCIATES, INC.,

                              Defendants.
————————————————————————————X

STATE OF NEW YORK          )
                           : ss. :
COUNTY OF WESTCHESTER      )

ELIZABETH MARGRABE, being duly sworn, deposes and says:

1.      I am a joint plaintiff in this action against my cousin, Anthony J. Rusciano

II ("A.J."), and defendant corporations and partnerships (the "Rusciano

Companies").

2.      I am the sister of Anthony Rusciano, III, ("Tony"), who is the other joint

plaintiff in this action.

1

3.    I make this Affidavit in Support of Elizabeth Margrabe's Memorandum in Opposition to Order to Show Cause.

4.    I have no training or experience in law. I rely on advice of counsel for all legal matters.

5.    Throughout the life of this case, I have been assisted by my husband Bill in communicating with, and attempting to manage, my relationship with Sexter & Warmflash, P.C. ("S&W"). Sometimes, including the past several months, I gave him a power of attorney granting him authority to deal with them on my behalf, and he did so.

6.    On April 9, 2004, after David Warmflash, Esq. ("Warmflash") refused to follow direct instructions not to schedule a closing during the week of April 12, when Bill and I had planned to be out of town on business, and then threatened to close the deal for Tony alone in my absence, I signed a letter prepared on my behalf by Bill, terminating the employment of S&W with cause.

7.    Bill typed the words "Confidential and Privileged" on that letter to make clear how we expected S&W and the other recipients to treat it.

8.    Bill sent a copy of that confidential letter to my two other lawyers, who had been advising us about my difficult relationship with S&W, and to Tony, my brother and joint plaintiff in the case, who also was represented by S&W.

9.    I thought it important that my two lawyers and Tony learn of my dismissal of S&W with cause, both to protect our own interests in the delicate days just prior to closing the deal, to help us procure replacement counsel, and to protect

Tony, who might himself have to seek other counsel, and who, based upon the contents of the letter of termination, might have concerns of his own about S&W.

10.    Bill sent the letter to no one else, and I have not disclosed or published it to anyone else since that time, except that I am aware that Bill has consulted with counsel for legal advice on my behalf about the action for defamation and related matters.

11.    I never dreamed that S&W would disclose the contents of the confidential letter in full text on a public record as part of the action for defamation they initiated against Bill and me in Manhattan.

12.    I consider the contents of that letter highly sensitive, confidential, and private family secrets.

13.    S&W never disclosed to me their intentions to publish the letter of termination in full text in a public record, and I never consented to such disclosure.

14.    On May 27, 2004, a process server taped to our front door two copies of a summons and a verified complaint.

15.    Upon reviewing the papers, I learned that S&W, Warmflash, and Michael Present, Esq. ("Present") had sued Bill and me for libel based solely on the contents of the letter of termination dated April 9, 2004, which we had copied to our attorneys and to Tony.

16.    I never have consented to the disclosure either of joint client confidences or joint client secrets by Michael Present, Esq., David Warmflash, Esq., or S&W in a public forum or on a public record.

3

17.    Upon information and belief, my brother Tony never has consented to the disclosure either of joint client confidences or joint client secrets by Michael Present, Esq., David Warmflash, Esq., or S&W in a public forum or on a public record.

18.    Without our consent, and without any waiver of secrecy, S&W annexed the termination letter, which contains joint client secrets, in full text and unsealed, as an exhibit to the complaint for defamation, spreading it on a public record.

**BILL AND I JUSTIFIABLY TERMINATED S&W'S EMPLOYMENT WITH CAUSE.**

19.    The termination letter annexed as an exhibit in full text to the complaint for defamation, is accurate and truthful, and spells out a long history of deterioration in the relationship between Bill, me, and S&W.

20.    Bill and I had scheduled a business trip to Maryland for the week of April 12, 2004, and I was unavailable to close the settlement during that week, but we planned to return by April 18, 2004.

21.    At that time, I, who had been loaning Tony money to support him and his family for a period of years prior to this date, had not heard that Tony desperately needed a closing by April 15, 2004, so he would have money to pay his taxes.

22.    Bill and I knew none of this information until April 15, 2004, and Warmflash never told us. On April 15, 2004, I learned for the first time about Tony's need for money to pay taxes.

23.    Based upon Warmflash's direct insubordination, and his threat to close the deal for Tony alone, abandoning me as a client, which threats of abandonment

4

we had repeatedly received from S&W before, Bill and I terminated the

employment of S&W by letter dated April 9, 2004.

24.    Although Tony and I <u>already</u> have paid S&W an amount <u>greater</u> than their

regular hourly rates of compensation, I refused to pay additional, excessive

amounts that S&W demanded, amounts not due and owing in the context of their

termination for cause.

**WARMFLASH ATTEMPTED AND FAILED TO NEGOTIATE AN "AMICABLE" SETTLEMENT" OVER SIXTEEN MONTHS AS THE STATUTE OF LIMITATIONS OPERATED TO BAR HIS CLIENT'S CLAIMS**

25.    On or about February 4, 2000, Tony and I signed a retainer agreement

with S&W.

26.    S&W were, or claimed to be, already familiar with the case, because they

had represented Tony's and my female cousins in a similar action against A.J.

some years earlier.  This was an important reason Tony and I had hired them in

the first place.

27.    I am now informed that Warmflash's delay of sixteen months without

tolling the statute cost Tony and me viable claims, totaling $340,000, which

Justice Donovan later determined had become time-barred by operation of the

statute of limitations during Warmflash's sixteen months of unsuccessful, albeit

highly "amicable", negotiations.

28.    S&W concealed from me that S&W's sixteen month delay in filing the

litigation had cost Tony and me some of our claims through the bar of the statute

of limitations to the extent of $340,000.

5

29.    Because of the disparate natures of Tony's and my interests, we had a

potential conflict of interest, as recognized in all three of the retainer agreements

that S&W drafted and Tony and I signed.

30.    However, Tony lacked the financial resources to realize full value from his

more valuable interests in the Rusciano Companies.

31.    Tony's participation in the litigation as my equal partner was important to

me, because he owned a block of voting shares that I lacked, and had a future

interest in a controlling block of voting stock that would pass control of the family

business to him upon death of his greedy cousin (a defendant herein).  Without

Tony's participation as a joint plaintiff, the potential recovery that I could expect

would be substantially less than the agreed-upon 50% of the value of a recovery

with his participation.  Thus, I would go to great lengths to remain "joined at the

hip with Tony", to maintain my agreement with Tony to split equally the proceeds

of their action against our greedy cousin.

32.    For example, on June 18, 2003, I accepted the defective settlement

dictated into the record by S&W and opposing counsel to avoid a split from Tony.

33.    After eleven (11) months of fruitless negotiations during which S&W failed

to secure a final version of the agreement because opposing counsel were

insisting upon terms and conditions contrary to "commercially reasonable

security", were failing and refusing to provide information essential to close the

deal such as the amount of tax certiorari refunds, or the personal financial

statement of defendant A.J. Rusciano, (which information S&W never had

obtained during disclosure prior to trial), and were enjoying the use of the joint

plaintiffs' money interest-free, Philip Halpern, Esq. concluded the negotiations and finally closed the deal on May 10, 2004.

34.     It was Mr. Halpern who conceived of the CPLR 2104 motion that brought a months-long impasse back under the auspices of this Court, enabling the final settlement on May 10, 2004.

35.     Contrary to the representations in paragraph 7 of the Present Affidavit, Mr. Halpern closed the deal, not S&W.  Significant issues remained open after the April 9 termination of S&W's employment, issues Mr. Halpern resolved up to and during the closing itself.

Wherefore Elizabeth Margrabe prays that the Court deny S&W the relief it seeks in the Present Affidavit, and order S&W to disgorge all fees and interest it determines to be illegal and excessive.

Dated: June 24, 2004

_Elizabeth William Margrabe_
Elizabeth Margrabe

Sworn to and subscribed before me this 24 day of June, 2004.

_Arlene Ricciardi_
*Notary Public

My commission expires:

ARLENE RICCIARDI
Notary Public, State of New York
No. 01RI6060362
Qualified in Bronx County
Commission Expires Sept. 9, 2006

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

———————————————————————————X

ELIZABETH MARGRABE AND ANTHONY J.
RUSCIANO, III, AS SHAREHOLDERS OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND VINRUS CORP., SUING IN THE RIGHT OF
RUSCIANO & SON CORP., SECOR LANE CORP.
AND SUBSIDIARIES, AND VINRUS CORP.,
ELIZABETH MARGRABE AND ANTHONY RUSCIANO,
III, INDIVIDUALLY,

**AFFIDAVIT OF
WILLIAM
MARGRABE**

Index No.10032/01

Plaintiffs,

(Justice W. Denis
Donovan)

-against-

ANTHONY J. RUSCIANO, II, RUSCIANO & SON
CORP., VINRUS CORP., SECOR LANE CORP.,
AND SUBSIDIARIES, PVE COMPANY JOINT VENTURE,
PVE II CO., AND TONGENE REALTY COMPANY,
AND RUSCIANO ASSOCIATES, INC.,

Defendants.

———————————————————————————X

STATE OF NEW YORK　　　　　)
　　　　　　　　　　　　　　　　: ss. :
COUNTY OF WESTCHESTER　　)

WILLIAM MARGRABE, being duly sworn, deposes and says:

1.　　　I am the husband of Elizabeth Margrabe ("Betty"), who is a joint plaintiff in

this action against her cousin, Anthony J. Rusciano II ("A.J."), and defendant

corporations and partnerships (the "Rusciano Companies").

2.　　　I am the brother-in-law of Anthony Rusciano, III, ("Tony"), who is the other

joint plaintiff in this action.

1

3.    I make this Affidavit in Support of Elizabeth Margrabe's Memorandum in Opposition to Order to Show Cause.

4.    Although I have an advanced degree in economics, I have no training or experience in law.  I rely on advice of counsel for all legal matters.

5.    From time to time, I have assisted my wife Betty in communicating with, and attempting to manage, her relationship with the law firm of Sexter & Warmflash, P.C. ("S&W").  I have a power of attorney from her, granting me authority to deal with them on her behalf, and did so.

6.    I have knowledge of the facts herein because of my involvement in the above-styled litigation on Betty's behalf.

7.    On April 9, 2004, after David Warmflash, Esq. ("Warmflash") refused to follow direct instructions not to schedule a closing during the week of April 12 (Collective Exhibit 1), when Betty and I had planned to be out of town on business, and then threatened to close the deal for Tony alone in Betty's absence, I prepared, signed (together with Betty), and sent a letter terminating the employment of S&W with cause.

8.    I typed the words "Confidential and Privileged" on that letter to make clear how I expected S&W and the other recipients to treat it.

9.    I sent a copy of that confidential letter to my two other lawyers, who had been advising us about Betty's and my difficult relationship with S&W, and to Tony, Betty's brother and joint plaintiff in the case, who also was represented by S&W.

2

10.    I thought it important that my two lawyers and Tony learn of Betty's and my dismissal of S&W with cause, to protect our own interests in the delicate days just prior to closing the deal, to help us procure replacement counsel, and to protect Tony, who might himself have to seek other counsel, and who, based upon the contents of the letter of termination, might have concerns of his own about S&W.

11.    I sent the letter to no one else, and have not disclosed or published it to anyone else since that time, except counsel for legal advice about the action for defamation and related matters.

12.    I never dreamed that S&W would disclose the contents of the confidential letter in full text on a public record as part of the action for defamation they initiated against Betty and me in Manhattan.

13.    I consider the contents of that letter highly sensitive, confidential, and private family secrets.

15.    S&W never disclosed to me their intentions to publish the letter of termination in full text in a public record, and I never consented to such disclosure.

14.    On May 27, 2004, a process server taped to my front door two copies of a summons and a verified complaint.

15.    Upon reviewing the papers, I learned that S&W, Warmflash, and Michael Present, Esq. ("Present") had sued Betty and me for libel based solely on the contents of the letter of termination dated April 9, 2004, which we had copied to our attorneys and to Tony.

3

16.    True and exact copies of the summons, verified complaint, and annexed exhibit (Letter of Termination) are annexed hereto as Exhibit 2.

17.    Upon information and belief, Betty never has consented to the disclosure either of joint client confidences or joint client secrets by Michael Present, Esq., David Warmflash, Esq., or S&W in a public forum or on a public record.

18.    Upon information and belief, Tony never has consented to the disclosure of joint client confidences or joint client secrets by Michael Present, Esq., David Warmflash, Esq., or S&W in a public forum or on a public record.

19.    Without our consent, and without any waiver of secrecy, S&W annexed the termination letter, which contains joint client secrets, in full text and unsealed, as an exhibit to the complaint for defamation, spreading it on a public record.

**BETTY AND I JUSTIFIABLY TERMINATED S&W'S EMPLOYMENT WITH CAUSE.**

20.    The termination letter, annexed as an exhibit in full text to Exhibit 2, is accurate and truthful, and spells out a long history of deterioration in the relationship between Betty, me, and S&W.

21.    Beginning on April 2, 2004, Warmflash and I exchanged a sequence of e-mail messages, annexed hereto as Collective Exhibit 1.

22.    After receipt on April 8, 2004 of Warmflash's first message dated April 7, 2004 in Collective Exhibit 1, I told Tony by phone that I was preparing an e-mail message to WarmflashDavid, informing Warmflash that Betty and I had scheduled a trip to Maryland for the week of April 12, 2004, that Betty would be

unavailable to close the settlement during that week, but that we would return by April 18, 2004.

23.     At that time Betty and I, who had been lending Tony money to support him and his family for a period of years prior to this date, had not heard that Tony desperately needed a closing by April 15, 2004, so he would have money to pay his taxes.

24.     Upon information and belief, <u>immediately after his phone conversation with me, Tony communicated to Warmflash (</u>but <u>not</u> to Betty or me) <u>Tony's need for a closing by April 15, 2004</u> to get the money he needed to pay his taxes.

25.     Betty and I knew <u>none</u> of this information until April 15, 2004, and Warmflash <u>never</u> told us. On April 15, 2004, I learned for the first time about Tony's need for money to pay taxes.

26.     Instead, Warmflash and I exchanged e-mail messages evidenced by Collective Exhibit 1 <u>after</u> Tony apparently told Warmflash <u>both</u> that Betty and I had planned to be out of town the week of April 12, <u>and</u> that Tony desperately wanted to close the deal on or before April 15, 2004.

27.     Based upon Warmflash's direct insubordination, and his threat to close the deal for Tony alone, abandoning Betty, which threats of abandonment we had repeatedly received from S&W before, Betty and I terminated the employment of S&W by letter dated April 9, 2004, sent to S&W by Federal Express on the evening of April 9, 2004, and faxed and e-mailed to them on Monday, April 11, 2004.

5

28.    As recited in the letter dated April 9, 2004 annexed as part of Exhibit 2,

Betty and I terminated the employment of S&W for cause, as detailed in the letter

itself.

29.    Although Betty and Tony <u>already</u> have paid S&W an amount <u>greater</u> than

their regular hourly rates of compensation, Betty refused to pay additional,

excessive amounts that S&W demanded, amounts not due and owing in the

context of their termination for cause.

**WARMFLASH ATTEMPTED AND FAILED TO NEGOTIATE AN "AMICABLE"
SETTLEMENT" OVER SIXTEEN MONTHS AS THE STATUTE OF
LIMITATIONS OPERATED TO BAR HIS CLIENT'S CLAIMS**

30.    On or about February 4, 2000 Betty, Tony, and S&W signed a retainer

agreement, a true and exact copy of which is annexed hereto as Exhibit 3.

31.    S&W were, or claimed to be, already familiar with the case, because they

had represented Betty's and Tony's female cousins in a similar action against

A.J. some years earlier.  This was an important reason Betty and Tony had hired

them in the first place.

32.    On or about June 26, 2001, S&W finally filed their summons and

complaint in this case, a delay of more than sixteen months after their

engagement on February 4, 2000.

33.    Warmflash's delay of sixteen months without tolling the statute cost the

joint plaintiffs viable claims, totaling $340,000, which Justice Donovan later

determined had become time-barred by operation of the statute of limitations

during Warmflash's sixteen months of unsuccessful, albeit highly "amicable",

negotiations with A.J.'s attorney, Alvin Goldstein, Esq. The Decision and Order dated February 26, 2003 is annexed hereto as Exhibit 4.

34.    S&W never provided Betty with a copy of Justice Donovan's Decision and Order (Exhibit 4).

35.    S&W never disclosed to Betty or to me that S&W's sixteen month delay in filing the litigation had cost the joint plaintiffs some of their claims through the bar of the statute of limitations to the extent of $340,000.

**S&W REPEATEDLY DISOBEYED BETTY'S WRITTEN INSTRUCTIONS TO ALLOW BETTY AND ME TO REVIEW S&W'S DRAFTS OF PROPOSED DOCUMENTS BEFORE THEY WENT TO THE OTHER SIDE.**

36.    By letter dated June 19, 2003, I, acting as Betty's agent under the power of attorney, instructed S&W to show her, me, and her other attorneys all drafts of documents they prepared for review and approval before sending it to opposing counsel. A true and exact copy of the letter is annexed hereto as part of Collective Exhibit 5.

37.    The letter was necessary because Betty and I had been having difficulties staying informed of S&W's actions during the period leading up to the June 18 "settlement", and we felt increasingly frustrated over our inability to exercise any degree of control over our own lawyers.

38.    S&W repeatedly disobeyed those instructions after June 19, and sometimes threatened to quit, rather than obey them, exacerbating our sense of frustration and anger.

39.    On July 7 and 9, 2003, sensing that S&W was ignoring the instructions, I repeated them in e-mail messages. True and exact copies of my e-mail

7

messages dated July 7 and 9, 2003 are annexed hereto as parts of Collective Exhibit 5.

40.     On July 9, 2003, Present replied that he already had sent over draft documents to opposing counsel, unseen by Betty or me, before receiving my written instructions.  Part of Collective Exhibit 5.

41.     I believe that he was deceiving me at that time to evade our earlier written instructions, to exclude us from participation in the negotiating process, and to keep us in the dark about the negotiations.

42.     My frustration increased markedly because it appeared that S&W was cavalierly and repeatedly ignoring our written instructions made in an effort to exercise a modest amount of control over their actions in negotiating with opposing counsel, including informing us of proposed negotiating positions and developments.

**S&W'S STRATEGY AS AGAINST THE JOINT PLAINTIFFS (THEIR OWN CLIENTS) SEEMED TO BE DIVIDE AND CONQUER**

43.     Because of the disparate natures of Betty's and Tony's interests, they had a potential conflict of interest, as recognized in all three of the retainer agreements that S&W drafted and the joint plaintiffs signed.

44.     However, Tony lacked the financial resources to realize full value from his more valuable interests in the Rusciano Companies.

45.     Tony's participation in the litigation as Betty's equal partner was important to her, because he owned a block of voting shares that his sister lacked, and had a future interest in a controlling block of voting stock that would pass control of

8

the family business to him upon death of his greedy cousin (a defendant herein). Without Tony's participation as a joint plaintiff, the potential recovery that Betty could expect would be substantially less than the agreed-upon 50% of the value of a recovery with his participation. Thus, Betty would go to great lengths to remain "joined at the hip with Tony", to maintain her agreement with Tony to split equally the proceeds of their action against their greedy cousin.

46.    As an added consequence, however, she also was extremely vulnerable to S&W's recurring threats (which occurred whenever she and Bill insisted on taking a "hard line" in the negotiations, and sometimes when they merely wanted to proofread Present's documents) to abandon her in favor of exclusive representation of Tony, bludgeoning her into submission, time after time, consistent with Tony, who was prepared to defer to S&W's "soft line" approach, no matter the circumstances.

47.    The unity of the joint plaintiffs in litigation was essential to maximizing their recovery. Without that unity, Betty and Tony could not obtain joint full value for their interests in the Rusciano Companies. S&W even acknowledged that to me.

48.    On June 18, 2003, since S&W and Tony ignored Betty's and Bill's repeated requests for an agreement that would align the interests of Tony and Betty, Betty decided that she must accede to the settlement S&W recommended to avoid the very serious risk of an open split with Tony, a split which S&W repeatedly threatened on behalf of themselves and of Tony.

49.    After June 18, 2003, those "potential" conflicts manifested themselves as a result of Tony's increasing financial difficulties. Tony's interests were in

9

alleviating these with the quick cash generated by a rapid settlement, contrasted with Betty's desire that she and her brother proceed to trial if necessary to accomplish what she had been led to believe was encompassed by the settlement.

50.     On July 9, 2003, just three weeks after the "settlement" in open court, Present acknowledged in an e-mail message to Betty, via Bill, that he had disobeyed Betty's repeated, written instructions to let her approve closing documents, before Present sent them to opposing counsel. Collective Exhibit 5. Finally, Present reveals an actual conflict of interest between his joint clients, Betty and Tony: "Contrary (and prior) to your instructions to withhold distribution of a draft agreement, Tony advised me on several occasions that he was happy with the terms of the settlement as encompassed in the draft – and that I should make every attempt to expedite the settlement as quickly as possible." Collective Exhibit 6.

51.     No later than September 4, 2003, when S&W threatened in writing to dump representation of Betty in favor of exclusive representation of Tony in the litigation, an actual conflict clearly had emerged with respect to those interests, combined with the pre-existing inherent conflict created by the law firm itself, a toxic combination for Betty. Collective Exhibit 6.

52.     In other words, S&W never contemplated withdrawal as counsel to both joint plaintiffs even after they identified an actual conflict of interest, as the ethical rules demand. Instead, S&W contemplated only withdrawal as to Betty, retaining representation of Tony, who shared their desire for quick cash and relative lack

of concern about the risk to the joint plaintiffs inherent in a six and one-half year payout.

53.    The conflict of interest issue recurred on February 13, 2004.  Collective Exhibit 6.

54.    Further evidence of S&W's plans to rid themselves of Betty as a client exists in the form of their letters to Justice Donovan, dated February 25, 2004 and April 12, 2004, that S&W faxed to me on April 12, 2004.  S&W's "corrected" letter, accurately dated April 12, 2004 on page one, was dated October 30, 2003 on the following pages,[1] Given the longstanding tense relationship between S&W and Betty and me, I wouldn't be amazed to learn that S&W had anticipated dumping Betty over the side on those days, and had prepared a letter for that purpose.  When Betty acceded to S&W's demands, S&W retained the letter for eventual use.  Collective Exhibit 7.

55.    S&W sent one or more letters and/or e-mails, threatening to stop representing Betty and continue representing Tony, on July 9, 2003, September 4, 2003, September 15, 2003, November 21, 2004 (two messages), February 13, 2004, and April 9, 2004.  In some of those messages Present seeks the right to transmit documents without Betty's approval.  In some messages S&W threatens

---

[1] February 25, 2004 was a date of significant conflict between S&W and Betty for two reasons: (1) Betty (on advice of her attorneys, Halpern and Lewis) wanted to file a notice of appeal of Justice Donovan's decision of late January, 2004, and Present was resisting that action; and (2) Present was preparing his papers in response to Josh Grauer's motion to clarify Justice Donovan's January decision, and Present's preparation of papers always led to tension between Present and Bill (for Betty).  October 30 was also a time of significant conflict between Betty, Tony, and S&W.  On October 26, 2003 Tony had told Bill that Tony didn't want to sign an agreement to split equally with Betty all money coming from proceeding to trial.  He said that Present and Warmflash had advised him not to sign such an agreement, aligning themselves directly with Tony and against Betty.  Apparently anticipating an opportunity to dump Betty based upon the advice they themselves had rendered, or a letter of termination from Betty based upon their obvious provocation of her, S&W had drafted a letter accomplishing this goal on October 30, 2003 (also never sent).

to go to closing with Tony and without Betty, unless Betty does what S&W and Tony want.

56.     I am attaching true and exact copies of those messages as Collective Exhibit 6.

57.     On Friday, February 13, 2004, only one week before the deadline to file important papers on behalf of Betty and Tony, and on Thursday, February 19, 2004, only one day before that deadline, Present sent Betty ultimatums, demanding, in essence, unfettered discretion to draft and submit whatever documents he pleased, on her behalf, without any input from me (as her agent) or from her.  True and exact copies of e-mail messages evidencing this position are annexed hereto in Collective Exhibit 6.

Also, after "settlement" on June 18, 2003, S&W repeatedly claimed that they could and would take Tony to a closing, leaving Betty on her own, with uncertain prospects.  Messages dated September 15, 2003 and April 9, 2004 in Collective Exhibit 6.

***Usurious Interest on Forborne Legal Fees***

58.     S&W drafted the engagement letters, dated April 5, 2001 (Tony's) and April 10, 2001 (Betty's) on its terms.

59.     S&W alone dictated the terms of Tony's letter of engagement, which Debbie (Tony's wife) signed on his behalf without modification.

60.     I negotiated the early payment option in Betty letter of engagement, which she never exercised.  Otherwise, S&W alone dictated the terms of Betty's letter of engagement.

12

61.     To the extent that S&W would receive the forborne legal fees at the conclusion of the litigation, plus 100% interest (or a much higher hourly rate without any contingency having occurred to justify it), contrary to Penal Law 190.40 and General Obligations Law 5-501 and 5-511, S&W acquired an improper interest in concluding the litigation as soon as possible, an incentive that should have disqualified it as counsel from the inception of the litigation.

### S&W Failed to Prepare for Trial

62.     To conceal their lack of preparation, S&W settled the case by selling their clients' ownership interests (minority on the date of settlement, but majority when Tony's future interest in the block of controlling stock vests upon the death of his cousin) to defendants at a bargain price (too cheaply) while abandoning other claims that the clients had been told would be preserved as part of the settlement[2], avoiding trial. As a consequence, the joint plaintiffs suffered losses totaling at least $6,940,242 ((a) their $12,435,242 proportionate share of the value of the Rusciano properties, using a report that the business analyst that S&W hired for plaintiffs prepared, but without discount for a minority interest (because of Tony's future interest in a controlling block of Class A voting shares), less (b) the $8,375,000 for which S&W ultimately settled, plus (c) plaintiffs $300,000 share of tax certiorari refunds and (d) $2,580,000, plaintiffs' 43% share of $6 million in excess compensation to A.J. from February 4, 1994 through June 18, 2003). The "Marketability / Minority Discount" that the report mentions is not

---

[2] As paragraph 5 of the Present Affidavit recites, Betty acquiesced in open court to the "settlement" S&W had dictated into the record on June 18, 2003. In doing so, she was maintaining unity with her joint plaintiff, and had received S&W's behind the scenes assurances about collateral, about preservation of her other claims, about receipt of the full array of tax cert refunds, and about other and similar matters, assurances that later were proved unfounded.

13

convincing for several reasons, mostly because of Tony's future controlling interest, but also because the lawsuit was already at the court, and plaintiffs could anticipate some relief.  Exhibit 8.

63.     Notwithstanding this bargain basement asset sale for $8,000,000, which the Present Affidavit proudly trumpets as if it is something to be proud of, S&W failed to value the joint plaintiffs' claims for their share of tax certiorari refunds of the Rusciano Companies, failed to adequately value their clients' ownership interests prior to trial, failed to value their claims for breach of fiduciary duty relating to their cousin's looting of the Rusciano companies and their claims for breach of fiduciary duty relating to their cousin's looting of the family trusts of which they were beneficiaries, failed to value claims by failing to obtain appraisals of some of the properties at issue, and failed to value various other claims held by the joint plaintiffs, so that they were not even considered as part of the settlement negotiations, and could not be considered at trial.

64.     Consequently, S&W was unprepared to present evidence of the amounts of these claims either for purposes of negotiating a settlement or at trial.

65.     S&W ignored repeated requests from me that they obtain all of this information about all of these claims, including the amounts of tax certiorari refunds already paid, due and owing, or to become due and owing, over a period of years.  I made numerous written requests to them to gather information about the amounts of multiple tax cert refunds alone, and despite Joe Adrian's written notification that more than one million dollar of refunds were due the Rusciano

14

Companies, S&W still failed to obtain the necessary information. Collective Exhibit 9.

66.     Despite S&W's specific assurances that claims relating to the trusts and other matters described in the preceding paragraphs would be carved out and remain viable despite the settlement, S&W stood silent as opposing counsel turned the settlement into a "global" settlement on the record in open court on June 18, eliminating all such claims in an instant. I was stunned. As far as I could tell, the joint plaintiffs had no idea what was happening to them.

67.     During the allocution on the record on June 18, 2003, S&W also failed to make clear on the record that the joint plaintiffs were entitled to their proportionate share of multiple tax certiorari refunds (estimated to total over $1.25 million) from multiple properties owned by the Rusciano Companies over many years, refunds either (1) already paid to the Rusciano Companies, (2) due and owing, but as yet unpaid, or (3) to become due and owing, once the proper claims were submitted by the Rusciano Companies. Instead, S&W permitted opposing counsel to limit the claims of the joint plaintiffs to a narrow subset of such refunds, substantially depriving the joint plaintiffs of monies S&W had led them to believe were included in the settlement.

68.     Further, at allocution on June 18, 2003, S&W failed to define "commercially reasonable security" for the installment promissory notes to be delivered to the joint plaintiffs with any precision on the record, depriving them of any real collateral for these instruments.

***S&W Failed to Prepare for a Pre-Trial Settlement***

15

69.    S&W failed to prepare for settlement negotiations, although I asked them to prepare for settlement discussions before the start of the trial, based on information that I found on the Internet, indicating that something like 95% of all financial cases settle immediately before trial.

70.    In rejecting my request that they confer with us in preparing a negotiating position in preparation for negotiations at the courthouse, Warmflash responded, "This case is going to trial."

71.    Repeatedly, I asked S&W to obtain the information necessary to value the tax certiorari cases (and resulting refunds, to which the joint plaintiffs were entitled to their proportionate share) for all the Rusciano Companies.  They ignored my requests, and hence could not advocate for the joint plaintiffs effectively at the settlement negotiations.

72.    As a result, opposing counsel dictated into the record a narrowly constricted definition of the relevant tax certiorari cases and refunds that severely diminished the joint plaintiffs' recoveries without objection from the ignorant S&W advocate, who was unprepared to respond effectively, a definition later upheld by Justice Donovan's Decision and Order, filed January 27, 2004.

73.    Consequently, the joint plaintiffs failed to recover their fair share of the school district refund for the 2002 tax year, and lost all participation in the refunds for Secor Lane Corp., Vinrus Corp., PER Building Corp., and VER Building Corp., together, due to S&W's failure to prepare.

74.    By my calculation the joint plaintiffs suffered a loss of $59,810.36, due to S&W's negligence with regard to tax certiorari refunds.

75.    Even at the closing on May 10, 2004, Warmflash not only remained ignorant of Betty's and Tony's fractional share of various corporations as of that late date, but claimed that that fraction was irrelevant to appraising the security of their loan!

76.    Fortunately, Philip Halpern, Esq., not S&W, handled the May 10, 2004 closing.

77.    Justice Donovan's Decision and Order, filed on January 27, 2004, denies the joint plaintiffs interest on the $8,375,000 settlement amount from July 18, 2003, because the transcript does not call for it.

78.    The joint plaintiffs' loss of interest at the prime rate (four percent over the entire, relevant period) on $8,375,000 for the 297 days from July 18, 2003 to May 10, 2004 amounts to some $276,375.  Betty's half share of that is $138,187.50.

**S&W's Mistakes Caused <u>Betty</u> Actual Economic Losses in the Following Categories (50% of total joint plaintiff losses, unless otherwise noted)— N.B.  This is a partial, not a complete, list of Betty's losses**

79.    Lost damage claims due to statute of limitations and David Warmflash delay, May 2000 to May 2001: $170,000.

80.    Lost interest on settlement funds unpaid by Defendants after June 18, 2003 allocutions: $138,187.50.

81.    Usurious interest on unpaid legal fees: $71,170.38.

82.    Principal amount of usurious loans on unpaid legal fees: $71,170.38.

83.    Unauthorized payment of disputed billing by A.J.'s attorney, Alvin Goldstein, Esq.[3]: $1,359.38.

---

[3] This is the same Alvin Goldstein, Esq., who had negotiated amicably with Warmflash for more than one year to no benefit for the joint plaintiffs.

17

84. Son Corp. consolidated tax case 16227/02, underpayment: $7,937.47.

85. Son Corp. tax certs. 16800/02, 16635/02: $13,841.67.

86. Vinrus tax certs., 1997-2002 assessment years: $4,111.85.

87. Secor tax certs., 1997-2002 assessment years: $4,014.19.

88. S&W legal fees post 6/30/03: $38,807.75.

89. Libel lawyer: $35,000. (100%)

90. Attorneys Lewis and Collier, Halpern, Newberg, Nolletti, & Bock to protect Betty from S&W: $146,313.14. (100%)

Damages to Betty in these categories: $701,913.69.

## S&W IS CHARGING, OR ATTEMPTING TO CHARGE, AN ILLEGAL OR EXCESSIVE FEE IN THIS CASE, CONTRARY TO DR 2-106 [22 NYCRR SECTION 1200.11(b)].

91. The total amount that the joint plaintiffs have paid S&W equals $329,455.44, composed of $128,327.70 paid by Betty and Bill through 8/25/03, $161,393.74 paid by Tony at closing on 5/10/04, and $39,734 paid by Betty under protest at closing on 5/10/04.

92. A true and exact summary of the amounts the co-plaintiffs have paid to S&W is annexed hereto as part of Collective Exhibit 10 .

93. The amount due S&W for 100% of their fees at regular hourly rates plus 100% of their disbursements is $310,764.43.

94. The computations that lead to that number are annexed hereto as part of Collective Exhibit 10.

95. S&W already has collected from Tony, and is attempting to charge Betty, 100% interest on those fees it forbore to collect month to month from April, 2001

onward.  For the oldest loans, from May 2001, paid May 10, 2004, that works out to an effective rate of interest per annum (popularly known as "annual percentage rate" or "A.P.R.") in excess of 33%.  For loans made in June, 2003 the A.P.R. is approximately 100%.

96.    S&W seeks to be compensated at rates even higher than their regular hourly rates, plus 100% interest on the forborne half of their fees.  The additional compensation sought (and some of the compensation already paid) is excessive and illegal for the reasons already set out in detail, above.

97.    On June 18, 2003[4], S&W settled the litigation on defective terms and conditions, using defective procedures.  Tony and Betty accepted the oral settlement on the record in open court (Exhibit B to Present Affidavit), although both joint plaintiffs were under serious misapprehensions about what many of those terms were or would be.[5]

98.    After eleven (11) months of fruitless negotiations[6] during which S&W failed to secure a final version of the agreement because opposing counsel were

---

[4] Not June 18, 2004, as paragraph 5 of the Present Affidavit erroneously states.

[5] The settlement, a buyout of the joint plaintiffs' ownership interests in the family businesses (with only a token $375,000 payment for damages earlier estimated at about 40% of $6,000,000), provided for an initial payment of $1,375,000, in total, with the balance to be evidenced by "secured" promissory notes providing for installment payments of the balance over six and a half years, was enough to pay S&W both the 50% unpaid balance of their fees plus the 100% interest payment in full, and give the joint plaintiffs some additional money.  Tony received inadequate funds at closing from his own share to meet his financial needs, so Betty loaned him an additional $250,000 (approximately) out of Betty's share at closing.  On June 18, 2003 Tony told me that he thought he and Betty were getting a "mortgage" as collateral to secure the promissory notes, while Betty told me that she thought they were getting "better than a mortgage".  As it turned out at the May 14, 2004 closing, both surmises turned out to be untrue.

[6] On approximately July 2, 2003, Betty and Bill engaged Philip Halpern, Esq. of the law firm of Collier, Halpern, Newberg, Nolletti & Bock, LLP of White Plains.  Less than one week later, Michael Present directly disobeyed Betty's and Bill's written instructions to show them draft settlement documents for their approval prior to sending those drafts over to opposing counsel for further negotiations.  Michael Present and David Warmflash repeatedly described such instructions (made by Betty and Bill so they could offer their comments on the drafts before opposing counsel saw them) as unacceptable intrusions upon their independent professional

19

insisting upon terms and conditions contrary to "commercially reasonable security", were failing and refusing to provide information essential to close the deal such as the amount of tax certiorari refunds, or the personal financial statement of defendant A.J. Rusciano, (which information S&W never had obtained during disclosure prior to trial), and were enjoying the use of the joint plaintiffs' money interest-free[7], Philip Halpern, Esq. concluded the negotiations and finally closed the deal on <u>May 10, 2004</u>.

99.     It was <u>Mr. Halpern</u> who conceived of the CPLR 2104 motion that brought a months-long impasse back under the auspices of this Court, enabling the final settlement on May 10, 2004.

100.    Contrary to the representations in paragraph 7 of the Present Affidavit, <u>Mr. Halpern</u> closed the deal, not S&W.  Significant issues remained open <u>after</u> the April 9 termination of S&W's employment, issues Mr. Halpern resolved up to and <u>during</u>[8] the closing itself.[9]

---

judgment, and upon their ability to competently represent <u>Tony</u>, who had no desire to review anything.  In short, Bill and Betty wanted some degree of client control over the post-June 18 settlement negotiations, while Tony was prepared to leave S&W with almost complete discretion in these matters.  Both Michael Present and David Warmflash repeatedly took the position that Betty's and Bill's attempts to exercise such control were unacceptable intrusions upon their professional judgment, threatening repeatedly to withdraw as Betty's attorneys, while continuing to represent Tony's interests.  Betty and Bill engaged Phil Halpern initially as a "buffer" between them and S&W in an effort to reduce rising tensions with S&W over client control of the settlement negotiations, while maintaining the unity of the joint plaintiffs, fearing that an open split between the joint plaintiffs would be exploited by opposing counsel.  Rather than mollifying Betty's and Bill's fears in this respect, S&W ruthlessly exploited them.

[7] During that eleven-month period, intervention of this Court also was necessary on at least three (3) separate occasions to resolve various negotiating stalemates.  It was Phil Halpern, acting behind the scenes, who guided those negotiations to a successful conclusion, not S&W.

[8] At closing on May 10, 2004, for example, the defendants abruptly demanded that the installment payments provided for in the promissory notes be extended an additional year to seven and a half years, a demand Mr. Halpern skillfully rebuffed.  S&W attended the closing as Tony's putative representatives, but played no significant role in it, except as courier for plaintiffs' stock certificates.

[9] To be fair to S&W, Michael Present continued to assist Mr. Halpern after Betty terminated S&W's employment, but as already noted, it was in S&W's self-interest that the deal close.

Wherefore William Margrabe prays that the Court deny S&W the relief it seeks in the Present Affidavit, and order S&W to disgorge all fees and interest it determines to be illegal and excessive.

Dated: June 24, 2004

*William Margrabe*

William Margrabe

Sworn to and subscribed before me this 24 day of June, 2004.

*Arlene Ricciardi*

Notary Public

My commission expires:

ARLENE RICCIARDI
Notary Public, State of New York
No. 01RI6060382
Qualified in Bronx County
Commission Expires Sept. 9, 2006

21